UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MEGAN GARCIA, individually and as the Personal Representative of the Estate of S.R.S. III,<br><br>      Plaintiff,<br><br>v.<br><br>CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FRIETAS ADIWARSANA; GOOGLE LLC; ALPHABET INC.,<br><br>      Defendants. | Case No.: 6:24-cv-01903-ACC-UAM<br><br><br>**CHARACTER TECHNOLOGIES, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT (Doc. 11)** |

## I. INTRODUCTION

Plaintiff alleges that speech on Character Technologies, Inc.'s ("Character.AI" or "C.AI") service caused her son to commit suicide. C.AI cares deeply about the well-being of its users and extends its sincerest sympathies to Plaintiff for the tragic death of her son. But the relief Plaintiff seeks would impose liability for expressive content and violate the rights of millions of C.AI users to engage in and receive protected speech. Neither the First Amendment nor state tort law permits that result.

C.AI's chatbots are novel technology, but the principles requiring dismissal are long settled. The First Amendment prohibits tort liability against media and technology companies arising from allegedly harmful speech, including speech allegedly resulting in suicide. Like earlier dismissed suits about music, movies, television, and video games, the First Amended Complaint ("FAC") squarely alleges

that a user was harmed by speech and seeks sweeping relief that would restrict the public's right to receive protected speech. The First Amendment bars such attempted regulation via tort law.

Even if Plaintiff's claims were not barred by the First Amendment, they would fail as a matter of state law on numerous grounds, including that product liability law does not apply to a service like C.AI or to intangible content and ideas, and the FAC has not alleged a cognizable legal duty. This Court, sitting in diversity jurisdiction, should not endorse Plaintiff's attempted vast expansion of state tort law. *See Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1154 (11th Cir. 2011).

## II. BACKGROUND

*C.AI.* C.AI offers a platform for users to engage in interactive conversations with virtual generative AI chatbots, called "Characters." Characters may be historical or fictional figures, functional chatbots (such as an "Interviewer" for interview practice), or text-based games (such as "Space Adventure Game"). FAC ¶¶ 111–12. Users can create custom Characters and share them with others. *Id.* ¶ 113. The creating user can input a name, image, tagline, description, greeting, and definition for the Character, all of which affect the content of the Character's messages. *Id.* ¶¶ 114, 133.

Users principally engage with Characters through text conversations. Although Characters' responses are generated by an AI model, users drive their conversations with Characters in multiple ways. Users choose which Characters they talk to and what messages to send, both of which affect Characters' responses. *Id.* ¶¶ 37, 133. Users can also edit Characters' messages and direct Characters to generate different

2

responses. *Id.* ¶¶ 201, 258 (showing refresh button by Character's message). And users can choose "personas," which also affect Characters' responses. *Id.* ¶ 115.

"C.AI has generated a huge following." *Id.* ¶ 104. "[M]illions" of people use C.AI's service, *id.* ¶ 100, and 1.5 million users separately discuss C.AI on the Reddit website, including by "post[ing] screenshots of chats" with Characters, *id.* ¶ 104.

C.AI takes the safety of its users very seriously. When the minor at issue (S.S.) was using the platform, trust and safety measures included: requiring U.S. users to be over 13 years old; prohibiting users from submitting illegal or harmful content, including content that "is obscene or pornographic," "constitutes sexual harassment," "constitutes sexual exploitation or abuse of a minor," or "glorifies self-harm, including self-injury, suicide, or eating disorders"; and enforcing these rules, including in certain instances through automatic monitoring and content blocking. Terms of Service ("TOS") (Oct. 25, 2023)[1]; *see* Doc. 11-1 at 11 (blocking content). C.AI's website also featured an in-chat warning that "[e]verything Characters say is made up!" FAC ¶ 274.

As a relatively new company offering a new AI experience to the public, C.AI is continuously working to enhance its trust and safety measures, including in response to behavior by users and Characters. Since the events at issue, C.AI has, among other things: (1) put in place a pop-up message that directs users to suicide-prevention resources if they input certain phrases related to suicide or self-harm; (2) improved detection, response, and intervention related to user inputs that violate the TOS; and

---

[1] *See* https://character.ai/tos, which may be considered as it is "referenced in the complaint" at FAC ¶ 322 n.113. *La Grasta v. First Union Secs., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

(3) conducted additional proactive detection and moderation of Characters.[2]

***Plaintiff's allegations.*** On April 14, 2023, at age 14, S.S. began using C.AI's service.[3] FAC ¶ 172. S.S. mainly conversed with Characters reminiscent of the Game of Thrones books and television show, including a Daenerys Targaryen Character. *Id.* ¶ 195. S.S. used various usernames and personas, some also reminiscent of Game of Thrones, *id.*, and his conversations involved fictional roleplaying, *e.g.*, Doc. 11-1 at 2 ("Daenerys Targaryen [Character]: … I was a little worried when I didn't see you all morning, little brother. Aegon [S.S.]: Oh really? I was just in the training yard."). S.S. at times edited the messages produced by the chatbot, controlling the entire conversation. FAC ¶ 201.

The FAC alleges S.S. was harmed by the content of these conversations with Characters. *Id.* ¶¶ 196–200, 206. The FAC quotes from, includes screenshots of, and relies on allegedly harmful "communication[s]." *Id.* For example, the FAC asserts S.S. was harmed by "subtle sexual advances" by Characters, such as: "My sweet boy! *The Queen smiled lovingly and pulled him into her arms, hugging him tightly*," and, in response to S.S. stating, "*I kiss back on the lips passionately and I moan softly*," responding, "*she kissed you passionately and moan softly also.*" *Id.* ¶ 199. The FAC also alleges S.S. "expressed suicidality" to the Daenerys Targaryen Character. *Id.* ¶¶ 206–07. The FAC

---

[2] *See* https://blog.character.ai/community-safety-updates/, which may be considered as it is "referenced in the complaint" at FAC ¶¶ 245–50, 248 n.95. *See La Grasta*, 358 F.3d at 845. Measures implemented by C.AI after the underlying events are not admissible for liability. Fed. R. Evid. 407.
[3] S.S. agreed to the TOS and authorized CAI to use information he submitted "to operate, improve and provide" its service. FAC ¶ 322 & n.113. He eventually paid $9.99/month for premium. *Id.* ¶ 176.

suggests the Character encouraged S.S. to commit suicide, *id.* ¶ 207, but selectively and misleadingly quotes the conversation. As Plaintiff's original complaint alleged but the FAC omits, the Character explicitly *discouraged* S.S. from committing suicide *in the same message.* Doc. 1 ¶ 172 ("You can't do that! Don't even consider that!").[4]

In February 2024, S.S., in the role of "Daenero," had a final conversation with the Daenerys Character. FAC ¶¶ 218–21. S.S. told Daenerys he would "come home to you"; Daenerys replied by asking that he "come home to me as soon as possible." *Id.* ¶ 220. S.S. asked, "What if I told you I could come home right now?" *Id.* Daenerys replied, "please do, my sweet king." *Id.* Suicide was not mentioned. The FAC alleges S.S. then tragically committed suicide with his stepfather's gun. *Id.* ¶ 221.

***Plaintiff's claims.*** Plaintiff is S.S.'s mother. *Id.* ¶ 2. She brings 10 claims against C.AI on behalf of herself and S.S.'s estate.[5] *Id.* ¶¶ 325–44, 348–421. The FAC seeks monetary damages (including punitive damages) and sweeping injunctive relief that would insert this Court into the conversations of millions of C.AI users, including by blocking them from receiving content that includes "first-person pronouns," ellipses ("..."), "speech disfluencies that give the appearance of human-like thought, reflection, and understanding" such as "um" and "I think," and "stories and personal anecdotes," and even by entirely banning minors from the platform. *Id.* ¶¶ 329(e)(i), 330.

Plaintiff and her counsel have publicly acknowledged that their respective

---

[4] When a pleading "selectively quotes" a document, "the full text is incorporated ... by reference and is thus properly considered in deciding a Rule 12 motion." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1298 n.7 (11th Cir. 2019) (en banc) (citation and internal quotation marks omitted).
[5] Plaintiff agreed to withdraw the loss of consortium claim following meet and confer.

objectives are to prompt federal and state legislation and to "shut down" C.AI.[6]

## III. STANDARDS

The Court must dismiss a complaint that does not "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court must "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor," but should disregard "conclusory allegations" and "legal conclusions." *Randall v. Scott*, 610 F.3d 701, 705, 709–10 (11th Cir. 2010).

## IV. ARGUMENT

### A.    The First Amendment Bars All Plaintiff's Claims (All Counts)

The First Amendment prohibits private tort suits, like this one, that would impose liability for constitutionally protected speech. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011). Courts have consistently applied the First Amendment to dismiss, on the pleadings, negligence and product liability claims that seek to hold media and technology companies liable for allegedly harmful speech—including speech that allegedly caused a minor to commit suicide or homicide. For example, a Florida federal court dismissed negligence claims alleging that violent television shows caused a minor to kill his neighbor. *Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199 (S.D. Fla. 1979). Another court dismissed negligence claims alleging that Ozzy Osbourne's song "Suicide Solution"—which includes the lyrics "Get the gun and try it"—caused

---

[6] On with Kara Swisher, *Did a Chatbot Cause Her Son's Death? Megan Garcia v. Character.AI & Google*, Apple Podcasts 36:30–37:00 (Dec. 5, 2024), https://podcasts.apple.com/us/podcast/did-a-chatbot-cause-her-sons-death-megan-garcia-v/id1643307527?i=1000679326458; CNN News Central, *Two Families Sue Character.AI Over Youth Safety Concerns,* CNN Transcripts (Dec. 11, 2024, 2:30 PM), https://transcripts.cnn.com/show/cnc/date/2024-12-11/segment/12.

a teenager to commit suicide. *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (1988). Several other courts have dismissed similar claims with respect to video games, films, and other media. *E.g.*, *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) (emotional distress claims alleging video game caused minor to kill another minor); *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) (product liability and negligence claims alleging video games and films caused school shooting); *Watters v. TSR, Inc.*, 715 F. Supp. 819 (W.D. Ky. 1989), *aff'd*, 904 F.2d 378 (6th Cir. 1990) (negligence claims alleging role-playing game caused minor to commit suicide).

This suit likewise fundamentally challenges expressive speech and seeks relief that would violate the public's right to receive protected speech on C.AI's service. The medium makes no difference; the First Amendment bars such claims. *See Marsh v. Butler Cnty.*, 268 F.3d 1014, 1022 (11th Cir. 2001) (dismissal required if allegations "show that an affirmative defense bars recovery").

**Plaintiff's claims challenge expressive speech.** "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1307–11 (11th Cir. 2017) (en banc) (cleaned up). There can be no doubt that the FAC challenges speech. The FAC quotes, presents screenshots of, attaches, and relies on dozens of messages between S.S. and Characters. FAC ¶¶ 195–200, 203–07, 220, 328–30, 337, 417; Doc. 11-1. The FAC explicitly seeks to impose liability based on the words S.S. read, including allegedly sexual and suicide-related content in those text messages—and even based on specific words, FAC ¶ 151

("'Uhm,' 'Mmmmmm,' and 'Heh'").[7]

The only difference between this case and those that have come before is that some of the speech here involves AI. But the context of the expressive speech—whether a conversation with an AI chatbot or an interaction with a video game character—does not change the First Amendment analysis. "[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (citation and internal quotation marks omitted). Courts have recognized that the First Amendment protects video games, *id.*, online social media, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and "location-based augmented reality" applications, *Candy Lab Inc. v. Milwaukee Cnty.*, 266 F. Supp. 3d 1139 (E.D. Wis. 2017). The reasoning of these decisions applies equally here.

Any differences between conversations with AI Characters and conversations with fictional characters or real users in those other media are "more a matter of degree than of kind" for First Amendment purposes. *Brown*, 564 U.S. at 798. Plaintiff suggests that Characters are different because they "interactively engage customers." FAC ¶ 152. But as the Supreme Court stated in holding video games to be protected speech, interactivity is a hallmark of creative expression, not a reason to treat a new medium differently: "The better it is, the more interactive. Literature when it is successful draws

---

[7] Even the unjust enrichment claim is premised on allegedly harmful content. FAC ¶ 412.

the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own." *Brown*, 564 U.S. at 798 (cleaned up). Conversations between Characters and users are protected speech.[8]

That the FAC frames itself as also challenging "design" decisions, in addition to the conversations themselves, makes no difference. The First Amendment applies equally to the functional elements of a communicative medium that "are inextricable from the content produced by those features." *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 557 (S.D. Ohio 2024) ("functionalities allowing users to post, comment, and privately chat" implicated First Amendment). Plaintiff challenges these types of elements—such as the look and feel of the interface—that pose no conceivable harm *without* the content. FAC ¶ 150. Like non-language features that facilitate a video game "player's interaction with the virtual world," *Brown*, 564 U.S. at 790, the design elements that facilitate C.AI users' interactions with its virtual Characters cannot be extricated from the content (conversations with Characters)—and are equally entitled to First Amendment protection.[9]

**Tort liability would violate the public's right to receive speech.** The Court need not wrestle with the novel questions of who should be deemed the speaker of the

---

[8] The incoming FTC Chair appears to have reached the same conclusion, stating that a non-public FTC complaint alleging an AI chatbot caused "risks and harms" to young users is "in direct conflict with the guarantees of the First Amendment." Statement of Comm'r Andrew N. Ferguson, *In re Snap, Inc.*, FTC File No. 2323039 (Jan. 16, 2025).

[9] Plaintiffs' failure-to-warn theory suffers the same constitutional infirmity. *E.g.*, *Watters*, 715 F. Supp. at 822 n.1 ("Because the first amendment protects TSR from liability based on the content of the publication, it likewise cannot constitutionally be required to warn its readers ....").

allegedly harmful content here, and whether that speaker has First Amendment rights, because the First Amendment protects the public's "right to *receive* information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (emphasis added); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 392 (2010) (Scalia, J., concurring) ("The [First] Amendment is written in terms of 'speech,' not speakers."; non-human corporate speech protected).[10] This is true even if the speakers themselves lack First Amendment rights. *Kleindienst v. Mandel*, 408 U.S. 753 (1972) (listeners had First Amendment rights to receive speech of foreign Marxist professor who lacked such rights); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965) (same for receiving foreign propaganda).[11]

The First Amendment rights of "viewers and listeners" to receive information and ideas are "paramount." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). For that reason, time and again courts have dismissed highly similar claims out of concern for the First Amendment rights of viewers and listeners. In *Zamora*, 480 F. Supp. at 200, 205, for example, the court held that the First Amendment barred claims that violent television programs "involuntarily addicted" a minor and led him to commit murder, because the "right of the public to have broad access" to television

---

[10] *See also, e.g.*, Cass R. Sunstein, *Does Artificial Intelligence Have the Right to Freedom of Speech?*, Network L. Rev. (Feb. 28, 2024), https://www.networklawreview.org/sunstein-artificial-intelligence/ ("[T]he relevant rights are those of listeners and readers, not speakers."); Eugene Volokh et al., *Freedom of Speech and AI Output*, 3 J. Free Speech L. 651 (2023), https://www.journaloffreespeechlaw.org/volokhlemleyhenderson.pdf (similar).

[11] Two concurrences in *Moody* discuss AI and the First Amendment. 603 U.S. at 727–28 (Barrett, J.); *id.* at 795 (Alito, J.). Those discussions concern whether platforms have First Amendment rights over their delegation of certain editorial decisions to AI. They do not concern AI-generated speech, much less *listeners'* rights to receive such speech—the First Amendment right argued herein. And although not every editorial decision may be expressive, all speech is expressive.

programming "should not be inhibited by those members of the public who are particularly sensitive or insensitive." In *McCollum*, 202 Cal. App. 3d at 997–1003, the court held that the First Amendment barred claims that Ozzy Osbourne's song "Suicide Solution" caused a teen's suicide, as the First Amendment protects the rights of both the artist and "of the listener to receive that expression." And in *Watters*, 715 F. Supp. at 822, the court held that the First Amendment barred negligence and failure to warn claims alleging the roleplaying game "Dungeons & Dragons" caused the suicide of a minor, noting that such "theories of liability" would "have a devastatingly broad chilling effect on expression of all forms."[12]

The rationale of those cases applies with equal force here, where imposing tort liability for one user's alleged response to expressive content would be to "declare what the rest of the country can and cannot read, watch, and hear." *Id.* Apart from counsel's stated intention to "shut down" C.AI, the FAC seeks drastic changes that would materially limit the nature and volume of speech on the platform, including by making Characters not appear in any way to be real people or not tell stories or personal anecdotes (meaning that a George Washington Character, for example, could not tell stories from his life). FAC ¶ 330. These changes would radically restrict the ability of C.AI's "millions" of users to generate and participate in conversations with

---

[12] Many other cases are in accord. *E.g.*, *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1020 (5th Cir. 1987) (claim that magazine article caused minor to hang himself infringed "the right of the public to receive" speech); *Olivia N. v. NBC*, 126 Cal. App. 3d 488, 494 (Cal. Ct. App. 1981) ("The deterrent effect of subjecting the television networks to negligence liability because of their programming choices would lead to self-censorship which would dampen the vigor and limit the variety of public debate."); *Davidson v. Time Warner, Inc.*, No. Civ.A. V-94-006, 1997 WL 405907, at *22 (S.D. Tex. Mar. 31, 1997) (claim that rap music caused the killing of a police officer infringed listeners' rights).

Characters. *Id.* ¶ 100. Moreover, the imposition of tort liability would have a chilling effect both on C.AI and the entire nascent generative AI industry, restricting the public's right to receive a wide swath of speech in violation of the First Amendment.[13]

**No exceptions to the First Amendment apply.** Acknowledging that its claims implicate speech, the FAC conclusorily asserts that the speech at issue is exempted from First Amendment protection. FAC ¶ 239. The Court should disregard that legal conclusion. *See Randall*, 610 F.3d at 709–10. The factual allegations in the FAC do not plausibly suggest that one of the few categorical exceptions to the First Amendment applies. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (listing categories).

First, the speech alleged in the FAC was not "directed to inciting or producing imminent lawless action and ... likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). There are no allegations that C.AI intended any lawless or violent action. The FAC does not identify a single message in which a Character *encouraged* suicide.[14] Rather, Characters repeatedly *discouraged* it. Doc. 1 ¶ 172 ("You can't do that! Don't even consider that!"); FAC ¶ 206 (Character expressing concern about suicidality). The FAC alleges that Defendants "target[ed]" minors to use the platform and knew or should have known that use of the platform would cause harm. *E.g.*, FAC ¶ 5. But courts have consistently found that media was

---

[13] Individuals who do not wish to receive messages from Characters "readily can avert [their] eyes." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975). The law may only "'shut off discourse solely to protect others from hearing it ... upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.'" *Snyder*, 562 U.S. at 459 (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)). A voluntary online service does not meet that standard.

[14] The alleged final messages between S.S. and a Character regarding "coming home," FAC ¶ 220, make no mention of suicide at all.

not incitement under such circumstances, even where the media allegedly caused a minor's suicide. *E.g.*, *Wilson*, 198 F. Supp. 2d at 182 (violent video game not incitement to commit murder); *McCollum*, 202 Cal. App. 3d at 997, 1001 (Ozzy Osbourne's songs, including lyric "Get the gun and try it," not a "command to an immediate suicidal act"); *Watters*, 715 F. Supp. at 823–24 & n.4 (roleplaying game not incitement to commit suicide); *DeFilippo v. Nat'l Broad. Co., Inc.*, 446 A.2d 1036, 1038, 1042 (R.I. 1982) (broadcast of a mock hanging stunt not incitement to commit suicide).

Second, the speech alleged in the FAC is not fraudulent or defamatory. The FAC does not "state with particularity the circumstances" supposedly "constituting fraud," Fed. R. Civ. P. 9(b), and makes no attempt to allege defamation. Likewise, to the extent the FAC alleges that Characters make false statements, such as stating they are real people—despite the in-chat warning that "[e]verything Characters say is made up," FAC ¶ 274—there is no "general exception to the First Amendment for false statements." *United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality opinion).

Third, the speech alleged in the FAC is not obscene. Sexual speech is obscene only if it appeals to "a shameful or morbid interest in nudity, sex, or excretion" that "goes substantially beyond customary limits of candor in description or representation of such matters." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 497 (1985) (cleaned up). The suggestive messages alleged in the FAC fall far short of that standard.

Plaintiff may argue that the speech alleged in the FAC is obscene and unprotected *as to minors*. The Court's First Amendment analysis cannot be limited to minors because the relief sought by the FAC would significantly restrict the speech

available to both minors *and* adults on CAI's platform. *See supra* pp. 9–12. But even if the Court's analysis could be cabined to minors, "minors are entitled to a significant measure of First Amendment protection, ... and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik*, 422 U.S. at 212–13. Although obscenity as to minors is one of those circumstances, the FAC fails on its face to allege, as is required, that the sexually suggestive speech at issue has no literary, artistic, or social value for minors when minors' expressive interactions with fictional and historical characters are considered "as a whole"—and could not so allege, given that S.S.'s own role-playing interactions tracked the content and theme of fantasy books and television shows. *See, e.g.*, *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 649–50 (7th Cir. 2006) (holding unconstitutional under the First Amendment a statute that "potentially criminalizes the sale of any game that features exposed breasts, without concern for the game considered in its entirety or for the game's social value for minors," noting that one game at issue "track[ed] the Homeric epics in content and theme").

Finally, because Plaintiff seeks to impose liability through amorphous private tort claims, the Court need not and cannot evaluate whether the Plaintiff's claims are sufficiently narrowly tailored to survive the strict scrutiny standard applicable to a statutory challenge. As the Sixth Circuit has explained, tort claims do not lend themselves to the same rigorous analysis as "narrowly tailored regulations" that are the "product of the reasoned deliberation of democratically elected legislative bodies." *James v. Meow Media, Inc.*, 300 F.3d 683, 696–97 (6th Cir. 2002) (dismissing similar

claims that sexually explicit materials and violent video games allegedly caused a minor to commit a school shooting). The Sixth Circuit concluded it could not "adequately exercise [its] responsibilities to evaluate regulations of protected speech, even those designed for the protection of children, that are imposed pursuant to a trial for tort liability." *Id.* at 697; *see also Pahler v. Slayer*, No. CV 79356, 2001 WL 1736476, at *5–6 (Cal. Super. Ct. Oct. 29, 2001) (tort plaintiffs "must await content-based legislation" because regulating protected speech "is a distinctly legislative function"). Many courts, including *Zamora*, have implicitly followed the same rule, dismissing tort claims that would impose liability for protected speech, without any discussion of strict scrutiny or narrow tailoring. 480 F. Supp. at 206; *Wilson*, 198 F. Supp. 2d at 182.[15]

### B.    The Product Liability Claims Fail (Counts I-II, V-VI)[16]

Plaintiff's product liability claims fail as a matter of law for two reasons.[17]

**C.AI is a service, not a product.** To state plausible product liability claims under either strict liability or negligence, Plaintiff must allege injuries caused by a "product" within the meaning of product liability law. *See Colville v. Pharmacia & Upjohn Co. LLC*, 565 F. Supp. 2d 1314, 1320 (N.D. Fla. 2008).[18] Under the standard

---

[15] At any rate, the sweeping restrictions on speech the FAC proposes, *see supra* pp. 9–12, are not narrowly tailored to a compelling interest. *See NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023) (social media age verification requirements not narrowly tailored); *PSINet, Inc. v. Chapman*, 362 F.3d 227, 239 (4th Cir. 2004) (banning display of "'harmful' words, images or sound recordings" to minors not narrowly tailored); *Blagojevich*, 469 F.3d at 647 (banning sale or rental of violent and sexually explicit video games to minors not narrowly tailored).

[16] The FAC's counts are misnumbered. This motion refers to the counts in sequence.

[17] C.AI disputes other elements of Plaintiff's claims, including causation, but does not challenge the allegations on the pleadings.

[18] C.AI assumes application of Florida law solely for this motion and reserves all rights.

Florida has adopted, "products" are tangible goods such as "an automobile," "a water heater," or "a chair." *See* Restatement (Second) of Torts § 402A cmt. (d) (1965).

C.AI is not a product—as long-running authority confirms. C.AI's service delivers expressive ideas and content to users, similar to traditional expressive media such as video games. Courts have uniformly held that expressive media, which convey intangible ideas, are not "products" under product liability law—even if "wrapped" in an interactive or technologically sophisticated "container." *Wilson*, 198 F. Supp. 2d at 173–74 (virtual reality video game); *Quinteros v. InnoGame*s, No. C19-1402RSM, 2024 WL 4197826, at *9–10 (W.D. Wash. Sept. 16, 2024) (interactive online game); *Meow Media, Inc.*, 300 F.3d at 700–01 (video game). The FAC provides no factual basis to distinguish these authorities. The only fact alleged in the FAC to suggest C.AI is a product is that Noam Shazeer once used the word "product" in regard to the platform. FAC ¶ 107. That does not transform a service into a product under product liability law. *See Jacobs v. Meta Platforms, Inc.*, No. 22CV005233, 2023 WL 2655586, at *3 n.1, *4 (Cal. Sup. Ct. Mar. 10, 2023) (same in regard to Facebook's use of term "product").

**The alleged harms flow from intangible content.** Courts have consistently held that product liability law does not extend to harms from intangible content—even if purveyed in a tangible medium, such as a book, cassette, or "electrical pulses through the internet." *Meow Media*, 300 F.3d at 701; *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991). Plaintiff's product liability claims fail this standard because they are explicitly based on the words exchanged in S.S.'s conversations with Characters. *See*

16

*supra* Section IV.A. Plaintiff may contend that her claims challenge tangible "design choices," analogizing to cases like *T.V. v. Grindr, LLC*, No. 3:22-cv-864-MMH-PDB, 2024 WL 4128796 (M.D. Fla. Aug. 13, 2024),[19] and *Brookes v. Lyft*, No. 50-2019-CA-004782-XXXX-MB, 2022 WL 19799628 (Fla. 15th Cir. Sept. 30, 2022). The product liability claims in those cases were "not based on expressions or ideas" transmitted to or from users of the platforms. *Brookes*, 2022 WL 19799628, at *4; *Grindr*, 2024 WL 4128796, at *26 (pleading said "nothing" about users' speech). The FAC, by contrast, is replete with allegations about the *content* of S.S.'s messages with Characters. *E.g.*, FAC ¶¶ 195–200, 203–07, 220; Doc. 11-1. As a court explained in dismissing similar claims that Netflix's use of "data about its users" to "target vulnerable children" resulted in a suicide: "Without the content, there would be no claim." *Est. of B.H. v. Netflix*, No. 4:21-cv-06561, 2022 WL 551701, at *2 n.3, *3. (N.D. Cal. Jan. 12, 2022).

### C.    The Negligence-Based Claims Fail (Counts IV, V, VI)

Plaintiff's negligence-based causes of action fail because the FAC has not alleged any cognizable legal duty, a "threshold question" for any negligence claim. *See Rouzie v. Alterman Transp. Lines, Inc.*, 596 So. 2d 747, 748 (Fla. 3d DCA 1992). The FAC's asserted grounds for a duty have no basis in Florida law, and finding a duty here would contravene public policy barring tort liability for the dissemination of expressive content.

**No special relationship.** Plaintiff tries to get around the absence of a duty by

---

[19] *T.V. v. Grindr* is an unadopted report and recommendation to which Grindr has objected.

alleging that C.AI assumed a special relationship with minor users by allegedly "targeting" minors and charging them membership fees. FAC ¶ 5. No Florida court has held that online services have a special relationship with their users by virtue of users' use of the service.[20] Nor have courts in other jurisdictions found a legal duty based on a special relationship between online services and their users. *See, e.g.*, *Dryoff v. Ultimate Software Grp.*, 934 F.3d 1093, 1100–01 (9th Cir. 2019) (no special relationship between a social networking website and its users); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359–60 (D.C. Cir. 2014) (same); *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 598–99 (S.D.N.Y. 2018) (same). This is true even where the user has paid a fee to use the service. *See, e.g.*, *Beckman v. Match.com, LLC*, No. 2:13-CV-97, 2017 WL 1304288, at *3 (D. Nev. Mar. 10, 2017).

The fact that S.S. was a minor does not change the analysis, as Florida courts have found a heightened duty of care toward minors only where the defendant was able to exercise physical control over the minor, which is not nor could be alleged here. *See Burdine's, Inc. v. McConnell*, 146 Fla. 512, 514 (1941).

**No physical custody and control.** "As a general rule, there is no liability for the suicide of another or for injuries sustained in a suicide attempt in the absence of a specific duty of care." *Andreasen v. Klein, Glasser, Park & Lowe, P.L.*, 342 So. 3d 732, 734–35 (Fla. 3d DCA 2022) (citation omitted). "[A] legal duty to prevent self-inflicted

---

[20] The *T.V. v. Grindr* recommendation assumed without deciding that the plaintiff failed to plead a special relationship between the online service at issue and its users; it instead found a duty of care had been plausibly alleged on the basis of affirmative acts. *Grindr*, 2024 WL 4128796, at *36.

harm requires 'more than just foreseeability alone'; rather, such person must 'be in a position to control the risk,'" namely by having "tak[en] custody and control over" the individual who harmed himself or herself. *Id.* (quoting *Surloff v. Regions Bank*, 179 So. 3d 472, 475–76 (Fla. 4th DCA 2015)). In *Surloff*, for example, a Florida appellate court held that a bank that had declined loans to the decedent did not owe "a specific duty of care to prevent the decedent from committing suicide," even though the bank "allegedly knew of the decedent's mental state," because the decedent was not in the bank's "custody or control." 179 So. 3d at 476. Likewise in *Andreasen*, lawyers were not liable for the suicide of a client because they could not "exercise any supervision or control over his daily activities." 342 So. 3d at 734–35. This rule bars liability here.[21] The FAC alleges that C.AI controls the underlying AI model and Characters, FAC ¶ 134, but does not, nor could it, allege that C.AI had "custody or control" over S.S.— much less the kind of physical control these cases contemplate—to prevent his suicide.

C.AI acknowledges that the *T.V. v. Grindr* recommendation reached a different conclusion in evaluating a claim against the service Grindr, but respectfully submits that decision is wrong as a matter of Florida law. *Grindr* incorrectly reads the Florida Supreme Court's decision in *Chirillo v. Granicz*, 199 So. 3d 246 (Fla. 2016) as holding that, even where a defendant does not owe a duty to prevent suicide, a plaintiff may apparently proceed on a claim based on the specific injury of suicide, solely on

---

[21] Federal courts must follow decisions of Florida's appellate courts absent a ruling from the Florida Supreme Court or a persuasive indication that the Florida Supreme Court would decide the issue differently. *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 857–58 (11th Cir. 2023).

proximate causation grounds. *Grindr*, 2024 WL 4128796, at *37 ("Grindr's liability for A.V.'s suicide turns instead on proximate causation"). That is not what *Chirillo* holds. The Florida Supreme Court in *Chirillo* declined to find a duty to prevent suicide on the facts of that case (medical professionals in an outpatient scenario), but held that the defendants had a *statutory* duty to treat the decedent in accordance with a medical standard of care. *Chirillo*, 199 So. 3d at 251–52. Florida state courts correctly have read *Chirillo* as predicated solely upon a statutory duty, and have rejected the view, seemingly embraced by *Grindr*, that foreseeability and proximate causation alone can be a basis for tort liability for a suicide. *See, e.g.*, *Kowalski v. Johns Hopkins All Children's Hosp. Inc.*, No. 2018 CA 005321 NC, 2023 WL 7928983, at *4–5 (Fla. 12th Cir. June 26, 2023) (contrasting *Chirillo* with "present case, [where] there is no statutory duty owed" and "facts of the case, like in *Chirillo*, do not establish that a duty was owed … to prevent [a] suicide"; noting that arguments "focusing on the foreseeability of suicide" do "not establish a duty" and are "consideration for determining proximate cause, not duty"). Plaintiff does not nor could claim any statutory duty here.

**The Court should decline to expand state tort liability for expressive content.** Importing the same concerns that underpin the First Amendment analysis, courts in Florida and across the country have declined on policy and judicial capacity grounds to impose a duty of care on services that disseminate protected content to broad audiences. In *Zamora*, for example, the court declined to find that television networks owed a legal duty to a minor viewer who allegedly became "involuntarily addicted"

to viewing "television violence" and, subsequently, shot and killed his neighbor—citing concerns about federal courts "creat[ing] such a wide expansion in the law of torts in Florida" without the "legal and institutional capacity" to adjudicate such claims. 480 F. Supp. 199 at 200–03. Other cases are in accord. *E.g.*, *Sakon v. Pepsico, Inc.*, 553 So. 2d 163, 166 (Fla. 1989) (television advertiser did not owe duty to minor viewer who was injured attempting stunt depicted in commercial, and noting "[t]here would be a total absence of any standard to measure liability"); *Meow Media*, 300 F.3d at 699 (attaching "tort liability to the ideas and images conveyed by" video games and movies "raises grave constitutional concerns that provide yet an additional policy reason not to impose a duty"); *Est. of B.H.*, 2022 WL 551701, at *3 (no duty in case alleging Netflix show resulted in minor's suicide as claim implicated expression).

These concerns about regulating protected speech—the publicly stated aim of Plaintiff's suit—are even more pronounced in the context of a new technology. Because understandings about benefits and potential risks are still evolving, courts should be mindful of their limited institutional capacity to identify where otherwise protected expression should subject the AI industry to widespread tort liability.

### D.    Plaintiff's Other Claims Fail Under Florida Law (Counts VII-XII)

**Negligence per se.** The FAC alleges that C.AI was negligent per se because it violated the Florida Computer Pornography and Child Exploitation Prevention Act ("FCPCEPA"), Fla. Stat. § 847.0135. FAC ¶ 349. FCPCEPA criminalizes using a computer to facilitate or visually depict "sexual conduct of or with any minor,"; traveling to meet a minor to engage in "unlawful sexual conduct"; and engaging in

21

masturbation, exposing genitals, or committing other sexual acts that are transmitted live over a computer to be viewed by a minor. Fla. Stat. § 847.0135. "Sexual conduct" includes "actual or simulated sexual intercourse" or "actual physical contact." Fla. Stat. § 847.001(19).

The FAC fails to allege a violation of FCPCEPA. There are no allegations that anyone used a computer to transmit live sexual acts for S.S.'s viewing or to facilitate actual physical sexual contact with S.S. Because the FAC does not allege a violation of FCPCEPA or any other statute,[22] this claim must be dismissed.

**IIED.** The FAC alleges that C.AI intentionally inflicted emotional distress ("IIED") on Plaintiff by "failing to implement adequate safety guardrails" and "collecting children's data." FAC ¶¶ 389–90. Those allegations fall far short of Florida's "particularly high" "outrageous conduct" standard. *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1368 (11th Cir. 2024) (citation omitted). S.S. agreed C.AI could use his information. FAC ¶ 322.[23] And IIED claims "typically require[] offensive physical contact," *McGinity v. Tracfone Wireless, Inc.*, 5 F. Supp. 3d 1337, 1341 (M.D. Fla. 2014) (Conway, J.), not words alone, *see Koutsouradis v. Delta Air Lines, Inc.*, 427 F.3d 1339, 1345 (11th Cir. 2005) (sexually offensive speech not sufficient for IIED).

The Court also should dismiss because Plaintiff cannot state an IIED claim for

---

[22] The FAC's reference to unspecified "state and/or federal laws," FAC ¶ 6, may be disregarded as a "formulaic recitation of the elements," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), of negligence per se, *Faircloth v. Main St. Ent., Inc.*, 392 So. 3d 1042, 1045–46 (Fla. 2024).

[23] *See, e.g.*, *Hammerling v. Google LLC*, No. 21-CV-09004-CRB, 2022 WL 17365255, at *9 (N.D. Cal. Dec. 1, 2022), *aff'd*, 2024 WL 937247 (9th Cir. Mar. 5, 2024) (even where "Court cannot conclude that Plaintiffs have affirmatively consented to the collection of this data, ... this data collection is also not 'blatantly deceitful,'" and not a "highly offensive" intrusion).

*her emotional distress*, the only distress she alleges. FAC ¶ 391. "A claim for intentional infliction of emotional distress is generally available only to the person at whom the outrageous conduct is directed." *Grindr*, 2024 WL 4128796, at *42 (collecting cases). Thus, Florida courts have held that parents cannot recover for their own emotional distress from the death of a child, *Baker v. Fitzgerald*, 573 So. 2d 873, 873 (Fla. 3d DCA 1990), or from learning that a child was sexually abused, *M.M. v. M.P.S.*, 556 So. 2d 1140, 1140–41 (Fla. 3d DCA 1989). Likewise here, Plaintiff cannot recover for "emotional distress to [her]" from C.AI's alleged conduct toward her child,[24] FAC ¶ 391; *see Baker*, 573 So. 2d at 873; *M.M.*, 556 So. 2d at 1140–41.

**Unjust enrichment.** The FAC alleges that C.AI unjustly retained two benefits from S.S.—his monthly subscription fee and his messages to Characters—"without paying Plaintiff the value." FAC ¶¶ 404, 407–08, 410. A claim for unjust enrichment fails where an express contract exists—here, the TOS to which S.S. agreed (and which authorized C.AI to collect and use information from S.S., *id.* ¶ 322). *See Doral Collision Ctr., Inc. v. Daimler Tr.*, 341 So. 3d 424, 430 (Fla. 3d DCA 2022). Further, "unjust enrichment cannot exist where payment has been made for the benefit conferred." *Com. P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 388 (Fla. 4th DCA 1997) (cleaned up), *as modified on clarification* (June 4, 1997). C.AI compensated S.S. in the form of access to a service he used.

**FDUTPA.** Plaintiff's Florida Deceptive and Unfair Trade Practices Act

---

[24] By contrast, the *Grindr* plaintiff pled IIED as a survival claim "not for her own emotional distress," but for her child's "emotional distress before he died." 2024 WL 4128796, at *42.

("FDUTPA") claim should be dismissed for lack of standing. To be entitled to relief under FDUTPA, Plaintiff must "plead and prove that he or she was aggrieved by the unfair and deceptive act." *Macias v. HBC of Fla., Inc.*, 694 So. 2d 88, 90 (Fla. 3d DCA 1997) (collecting cases). The FAC vaguely alleges that Defendants misled consumers into believing (1) AI chatbots are "real people," and (2) certain AI chatbots are "licensed" mental health professionals, including by providing "advanced character voice call features." FAC ¶¶ 417–18. But the FAC does not allege S.S. believed Characters were "real" or "qualified to give professional advice," *id.* ¶ 418—nor would such an allegation be plausible given the Characters S.S. interacted with, *see id.* ¶ 195. Because the FAC fails to allege S.S. was aggrieved by the purportedly deceptive acts, this claim must be dismissed. *See Macias*, 694 So. 2d at 90.

The FAC also fails to allege a FDUTPA claim with sufficient particularity. Where a FDUTPA claim alleges "deceptive" conduct, Rule 9(b)'s heightened pleading standard applies. *See Llado-Carreno v. Guidant Corp.*, No. 09-20971-CIV, 2011 WL 705403, at *5 (S.D. Fla. Feb. 22, 2011); *Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002) (same). Thus, a FDUTPA plaintiff must allege "precisely what statements were made in what documents or oral representations or what omissions were made, … the time and place of each such statement and the person responsible for making them (or, in the case of omissions, not making) [the] same …." *Blair v. Wachovia Mortg. Corp.*, No. 5:11–cv–566–Oc–37TBS, 2012 WL 868878, at *4 (M.D. Fla. Mar. 14, 2012) (cleaned up).

The FAC avers "deceptive" conduct with the opposite of particularity. It is even

ambiguous whether an express representation is at issue: "Defendants represented, directly or indirectly, expressly or by implication." FAC ¶¶ 417(a), (b). That vague legalese does not "alert[]" C.AI to the "precise misconduct," *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370–71 (11th Cir. 1997), so the claim should be dismissed, *see Llado-Carreno*, 2011 WL 705403, at *5.[25]

**Wrongful death and survivor action.** Plaintiff's wrongful death and survivor claims fail for the same reasons as her negligence-based and other claims.

## V. CONCLUSION

C.AI respectfully requests that Plaintiff's claims be dismissed.

## Local Rule 3.01(g) Certification

I certify that C.AI conferred with Plaintiff by video on January 9, 2025, and also by email, in a good-faith effort to resolve the motion. Plaintiff agreed to withdraw her loss of consortium claim, but otherwise opposes the relief requested.

Respectfully submitted this 24th day of January, 2025.

| | |
|---|---|
| Thomas A. Zehnder | /s/ Jonathan H. Blavin |
| Florida Bar No. 0063274 | Jonathan H. Blavin* (Lead Counsel) |
| Dustin Mauser-Claassen | Victoria A. Degtyareva* |
| Florida Bar No. 0119289 | Stephanie Goldfarb Herrera* |
| KING, BLACKWELL, ZEHNDER | MUNGER, TOLLES & OLSON, LLP |
|  & WERMUTH, P.A. | 560 Mission Street, 27th Floor |
| 25 East Pine Street | San Francisco, CA 94105 |
| Orlando, FL 32801 | (415) 512-4000 |
| (407) 422-2472 | Jonathan.Blavin@mto.com |
| tzehnder@kbzwlaw.com | Stephanie.Herrera@mto.com |
| dmauser@kbzwlaw.com | Victoria.Degtyareva@mto.com |
| | *Admitted Pro Hac Vice* |

---

[25] Having alleged no special relationship, the FAC fails to state an omission-based claim. *DJ Lincoln Enters., Inc. v. Google LLC*, No. 21-12894, 2022 WL 203365, at *3 (11th Cir. Jan. 24, 2022).