UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MEGAN GARCIA, individually and as the Personal Representative of the Estate of S.R.S. III,<br><br>     Plaintiff,<br><br>v.<br><br>CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FRIETAS ADIWARSANA; GOOGLE LLC; and ALPHABET INC.,<br><br>     Defendants. | Case No. 6:24-cv-01903-ACC-UAM |

**DEFENDANTS GOOGLE LLC'S AND ALPHABET INC.'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
AND MEMORANDUM OF LAW IN SUPPORT**

Defendants Google LLC and Alphabet Inc. (collectively "Google") through their undersigned attorneys, and pursuant to FRCP 8, 10 and 12, hereby move this Court to dismiss Plaintiff's First Amended Complaint ("FAC"), ECF No. 11.

**INTRODUCTION**

Plaintiff Megan Garcia's loss of her son, Sewell Setzer III, is a tragedy for which Google offers its deepest sympathies. But Google had no role in that tragedy and does not belong in this case.

Plaintiff alleges that her son died by suicide as a result of his use of the "generative AI" service offered by Defendant Character Technologies, Inc. ("C.AI"),

1

FAC ¶ 2: an artificial intelligence chatbot capable of "back-and-forth conversations with customers," *id.* ¶ 38. The gravamen of Plaintiff's suit is that C.AI's chatbot service was "defectively designed," *id.* ¶ 328, and "proximately caused Plaintiff's injuries," *id.* ¶ 331. Plaintiff's claims against Google fail on the same grounds asserted in C.AI's motion to dismiss, and for even more fundamental reasons.[1]

Plaintiff acknowledges, as she must, that C.AI is an entirely separate company from Google, with entirely separate services. And the FAC does not, and cannot, allege that the decedent's tragic suicide resulted from any contact with Google or from any Google service. Nor does Plaintiff plead, or have any basis to plead, facts showing that Google had any control or authority over C.AI's operations; any ownership stake in C.AI; or any proprietary interest in the C.AI chatbot at issue.

With no facts to show that Google had any actual role here, Plaintiff attempts to lump all Defendants together, averring that "*Defendants* financed, designed, coded, engineered, manufactured, produced, assembled, and marketed C.AI," without any distinction among the five defendants named in her complaint. FAC ¶ 326. And Plaintiff makes broad and conclusory claims about the ties between Google and C.AI, alleging that "Google contributed financial resources, personnel, intellectual property, and AI technology to the design and development of C.AI," without

---

[1] As authorized by the Court, *see* ECF No. 58, Google joins C.AI's motion to dismiss, ECF No. 59. Plaintiff's claims fail as a matter of law for the independent additional reasons discussed therein: they are barred by the First Amendment; C.AI's service is not a "product" and Plaintiff alleges her harm flows from intangible information and ideas in conversations with chatbots; Plaintiff has not alleged a cognizable duty or special relationship; the decedent was compensated for any benefit he conferred on C.AI; and Plaintiff lacks standing under the FDUTPA and has not alleged a FDUTPA claim with particularity.

elaboration of what those contributions supposedly were or how they could possibly make Google share any responsibility for C.AI's service, let alone the decedent's suicide. *Id.* ¶ 68.

Shorn of rhetoric and conclusory allegations, the FAC boils down to three alleged factual ties between Google and C.AI: (1) that Google previously employed C.AI's founders, who brought their general AI experience (but no proprietary Google technologies) to C.AI; (2) that Google later entered into an arm's length debt agreement with C.AI; and (3) that Google entered into an arm's length agreement to provide C.AI with cloud data services, similar to those Google provides to numerous companies around the world. These connections are too remote and tenuous, as a matter of law, to make Google liable under any theory of liability for C.AI's chatbot service, much less Plaintiff's alleged injury.

Because Plaintiff has not pled, and cannot state, a cognizable claim against Google, the FAC should be dismissed as to Google with prejudice.

## BACKGROUND

**Google Prioritizes Safety in its Approach to AI:** Plaintiff does not allege that any AI technology offered by Google is unsafe, or that the decedent ever used such technology. In fact, Plaintiff acknowledges Google's "safety and fairness policies" in the development of AI technology.  FAC ¶ 58; *see id.* ¶¶ 25, 55-58.

As Google employees, Defendants Noam Shazeer and Daniel De Freitas worked on the development of large language models ("LLMs") used to power generative AI technologies. *Id.* ¶¶ 54-56. They conducted foundational research,

disclosed in public research papers, and invented an AI "architecture" that has now been "widely adopted across much of the AI industry." *Id.* ¶ 54 & n.13; *see also id.* ¶¶ 56, 59 (discussing publications and citing papers). Among their projects at Google was an AI chatbot called LaMDA (Language Model for Dialogue Applications). *Id.* ¶ 56. While Shazeer and De Freitas were eager to release LaMDA to the public early in its development, Google repeatedly denied their requests, as LaMDA did not yet "meet[] the company's AI principles around safety and fairness." *Id.* ¶¶ 55-56.

**C.AI Forms as an Independent Company:** In November 2021, Shazeer and De Freitas left Google to form C.AI. FAC ¶ 66. Although Plaintiff alleges that they "invented and initially built" the "infrastructure" of C.AI's chatbot at Google, *id.* ¶ 63, Plaintiff pleads no facts plausibly suggesting that C.AI's chatbot used LaMDA or any proprietary Google technology, *id.* ¶¶ 54, 59, 66; *infra*, Part II.A. Indeed, the FAC contains no allegation that Google had any connection whatsoever with C.AI until a year and a half after its founding, after C.AI had already developed and launched its chatbot service to the public. *Id.* ¶¶ 66, 75.

**After Launching Its Service, C.AI Becomes a Google Cloud Customer:** C.AI first released its chatbot to the public in September 2022. FAC ¶ 69. Six months later, in March 2023, C.AI undertook a round of funding, led by venture capital firm Andreessen Horowitz, that valued C.AI at $1 billion. *Id.* ¶ 77.

Later that spring, C.AI entered into a commercial cloud services agreement with Google. *Id.* ¶ 75. In essence, the agreement allowed C.AI to rent servers and

advanced computational hardware—graphics processing units (GPUs) and tensor processing units (TPUs)—in Google's internet-connected cloud to run C.AI's software and store its data. *Id.* ¶¶ 75, 77, 347(b); *see also id.* ¶ 75 n.40 (citing video interview discussing deal).[2] In an interview cited in the FAC, Shazeer explained that C.AI considered different cloud services providers, including Microsoft, but chose Google Cloud as the best option for C.AI. *Id.* Shortly after, Google invested in C.AI in exchange for a convertible note. *Id.* ¶¶ 76, 82.[3]

**After the Events at Issue in This Case, Google Licenses C.AI's LLM and Hires Certain Former C.AI Employees:** The FAC alleges no further dealings between Google and C.AI prior to the decedent's tragic death in February 2024. The next—and only additional—alleged interaction between Google and C.AI took place in August 2024, when Google entered into a release and non-exclusive license agreement with C.AI for its then-current large language model technology. FAC ¶ 80. Google paid C.AI $2.7 billion in cash and withdrew its convertible note. *Id.* ¶¶ 80, 82. Additionally, Shazeer, De Freitas, and several other C.AI employees left that

---

[2] This court can and should consider materials referenced in the FAC, including cited news articles, interviews, and video presentations discussing C.AI, since they are "central to the plaintiff's claims" and Plaintiff has endorsed their "authenticity." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024); *see Baron v. Syniverse Corp.*, 2022 WL 6162696, at *5 (M.D. Fla. Oct. 7, 2022) (considering "proxy statement and article" referenced in complaint); *Garin v. Menegazzo*, 2022 WL 1658831, at *8 (S.D. Fla. May 25, 2022) (considering video referenced in complaint).

[3] *See* Kalley Huang, *Character, a Chatbot Pioneer, Mulls Deals With Rivals Google and Meta*, The Information (July 1, 2024), https://www.theinformation.com/articles/a-chatbot-pioneer-mulls-deals-with-rivals-google-and-meta (cited at FAC ¶ 92 n.60).

company and were hired by Google. *Id.* ¶ 80. Leading up to that deal, C.AI reportedly had been in discussions with other big tech firms, including Meta. *Id.* ¶ 92 & n.60.

**Plaintiff Files Suit Against C.AI, Its Founders, and Google:** Plaintiff brings this case against C.AI, its founders, and Google in her capacity as a Personal Representative of the Estate of the decedent and primarily for harms he suffered. FAC 1. The FAC asserts twelve causes of action, but Plaintiff currently asserts only eight claims against Google: strict product liability (defective design); strict product liability (failure to warn); aiding and abetting; negligence (defective design); wrongful death; survivor action; unjust enrichment; and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Leading up to this motion, Plaintiff conceded dismissal of the remaining claims, agreed to dismiss Alphabet without prejudice, and stated that she intends to amend the complaint to add the decedent's father as a plaintiff.[4]

## ARGUMENT

Plaintiff's core theory of liability—that Google is somehow liable as a co-creator of the C.AI chatbot service that allegedly caused her loss, FAC ¶ 68—is not plausibly supported by the facts pled in the FAC. In an effort to blur the lines between

---

[4] Specifically, on January 21, 2025, counsel for Plaintiff informed Google that Plaintiff had been appointed as co-trustee of the decedent's estate along with the decedent's father, who Plaintiff represented would later seek to join this matter as a plaintiff. Counsel also indicated that Plaintiff would agree to dismiss Alphabet as a defendant, dismiss her claim for loss of consortium against all defendants, and dismiss the claims against Google for intentional infliction of emotional distress and negligence (failure to warn). Although Google proposed that Plaintiff seek to amend her complaint to add the co-administrator as a plaintiff and implement these other changes before Defendants' responsive pleading deadline, Plaintiff declined to do so. In reliance on Plaintiff's representations, Google does not herein address the claims that Plaintiff has agreed should be dismissed against Google.

C.AI and Google and collapse them into "co-creator[s]" of C.AI's service, Plaintiff resorts to improper group pleading and conclusory statements of fact and law. *Id.* The Court should reject those gambits.

## I.    PLAINTIFF'S GROUP ALLEGATIONS ABOUT ALL "DEFENDANTS" ARE IMPROPER SHOTGUN PLEADING, ENTITLED TO NO WEIGHT.

Unable to plead concrete facts about Google's supposed role in the development and marketing of C.AI's chatbot, Plaintiff lumps together all defendants rather than spelling out a claim against each. This "shotgun pleading" approach, "assert[ing] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions," *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015), is a subterfuge for which courts in this Circuit have "little tolerance," *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021).

The FAC repeatedly refers to "Defendants'" conduct in blunderbuss fashion, alleging they "decided to incorporate Character AI and place C.AI into the stream of commerce," FAC ¶ 52; "marketed C.AI to children," *id.* ¶ 94; and "falsely represented the safety of" the C.AI app, *id.* ¶ 97. Five of the eight claims Plaintiff asserts against Google refer to all Defendants as if they were one entity, with sweeping conclusory allegations that fail to specify Google's purported misconduct. *E.g.*, FAC ¶ 326 ("Defendants financed, designed, coded, engineered, manufactured, produced, assembled, and marketed C.AI, and then placed it into the stream of commerce."); *see also id.* ¶¶ 327(a), 329(d), 335, 336(a), 337, 338, 339, 341, 394, 395, 399, 400, 408,

417, 418. The claim for negligence (design defect) does not make any mention of Google at all, *see id.* ¶¶ 361-371, leaving Plaintiff's legally deficient aiding and abetting theory as the only claim that even discusses Google expressly, *see infra*, Part III.C.

By "impermissibly lump[ing] [d]efendants together," in this manner, *Barmapov*, 986 F.3d at 1324, the FAC "fail[s] . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests," *Luiggi v. Harlem Heights Leasing LLC*, 2024 U.S. Dist. LEXIS 167237, at *6 (M.D. Fla. Sept. 16, 2024) (Conway, J.) (quoting *Lapread v. Slaughter*, 2023 WL 8004566, at *2 (M.D. Fla. Nov. 17, 2023)). Plaintiff's claims against Google should be dismissed for this reason alone.

## II.    PLAINTIFF FAILS TO ALLEGE THAT GOOGLE CO-CREATED C.AI'S CHATBOT SERVICE OR PROXIMATELY CAUSED PLAINTIFF'S INJURY.

Beyond Plaintiff's improper group pleading, the FAC is bereft of any factual allegations creating a plausible, or even conceivable, basis for treating Google as the co-creator of C.AI's chatbot service or otherwise imposing liability on Google for C.AI's purportedly tortious actions.

### A. Plaintiff's Allegations Do Not Plausibly Support Treating Google as a Co-Creator of C.AI's Service.

Plaintiff attempts to cast Google, variously, as a "co-creator" of C.AI's service, FAC ¶ 68; as being in a "partnership with Character.AI," *id.* ¶ 76; and as using C.AI as a "vehicle to develop the dangerous and untested technology" at issue, *id.* ¶ 67. To survive a motion to dismiss, however, a plaintiff cannot merely assert such "'[c]onclusory statements' of fact and 'legal conclusions'," *Turner v. Williams*, 65 F.4th

564, 577 (11th Cir. 2023), nor offer "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Plaintiff's allegations against Google reduce to the theory that "Google contributed financial resources, personnel, intellectual property, and AI technology to the design and development of C. AI." FAC ¶ 68. But when shorn of rhetoric, the FAC lacks factual allegations to support this theory. *Cf. Twombly*, 550 U.S. at 570. Because the FAC's allegations of fact "stop[] short of the line between possibility and plausibility of entitlement to relief," *Iqbal*, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557) (internal quotations omitted), it must be dismissed.

*"Financial resources"*: It is blackletter law that being an investor in, or even owner of, a corporation does not make one liable for the corporation's actions "absent some basis to pierce the corporate veil." *Beltran v. Miraglia*, 125 So. 3d 855, 858 (Fla. 4th DCA 2013).[5] But Plaintiff does not, and cannot, allege facts showing that Google even had an equity interest in C.AI, much less any grounds for veil-piercing.

Plaintiff alleges no facts suggesting Google "dominated and controlled [C.AI] to such an extent that the corporation's independent existence was[] in fact non-existent." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008) (citation

---

[5] Plaintiff relies on Florida law in the FAC. *See* FAC ¶¶ 102, 413-421. For purposes of this motion, Google assumes that Florida law governs, but reserves the right to address the issue on a more developed record.

omitted). Far from alleging facts indicating "that the corporate formalities for these entities were not observed," *Windering Invs., LLC v. Furnell*, 144 So. 3d 598, 603 (Fla. 2d DCA 2014), the FAC recognizes that C.AI undertook "series funding," FAC ¶ 24, and "raised a large round of funding led by [venture capital fund Andreessen Horowitz]," *id.* ¶ 77, before any alleged involvement by Google. This situation is a solar system away from those in which one company could be treated as a "mere instrumentality" of another. *Ocaala Breeders' Sales Co. v. Hialeh, Inc.*, 735 So. 2d 542, 543 (Fla. 3d DCA 1999).

Nor does Plaintiff allege any facts plausibly suggesting that Google could be held liable for C.AI's actions on some agency theory, which would require plausible allegations that one company had "control[]" over "the method or mode of operation of [the company]," for liability to attach. *Cf. Ortega v. Gen. Motors Corp.*, 392 So. 2d 40, 43 (Fla. 4th DCA 1981) (franchisor was not liable for shooting on franchisee's property where franchisee was not acting as an agent). Plaintiff comes nowhere close to alleging anything like this.

To the contrary, the FAC's allegations make clear that Google's only financial involvement in C.AI was as a *passive creditor*. While Plaintiff makes general references to "Google's investment in C.AI," FAC ¶ 322; *see also id.* ¶¶ 75, 77, and to a general "paradigm" in which "startups exchange equity for cloud computing credits," *id.* ¶ 40, the FAC and material cited by Plaintiff confirm that Google's investment in C.AI took the form of a "convertible note." FAC ¶ 82; *see* Huang article, *supra*, cited at FAC ¶ 92 n.60. Such notes "can be converted by the holder into stock of the issuing

10

company," *U.S. Sec. & Exch. Comm'n v. Morningview Fin. LLC*, 2023 WL 7326125, at *1 (S.D.N.Y. Nov. 7, 2023), but Plaintiff does not allege that Google ever converted, or even had the ability to convert, its note to equity: As Plaintiff recognizes, Google eventually "withdrew" the unconverted note in 2024 as part of the license transaction. FAC ¶ 82; Huang article, *supra*, cited at FAC ¶ 92 n.60. Thus, Google was never an equity holder in C.AI. There is no suggestion anywhere in the FAC that this investment (which post-dated C.AI's launch of the chatbot and Setzer's first use of the same) gave Google governance rights or control over C.AI, and Plaintiff cannot plead otherwise. *Cf. Ortega,* 392 So. 2d at 42.

*"Intellectual Property and AI Technology"*: Plaintiff avers that "[o]n information and belief, the model underlying C.AI was invented and initially built at Google." FAC ¶ 63. But Plaintiff does not identify the "model" at issue. To the extent Plaintiff means that C.AI (along with much of the AI industry) used a general framework for AI that Shazeer initially worked on while at Google, that "model" was disclosed in published research papers and has thus been "widely adopted across much of the AI industry." *See* FAC ¶ 54 & n.13. Plaintiff does not explain how C.AI's alleged use of this general framework should subject Google to liability. Indeed, Plaintiff does not and could not allege that AI technology itself is inherently dangerous, but instead acknowledges that LLM chatbots can be made safely. *See* FAC ¶¶ 3, 330, 368.

To the extent Plaintiff means to imply that C.AI took actual computer files—such as proprietary code, data, or a fully-built chatbot—from Google, FAC ¶ 68, that allegation is never actually asserted in the complaint and would be, at best, a

11

conclusory "information and belief" contention, *id.*, unsubstantiated by allegations of actual fact, *see Iqbal*, 556 U.S. at 664, 681-82 (allegations "that Ashcroft was the 'principal architect' of" challenged government action "and that Muller was 'instrumental' in adopting and executing it" were "conclusory and not entitled to be assumed true"). "[U]nwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020) (citation omitted); *accord Smith v. City of Sumiton*, 578 F. App'x 933, 935 n.4 (11th Cir. 2014) ("[F]or purposes of a Rule 12(b)(6) motion to dismiss, we do not have to take as true allegations based merely 'upon information and belief.'") (citation omitted). What is more, the FAC's allegations actually tend to *refute* the notion that C.AI derived its chatbot from any proprietary Google technologies. According to Plaintiff, Shazeer and De Freitas left Google to "work[] on a startup using *similar* technology" to Google's LaMDA, FAC ¶ 60 (emphasis added), and C.AI "differentiated itself from other AI startups" by focusing on its own "LLM development" in addition to "data collection" and "user engagement," *id.* ¶ 105.

And to the extent Plaintiff's references to "intellectual property" describe the agreement with C.AI to provide "computing services and advanced chips" through the Google Cloud infrastructure, FAC ¶¶ 75-77, there are no factual allegations plausibly suggesting that this common commercial transaction rendered Google a "co-creator," *id.* ¶ 68, or amounted to "combin[ing]" the companies' "AI capabilities," *id.* ¶ 76. Plaintiff takes out of context public statements referring to a "partnership" between C.AI and Google, *see id.* ¶¶ 75, 76, 78, but the statements in

context clearly refer to Google's role as a service provider, not to some joint venture.[6]

Plaintiff alleges that Google's cloud services "were necessary to building and maintaining" the C.AI chatbot such that "Character.AI could not have operated its app without them." *Id.* ¶¶ 75, 347(b). But such allegations hardly suffice to convert Google from a service provider to a full-fledged "co-creator" of C.AI's app. *Id.* ¶ 68. If that were so, internet platforms, data storage companies, and even electric companies would be categorically liable in tort for the online operations of the many companies they serve—despite the general and contractual nature of their services. Unsurprisingly, there is no legal support for this head-snapping notion. *Cf. Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) (Easterbrook, J.) ("Just as the telephone company is not liable as an aider and abettor for tapes or narcotics sold by phone, and the Postal Service is not liable for tapes sold (and delivered) by mail, so a web host cannot be classified as an aider and abettor of criminal activities conducted through access to the Internet.").

In any event, Plaintiff's own allegations belie the conclusion that Google's cloud services were essential for C.AI's existence. Not only did C.AI launch its chatbot *prior* to entering into the Google Cloud agreement, FAC ¶¶ 69, 75, but, as

---

[6] Notably, the same Google presentation cited in support of this allegation referred to other cloud customers as "partners," including Salesforce, Deloitte, KPMG, BCG, Snap, Accenture, Box, UKG, Jasper, GitLab, Dialpad, and Cognizant. *See* Google, *Google Keynote (Google I/O '23)*, YouTube (May 10, 2023), https://www.youtube.com/watch?v=cNfINi5CNbY&t=3538s (starting at 58:58) (cited at FAC ¶ 76 n.41). Similarly, while the FAC quotes a statement about cloud deals driving "topline revenue growth for Google," *id.* ¶ 75, that statement was not specific to C.AI and referred generally to Google's opportunity to profit from companies that use AI "buying" Google's cloud services, *see* CNBC Television, *Large language models creating paradigm shift in computing, says character.ai's Noam Shazeer*, YouTube (May 11, 2023), https://www.youtube.com/watch?v=UrofA0IIF98 (starting at 6:12) (cited at FAC ¶ 75 n.40).

13

noted in one of the interviews Plaintiff cites, C.AI had other cloud providers to choose from, including Microsoft and Amazon, *id.* ¶ 81.[7]

*"Personnel"*: The only allegation even remotely related to Google providing "personnel" to C.AI is that Shazeer and De Freitas worked at Google prior to leaving to start C.A.I. FAC ¶¶ 53, 55-56. But, obviously, there is no legal basis to treat Google as responsible for the actions of a separate company based simply on its prior employment of that company's founders.

### B. Shorn of Conclusory Allegations, the FAC Fails to Establish That Google Proximately Caused Plaintiff's Injuries.

The FAC fails, in equal measure, to allege facts plausibly suggesting that the tragic loss Plaintiff suffered proximately resulted from anything Google did. The only concrete actions she alleges—Google's purported roles as an "investor," cloud services provider, and former employer—are far too tenuously connected to that harm to be actionable. Because proximate causation is a required element of all of Plaintiff's claims, from strict products liability to aiding and abetting, this failure warrants dismissal of every claim brought against Google.[8]

"[H]arm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Phelps v. Delphi Behav. Health Grp., LLC*, 2024 WL 2290019,

---

[7] *See* CNBC Television, *supra* (at 5:00-6:00) (cited at FAC ¶ 75 n.40).

[8] *See R.J. Reynolds Tobacco Co. v. Nelson*, 353 So. 3d 87, 90 (Fla. 1st DCA 2022) (strict and negligent product liability); *Worldspan Marine Inc. v. Comerica Bank*, 2020 WL 1238732 at *14-15 (S.D. Fla. Feb. 27, 2020) (aiding and abetting); *Kurimski v. Shell Oil Co.*, 2022 WL 2913742, at *11-12 (S.D. Fla. June 29, 2022) (FDUTPA). Plaintiff's remaining claims are derivative of these primary claims, and thus must also fail for lack of proximate causation. *See infra*, Parts III.D, III.F.

14

at *1 (11th Cir. May 21, 2024) (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992)). Courts may dismiss for lack of proximate cause if, "after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that [the conduct] should have brought about the harm." *Id.* at *2.

The FAC posits the following chain of causation: (1) Google employed Shazeer and De Freitas, who helped develop published AI technologies and LaMDA, FAC ¶¶ 55-56; (2) Google refused to release LaMDA to the public because LaMDA did not yet satisfy Google's stringent safety standards, *id.*; (3) Shazeer and De Freitas left Google and founded C.AI, *id.* ¶ 66; (4) C.AI developed and marketed the C.AI chatbot service, *id.* ¶¶ 185-187, 189-191; (5) Setzer began using the C.AI chatbot service, *id.* ¶ 172; (6) "soon after, his mental health quickly and severely declined," *id.*; (7) Google began providing "computing services and advanced chips" to C.AI, *id.* ¶ 75; (8) Setzer was diagnosed with "anxiety and disruptive mood disorder," *id.* ¶ 180; (9) Setzer "found his stepfather's pistol" and used it to kill himself, *id.* ¶¶ 221, 222; (10) Plaintiff, Setzer's mother, suffered serious harm as a result of his death, *id.* ¶ 359; and (11) after Setzer's death, Google hired several C.AI employees and licensed its LLM, *id.* ¶¶ 80, 84, 86.

This attenuated chain does not establish any "specific act[s] or omission[s]" by Google that would "likely" or "substantially cause[]" harm similar to the tragic loss Plaintiff experienced. *See Phelps*, 2024 WL 2290019, at *1. As an initial matter,

Plaintiff cannot establish that any Defendant proximately caused her injuries in light of the "general rule that 'a suicide is an intervening cause that is unforeseeable.'" *Id.* at \*2 (quoting *Est. of Brennan v. Church of Scientology Flag Serv. Org., Inc.*, 832 F. Supp. 2d 1370, 1381 (M.D. Fla. 2011)). But even beyond that, it is not reasonable to foresee or expect that C.AI's alleged actions would have led to Setzer's tragic death, much less Google's more remote actions. The link between Plaintiff's injury and C.AI's development and marketing of software capable of "engag[ing] in back-and-forth conversations" with customers, FAC ¶ 38, is mediated by multiple intervening events. Google stands even further removed from the harm. *Supra*, Part II.B. "Not even a psychiatrist is charged with a duty to predict, and prevent injury resulting from, 'an individual's propensity to do violence to himself or others." *Est. of Brennan*, 832 F. Supp. 2d at 1382 (quoting *Paddock v. Chacko*, 522 So. 2d 410, 416 (Fla. 5th DCA 1988)). If Setzer's own therapist, who "diagnosed him with anxiety and disruptive mood disorder," FAC ¶¶ 179-180, 395, is not responsible for foreseeing his death, a company that had no relationship with Setzer certainly cannot be responsible for doing so. Nor can Plaintiff allege that Google's hiring of C.AI's employees or licensing of C.AI's LLM proximately caused her harms, as that occurred *after* Setzer's death. *See Julin v. Chiquita Brands Int'l, Inc.*, 690 F. Supp. 2d 1296. 1314 (S.D. Fla. 2010) ("To sufficiently allege proximate cause, Plaintiffs must also allege that their payments to FARC occurred prior to, not subsequent to, the kidnappings at issue[.]").

III.    **THE WELL-PLEADED FACTS DO NOT SUPPORT THE REMAINING ELEMENTS OF PLAINTIFF'S CLAIMS.**

As set forth above, Plaintiff fundamentally fails to establish that Google played any material or proximate role in the development or distribution of C.AI's chatbot service, let alone in the attenuated chain of events that allegedly caused Plaintiff's injuries. While Plaintiff's claims should be dismissed on those grounds alone, the allegations in the FAC also do not satisfy the other essential elements of Plaintiff's claims.

### A. Plaintiff's Strict Product Liability Claims Fail Because Google Did Not Manufacture or Distribute Any Product.

Plaintiff's strict product liability claims fail because she alleges no facts suggesting that Google manufactured or distributed *any* product, let alone the C.AI chatbot service that is the subject of Plaintiff's claims.

To state a claim for product liability, "a plaintiff must show that the defendant manufactured or distributed the product in question." *Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F. Supp. 2d 1270, 1285 (M.D. Fla. 2009). That claim fails for the basic reason that C.AI's service—an intangible interface that shows users text—is not a "product" for purposes of products liability law. *See* Restatement (Second) of Torts § 402A cmt. (d) (1965) (providing examples of a "product").

Even assuming products liability law could apply, though, Plaintiff's allegations fail to state a claim against Google. Plaintiff's strict product liability claim is based on the entirely conclusory allegation that "Defendants financed, designed, coded, engineered, manufactured, produced, assembled, and marketed C.AI, and

then placed it into the stream of commerce," FAC ¶¶ 326, 335, with no facts explaining how *Google* allegedly did any of those things. *Supra*, Part II.A. That "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," does not plausibly state a claim. *See Iqbal*, 556 U.S. at 678.

To the extent Plaintiff alleges that Google should be liable because Google had some role in the development of AI technology generally or provided C.AI with cloud computing services, FAC ¶¶ 63, 68, these theories are inadequate. Under Florida law, "strict liability should be imposed only when a . . . manufacturer places [a product] on the market." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 502 (Fla. 2015). Florida vests manufacturers with a "special responsibility toward the consuming public" because they play a "central role in crafting the image of a product and establishing the consumers' expectations." *Id.* at 507, 510. That rationale is entirely absent where, as here, a defendant has not actually placed anything into the stream of commerce. *See Lalonde v. Royal Caribbean Cruises, Ltd.*, 2019 WL 144129, at *2 (S.D. Fla. Jan. 9, 2019) (dismissing strict product liability claim where defendant was not "'engaged in the business of selling' the product.") (quoting Restatement (Second) of Torts § 402A(1)). Indeed, on Plaintiff's own reckoning, Google *refused* to release any public-facing application without confirming its safety. FAC ¶¶ 25, 55, 57.

## B. Plaintiff Alleges No Facts in Support of Her Negligence Claims Against Google.

While Plaintiff purports to assert a common law negligence claim against Google, every allegation in support of that claim refers only to C.AI's alleged activity,

with nary a mention of Google's conduct. *See* FAC ¶¶ 361-371. Because Plaintiff utterly fails to "satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests," the negligence claim must be dismissed as to Google. *Twombly*, 550 U.S. at 555 n.3 (citing 5 Wright & Miller § 1202, at 94, 95).

### C. Google's Role as a Prior Employer, Investor, and Service Provider to C.AI Are Inadequate to Support a Claim for Aiding and Abetting.

In addition to her failed theories of direct liability, Plaintiff also seeks to hold Google liable as an aider and abettor of C.AI's alleged strict product liability violations. *See* FAC ¶¶ 325-344, 346-347. To state an aiding and abetting claim, a plaintiff must allege "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and [abettor]; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (citing *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991) and *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005)). As detailed in C.AI's motion to dismiss, Plaintiff fails to adequately allege any underlying violation by C.AI. Plaintiff's conclusory allegations also cannot establish that Google had actual knowledge or provided substantial assistance.

### *1. Google Did Not Have Knowledge of Any Underlying Violation.*

"Actual knowledge" requires more than mere negligence or even

19

"recklessness." *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1247 (M.D. Fla. 2013), *aff'd*, 677 F. App'x 573 (11th Cir. 2017). Yet Plaintiff fails to allege facts plausibly suggesting Google actually knew of any alleged tortious conduct by C.AI.

As a threshold matter, Google is aware of no authority suggesting this standard can be satisfied where, as here, the underlying tort is negligence or strict liability—as opposed to an intentional tort. *See In re Chiquita Brands Int'l, Inc.*, 2022 WL 18957608, at *38 (S.D. Fla. Dec. 15, 2022) (aiding and abetting "requires a showing that a defendant has rendered 'substantial assistance' to another in the commission of an intentional tort"); Restatement (Second) of Torts § 876 (1979) (imposing secondary liability only where defendant "knows that the other's conduct constitutes a breach of duty"); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489 (2023) ("[C]ourts have long recognized the need to cabin aiding-and-abetting liability to cases of truly culpable conduct.").

In any event, Plaintiff fails to allege knowledge of even the facts grounding her strict liability claims. The FAC asserts that Google (1) knew about C.AI's "intent to launch this defective product," FAC ¶ 347; (2) was "aware of the risks associated with the LLM," *id.* ¶ 347(a); and (3) had "actual knowledge regarding the foreseeable harms and privacy risks associated with C.AI," *id.* ¶ 72. But these are mere "conclusory allegations of knowledge," rather than factual allegations about *what* Google actually knew regarding any purported defects. *See Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 950 (11th Cir. 2014). Moreover, Plaintiff's knowledge allegations are, on their face, limited to the LaMDA model "built at Google," FAC ¶ 347(a), and

say nothing about Google's knowledge regarding the C.AI chatbot service at issue in this lawsuit, much less about the alleged "defects" Plaintiff claims tainted that chatbot, FAC ¶¶ 45-49, 328, 337 (referring to "flawed, biased or poor quality" and "sexually explicit" training material).

Indeed, the Supreme Court rejected a similar aiding-and-abetting theory in *Twitter, Inc. v. Taamneh*. There, the victims of an ISIS attack sought to hold Google, Twitter, and Facebook liable under a federal antiterrorism law on the theory that "[d]efendants allegedly knew that ISIS was using their platforms [for recruiting and fundraising] but failed to stop it from doing so." 598 U.S. at 477. The Court held that defendants' mere knowledge that "wrongdoers were using its services and fail[ure] to stop them" was insufficient to impose aiding-and-abetting liability. *Id.* at 503. As in *Taamneh*, the allegations here fall far short of showing that Google "consciously and culpably" participated in the purported design defects "in such a way as to help 'make it succeed.'" *Id.* at 497 (citation omitted). Otherwise, Plaintiff's theory would "take aiding and abetting far beyond its essential culpability moorings." *Id.* at 503.

### 2. *Google Did Not Provide Substantial Assistance for Any Alleged Wrongdoing.*

Plaintiff also does not plausibly allege that Google substantially assisted C.AI in producing and marketing its chatbot. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so, thereby enabling the breach to occur." *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003-04 (Fla. 4th DCA 2020) (citation omitted). As discussed, Plaintiff's conclusory allegation

that "the model underlying Character.AI was invented and initially built at Google," FAC ¶ 347(a), is unsupported by well pleaded facts and not entitled to an assumption of truth, *see supra*, Part II.A. Even if that were not so, Plaintiff alleges that Google acted to *prevent* the release of any LLM application to the public. FAC ¶¶ 25, 55, 57.

Plaintiff's "substantial assistance" theory appears to boil down, then, to the allegation that Google, through its cloud services agreement, provided "access to computing services and advanced chips" to C.AI. FAC ¶ 347(b). But Google's provision of ordinary business services cannot rise to the level of substantial assistance to a third party's alleged wrongdoing. This is no different from the "arm's length, passive, and largely indifferent relationship" between the defendant social media companies and ISIS that the Supreme Court found insufficient for secondary liability in *Taamneh*. 598 U.S. at 500. For the same reasons the social media defendants' "mere creation of those platforms" and provision of "services to the public writ large" fell short of substantial assistance to ISIS, *id.* at 499, Google's provision of cloud computing services to companies like C.AI is no basis for imposing secondary liability. Plaintiff does not allege that Google provided C.AI with anything more than a general service, available to numerous other business customers. *See Taamneh*, 598 U.S. at 505 ("Plaintiffs allege only that defendants supplied generally available virtual platforms that ISIS made use of, and that defendants failed to stop ISIS despite knowing it was using those platforms.").

If aiding-and-abetting liability were extended to mere vendors, "then ordinary merchants could become liable for any misuse of their goods and services, no matter

how attenuated their relationship with the wrongdoer." *See id.* at 489. The same is true of companies alleged to be previous employers or investors. Nor can Plaintiff rely upon Google's subsequent hiring of some of C.AI employees, FAC ¶ 347(a)—that transaction was undertaken after Setzer's death and, even apart from the chronology, still entailed no control over, or interest in, C.AI's service.

### D. Plaintiff's Unjust Enrichment Claim Fails Because No Benefit Was Conferred Upon Google.

Plaintiff's unjust enrichment claim is derivative of her underlying tort claims and thus fails with them. *See Muy v. Int'l Bus. Machs. Corp.*, 2019 WL 8161745, at *3 (N.D. Fla. July 19, 2019). It also fails for the additional reason that Plaintiff does not plausibly allege that Plaintiff or Setzer "directly confer[red] a benefit to" Google. *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017). While the FAC alleges that Setzer "confer[red] a benefit on Defendants in the form of subscription fees and, more significantly, furnishing personal data for Defendants to profit from," FAC ¶¶ 8, 403, 408, these purported benefits were conferred, if at all, to C.AI, and were not "unjust" for the reasons C.AI explains in its motion to dismiss. Nor is there any allegation that the benefits were ever passed to Google, even indirectly. While Google licensed C.AI's LLM, it is not alleged to have received any user data. FAC ¶ 80.

### E. Plaintiff Does Not Allege That Google Engaged in Any Unfair or Deceptive Trade Practice.

Plaintiff's FDUTPA claim against Google fails because none of the allegations suggests that Google engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce," *see* Fla. Stat. § 501.204(1), much less with the particularity

23

required under FRCP 9(b), *Smith v. REV Grp., Inc.*, 2023 WL 1861414, at *4 (M.D. Fla. Feb. 9, 2023). The FAC alleges that "Defendants engaged in deceptive or unfair acts or practices" by (1) "represent[ing] . . . that the AI chatbot operates like a human being," and (2) "provid[ing] advanced character voice call features that are likely to mislead and confuse users." FAC ¶¶ 417-418. Again, Plaintiff's general reference to "Defendants" constitutes improper group pleading, and the FAC is devoid of facts from which a court could infer that *Google* made any representations to consumers about the functionality of C.AI's service or developed any of its features.

### F. Plaintiff's Remaining Derivative Claims Fail

Plaintiff's claims for wrongful death and survival action are derivative of her primary claims and should be dismissed with them. *See Hernandez v. Aurobindo Pharma USA, Inc.*, 582 F. Supp. 3d 1192, 1213-14 (M.D. Fla. 2022).

## CONCLUSION

For these reasons, Plaintiff's FAC should be dismissed.

Dated: January 24, 2025

Respectfully submitted,

*/s/ Lauren Gallo White*

Jay B. Shapiro
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 W. Flagler Street, Suite 2200
Miami, FL 33130
(305) 789-3200
jshapiro@stearnsweaver.com

Lauren Gallo White (PHV) (Lead Counsel)
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Suite 3300

San Francisco, CA 94105
(415) 947-2000
lwhite@wsgr.com

Fred A. Rowley, Jr. (PHV)
Matthew K. Donohue (PHV)
WILSON SONSINI GOODRICH & ROSATI
953 E. Third Street, Suite 100
Los Angeles, CA 90013
(323) 210-2900
fred.rowley@wsgr.com
mdonohue@wsgr.com

*Counsel for Google LLC and Alphabet Inc.*

## LOCAL RULE 3.01(g) CERTIFICATE

I certify that, on January 13, 2025, and pursuant to Local Rule 3.01(g), counsel for the Google Defendants conferred with counsel for Plaintiff about this motion. Plaintiff's counsel consented to dismiss Alphabet, as well as Plaintiff's claims against Google for loss of consortium, negligence (failure to warn) and intentional infliction of emotional distress, but otherwise confirmed Plaintiff's opposition to the relief sought by this motion.

Dated: January 24, 2025          */s/ Lauren Gallo White*
                                 Lauren Gallo White