UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MEGAN GARCIA, individually and as the Personal Representative of the Estate of S.R.S III,<br><br>        Plaintiff,<br><br>  v.<br><br>CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FREITAS ADIWARSANA; GOOGLE LLC; ALPHABET INC.,<br><br>        Defendants. | Civil No. 6:24-cv-01903-ACC-EJK<br><br><br>PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO NOAM SHAZEER'S AND DANIEL DE FREITAS' MOTIONS TO DISMISS |

Plaintiff opposes the Motion to Dismiss (Doc. 63) filed by Defendant Daniel De Freitas ("De Freitas") and the Motion to Dismiss (Doc. 65) filed by Defendant Noam Shazeer ("Shazeer" and collectively "Individual Defendants") on the following grounds:

## I.      FACTUAL BACKGROUND

Shazeer is a co-founder of Character.AI, former CEO of the company, and one of the technical leads. First Amended Complaint ("FAC") ¶ 24, (Doc. 11). He is also a co-inventor of the generative AI chatbots themselves, having personally coded and designed a substantial portion of C.AI's Large Language Model ("LLM"). He has repeatedly acknowledged the potential dangers of the LLM to consumers in interviews, noting that even Google recognized the danger of the product he was designing when Shazeer first began working on it when he worked for Google. FAC ¶ 24.

De Freitas is also a co-founder of Character.AI, former President of the company, and also one of the technical leads. FAC ¶ 25. De Freitas is likewise a co-inventor of the generative AI chatbots who, alongside Shazeer, also personally coded and designed a substantial portion of C.AI's LLM.

The Individual Defendants were not mere officers heading up the Character.AI corporate entity. Rather, they are alleged to have directly and personally financed, designed, coded, engineered, manufactured, produced, assembled, and marketed the C.AI product. FAC ¶ 335. They did so despite knowing of the inherent dangers associated with C.AI, as evidenced in part by Shazeer's own public statements and De Freitas' direct knowledge that they were "developing products that should not be released to consumers yet." FAC ¶¶ 42, 65, 69, 337. Moreover, neither of the Individual Defendants made any attempt to provide an appropriate warning to customers despite knowing the product they had both personally designed and coded was unreasonably unsafe. FAC ¶¶ 339, 362-65, 375-376. The fact that the Individual Defendants decided to target children, who they understood to have a "premium value assigned to their sensitive personal data," renders the Individual Defendants' acts and omissions especially outrageous. FAC ¶¶ 389-90.

## II.    ARGUMENT

### A.    The Court Has Personal Jurisdiction over Individual Defendants

The Florida Supreme Court applies a two-step test to determine whether a court has personal jurisdiction over a nonresident. *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989). The first prong focuses exclusively on the plaintiff's

complaint, and whether it either tracks the language of Florida's long-arm statute (Fla. Stat. § 48.193(1)-(2)) or alleges facts sufficient to show that the defendant's actions fit within one or more subsections of the statute. *Id.* If the complaint contains sufficient allegations to establish that Florida's long-arm statute applies, the court then conducts the second prong of the inquiry, determining whether the defendant has "sufficient minimum contacts" with Florida to satisfy constitutional due process concerns. *Id.* "If Florida's long-arm statute does not provide a basis for personal jurisdiction under the initial statutory prong of this inquiry, the constitutional analysis is unnecessary." *Homeway Furniture Co. of Mount Airy, Inc. v. Horne*, 822 So. 2d 533, 536 (Fla. 2d DCA 2002).

"The alter ego theory of long-arm jurisdiction exists as a limited exception to the general, two-step process for establishing long-arm jurisdiction" under Florida's long-arm statute. *Bellairs v. Mohrmann*, 716 So. 2d 320, 322 (Fla. 2d DCA 1998). The procedure for pleading the alter-ego theory is as follows:

> [A] plaintiff must first allege a jurisdictional basis in his pleading. Then, if the defendant wishes to contest these allegations, he must file an affidavit specifically addressing the allegations. Once a defendant submits an appropriate affidavit, the plaintiff must support his allegations with an affidavit of his own.

*Bellairs*, 716 So.2d at 323. "The burden, however, does not shift back to the plaintiff when the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction," *Floridians for Solar Choice, Inc. v. PCI Consultants, Inc.*, No. 15-62688-CIV, 2020 WL 5757083, at *2 (S.D. Fla. Sept. 28, 2020). Similarly, "[t]he district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits."

*Damian v. Yellow Brick Cap. Advisers (UK) Ltd.*, No. 19-21538-CIV, 2019 WL 5887360, at *6 (S.D. Fla. Nov. 12, 2019); *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

The FAC is replete with the requisite allegations and citations to evidence that support personal jurisdiction over Individual Defendants under the alter ego exception to the Florida longarm statute. Individual Defendants fail to address any of the allegations related to the alter ego theory in their affidavits. Importantly, Defendants do not argue—nor could they in good faith—that this Court lacks personal jurisdiction over C.AI. Because C.AI is subject to personal jurisdiction here, so too are alter egos De Freitas and Shazeer.

> 1. <u>Plaintiff adequately alleges that Individual Defendants are subject to personal jurisdiction under the alter ego exception.</u>

"Under the alter ego theory, the complaint only must allege facts sufficient to pierce the corporate veil of the resident corporation." Bellairs, 716 So.2d at 322. To this end, the complaint must contain allegations demonstrating that (1) the corporation is the "mere instrumentality" of the nonresident defendant and that (2) the nonresident defendant engaged in "improper conduct in the ... use of the corporation." *Id.* at 323 (quoting *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114 (Fla. 1984)). The "mere instrumentality" element is met where the complaint alleges that the corporation was "dominated and controlled" by the nonresident defendant. *Damian*, 2019 WL 5887360, at *8, n.15.

Plaintiff has plausibly alleged that Individual Defendants[1] dominated and

---

[1] The FAC alleges that Google also controlled C.AI for an improper purpose. This discussion is limited to Individual Defendants because Google has not challenged this Court's personal jurisdiction over Google.

controlled C.AI such that the corporation was a mere instrumentality of Individual Defendants. Plaintiff alleges that "Shazeer and De Freitas were involved in every iteration of the evolution of LLMs that eventually created the infrastructure for the Character.AI LLM." FAC ¶ 63. "Shazeer and De Freitas specifically directed and controlled the design of C.AI in a manner which they knew would pose an unreasonable risk of harm to minor users of the product to minor users such as Sewell. Shazeer and De Freitas directly participated in the decision to design C.AI to prioritize engagement over user safety ... ." FAC ¶ 79. This type of control of policy and business practices is indicative of domination and control over the corporation. *See MCI Telecommunications Corp. v. O'Brien Mktg., Inc*., 913 F. Supp. 1536, 1543 (S.D. Fla. 1995).

The Amended Complaint contains allegations that C.AI lacked a separate business form from either De Freitas and Shazeer. Plaintiff alleges that C.AI had no real physical address, FAC ¶ 87; that it was financed almost exclusively by Google for the benefit of Shazeer, and De Freitas, FAC ¶¶ 68, 76, 92, 265, 326, 347(b); and that it was inadequately capitalized, FAC ¶ 92. Read together, the FAC states that C.AI was created by Individual Defendants to avoid safety requirements and push technology to market that they knew posed a risk to safety to the public. FAC ¶¶ 56, 65, 67, 79. Once the technology was available to consumers, "Individual Defendants announced ... that they were striking a $2.7 billion deal with Google, in the form of Google hiring Shazeer and De Freitas, FAC ¶ 80, "leaving behind a shell of a company" in C.AI. FAC ¶ 81. Shazeer, as a 30-40% shareholder in Character.AI, obtained a windfall of between $750 million and

$1 billion personally. FAC ¶ 86. These allegations plausibly allege that C.AI was nothing more than a mere instrumentality of Individual Defendants.

Plaintiff also clearly alleged that C.AI was formed for an improper purpose. The FAC is replete with allegations indicating that Individual Defendants created C.AI specifically for the purpose of avoiding safety protocols and to push their technology to market as quickly as possible. As alleged, Individual Defendants both wanted "to release LAMDA to the public and to integrate it into Google Assistant," but such requests "were denied by Google as contravening the companies' safety and fairness policies." FAC ¶ 56. Because of this denial, Shazeer and De Freitas immediately began working on a new "startup"—which would eventually become C.AI. FAC ¶ 60. All Defendants—including Shazeer and De Freitas—understood that they would have to leave Google to bypass the safety and fairness policies that were preventing them from quickly pushing their technology to market. FAC ¶ 67. "C.AI thus became the vehicle to develop the dangerous and untested technology over which Google ultimately would gain effective control. Shazeer and De Freitas's goal was building Artificial General Intelligence at any cost, at either Character.AI or Google." FAC ¶ 68. This is just a subset of the detailed and well-pleaded allegations in the Amended Complaint that plausibly allege that C.AI was created by Shazeer and De Freitas for an improper purpose.

Because Plaintiff adequately alleged that C.AI was a mere instrumentality of Shazeer and De Freitas, and that C.AI was created and used for an improper purpose, Plaintiff has adequately alleged a basis for this Court's exercise of

personal jurisdiction over Shazeer and DeFreitas. *See Bellairs*, 716 So.2d at 323. The burden thus shifts to Shazeer and DeFreitas to contravene these allegations with "an affidavit specifically addressing the allegations." *Id.* (emphasis supplied).

      2.   <u>Individual Defendants fail to rebut Plaintiff's allegations related to alter ego.</u>

Both Individual Defendants failed to contravene any of the allegations related to alter ego. While Shazeer and De Freitas submitted affidavits, they failed to address any of the facts related to the alter-ego exception. *Merkin v. PCA Health Plans of Fla., Inc.,* 855 So. 2d 137, 142 (Fla. 3d DCA 2003) (denying motion to dismiss for lack of personal jurisdiction because the defendants did not counter all the alleged facts that supported the alter-ego theory). Instead, they focus solely on the nature and extent of their personal contacts with the State of Florida. This is irrelevant to the alter-ego analysis, which operates as an exception to the long-arm statute. *Bellairs*, 716 So. 2d at 322. "Under the alter ego theory, the complaint only must allege facts sufficient to pierce the corporate veil of the resident corporation." *Id.*

Shazeer and De Freitas aver all the work they performed for C.AI was within the scope of their employment. This fact would be relevant to the extent that Plaintiff was alleging jurisdiction of Shazeer and De Freitas solely based on their position as an employee. But for purposes of the alter-ego theory, their scope of employment is irrelevant. Under alter-ego analysis, "courts will look through the screen of corporate entity to the individuals who compose it in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose."

*Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So. 2d 1114, 1117 (Fla. 1984). In such cases, the acts of the corporation are the acts of the individual. *Id.* Here, the Parties concede that this Court has personal jurisdiction over C.AI. Because Plaintiff has plausibly alleged that C.AI is the alter ego of Shazeer and De Freitas, the acts of C.AI become the acts of Shazeer and De Freitas.[2]

## B.    Plaintiff's Claims Against Individual Defendants Are Properly Plead

Individual Defendants castigate Plaintiff for using "shotgun pleading" to create a "hodgepodge of allegations [that] fails to explain what facts support which claims against whom.[3] This contention is unwarranted. The Eleventh Circuit has instructed that a "shotgun pleading" is characteristic of a complaint that makes it "virtually impossible" to determine what facts support what claims. *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1325 (11th Cir. 2015). If the complaint provides "adequate notice of the claims against [the defendants] and the grounds upon which each claim rests," it is not a shotgun pleading. *Id.* at 1323. Importantly, the liberal pleading standard applied in federal courts under Fed. R. Civ. P. 8— requiring only a short and plain statement of the claim showing that the pleader

---

[2] "Section 48.193(1)(b) provides that a nonresident subjects himself to the personal jurisdiction of a Florida court by 'committing a tortiousact *within* this state.' Thus, in order to assert specific personal jurisdiction over a nonresident defendant, the plaintiff must allege sufficient facts to prove that the defendant committed a tortious act in Florida." *Wiggins v. Tigrent, Inc.,* 147 So. 3d 76, 86 (Fla. 2d DCA 2014) (citing Florida's Long-Arm Statute). Plaintiff has sufficiently alleged facts to show that the Individual Defendants actively committed and/or participate in tortious act *within* the state of Florida that caused the harms described in the FAC. *See infra* pp. 9-19. Thus, the Individual Defendants are also subject to *specific personal jurisdiction* for the tortious acts they committed in Florida. *See Wiggins,* 147 So. 3d at 86 (describing out-of-state conduct or communication directed into Florida in the context of personal jurisdiction). "Importantly, however, under Florida law, this corporate shield doctrine is inapplicable where the corporate officer commits intentional torts." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013).

[3] De Freitas Mot. to Dismiss at 11.

is entitled to relief—is not altered by the Eleventh Circuit's "shotgun pleading" precedent. *See Mayle v. Felix*, 545 U.S. 644, 649 (2005) (citing Fed. R. Civ. P. 8).

As the FAC unambiguously alleges, Plaintiff seeks to hold Individual Defendants responsible—along with Google and C.AI—for the development, manufacture, marketing, and sale of dangerous and defective AI software. The FAC alleges that all Defendants worked together toward the design and marketing of the product at issue in this litigation, making individual counts against each Defendant unpracticable and unnecessary. Indeed, the Eleventh Circuit expressly permits the grouping of defendants where the complaint could be read to "aver that all defendants are responsible for the alleged conduct." *Bluegreen Vacations Unlimited, Inc. v. Montgomery L. Firm, LLC*, 2020 WL 12182222, *2 (S.D. Fla. Nov. 30, 2020) (quoting *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000)). This Court should reject Individual Defendants boilerplate argument about the grouping of defendants

## C. Plaintiff Plausibly Alleges that Individual Defendants Each Committed Tortious Acts Individually

Individual Defendants argue that Plaintiff fails to allege facts that could support personal liability, but this is mistaken. In fact, the FAC is replete with references to individual actions and omissions by both individual defendants in the design and distribution of the generative AI chatbot software underpinning C.AI and the LLM upon which it was trained. Under well-settled principles of Florida law, Individual Defendants may be personally liable for their own tortious conduct. The Court should deny their requests for dismissal at this early pleading

stage.

"The existence of a corporation does not shield an individual tortfeasor from potential personal liability." *Fla. Specialty, Inc. v. H 2 Ology, Inc.*, 742 So. 2d 523, 527 (Fla. 1st DCA 1999). On the contrary, individual officers and agents of a corporation "are personally liable where a tort has been committed." *Id.* This is true even if the tortious acts are "performed within the scope of their employment as corporate officers or agents." *Id.* However, the individual officer must have personally breached a duty, "as opposed to doing so technically or vicariously." *McPherson v. Wells Fargo Bank, N.A.*, No. 1:13-CV-20545-KMM, 2013 WL 12059608, at *3 (S.D. Fla. Apr. 10, 2013).

Individual Defendants strain credulity by suggesting that Plaintiff has not alleged any fact specific to each of them.[4] On the contrary, both Individual Defendants were personally and directly involved in designing and creating (coding) the dangerously defective software at issue. FAC ¶¶ 24, 25, 79. Shazeer, who personally coded and designed a substantial portion of C.AI's LLM, acknowledged and understood the potential dangers to consumers of what he had helped to create in several interviews. FAC ¶ 24, 65. He conceded that the product he personally helped to design had been rushed out the door, stating, "The most important thing is to get it to customers like, right, right now so we just wanted to do that was quickly as possible …." FAC ¶ 42; FAC ¶ 64.

---

[4] Shazeer Mot. to Dismiss at 11 ("Plaintiff's specific claims against Mr. Shazeer do not specify any personal conduct of his that purportedly gives rise to those claims."); De Freitas Mot. to Dismiss at 14 ("[T]he hundred-plus-page FAC is virtually devoid of allegations directly related to Mr. De Frietas's conduct.").

Despite knowing the risks of the product he had designed, Shazeer expressed indifference—even excitement—at getting their product into the hands of consumers, telling reporters, "I love that we're presenting language models in a very raw form" and that customers (including vulnerable children) would have "a chance to really play with the core of the technology." FAC ¶ 69.

Like Shazeer, De Freitas "personally coded and designed a substantial portion of the C.AI's Large Language Model." FAC ¶ 60. Also like Shazeer, De Freitas had been warned by multiple sources that they personally "were developing products that should not be released to consumers yet." FAC ¶ 65. As hands-on developers of the LLM that would ultimately power the generative AI chatbots of C.AI, both Shazeer and De Freitas "possessed a unique understanding of the risks they were taking with other peoples' lives." FAC ¶ 65. Individual Defendants knew the risk of harm to the public and minors in particular related to the use of untested LLM product. A legal duty will arise "whenever a human endeavor creates a generalized and foreseeable risk of harming others." *McCain v. Florida Power Corp.,* 593 So. 2d 500, 503 (Fla. 1992).

Individual officers are personally liable for direct and personal tortious conduct resulting in a foreseeable risk of harm. *Id.* In Florida Specialty, a company manufactured an extremely corrosive saltwater solution that posed a substantial risk to motor vehicles. 742 So.2d at 525. When the company allowed its solution to flow into a street and cause damage to passing vehicles, the plaintiffs named not just the company but also its "sole stockholder, sole officer and sole employee." *Id.* The court rejected the officer's motion to dismiss, writing that he was "not entitled

to dismissal at this stage of the litigation" because the complaint had alleged that he "actually committed the tortious act at issue here by negligently causing the [solution] to flow onto the public street … ." *Id.* at 527. The court explained that officers and agents are liable for their own actions, and that this is so "even if no argument is advanced that the corporate form should be disregarded." *Id.* at 528 (quoting *White-Wilson Med. Ctr. V. Dayta Consultants, Inc.*, 486 So.2d 659, 661 (Fla. 1st DCA 1986).

Similarly, in *Estate of Canavan v. National Healthcare Corp.*, the estate of a deceased man filed suit against a nursing home and the sole member of its "governing body." 889 So. 2d 825, 827 (Fla. 2d DCA 2004). The trial court granted the individual member a directed verdict, but the Second District reversed, noting that "there was evidence by which the jury could have found that [the individual's] negligence in ignoring the documented problems at the facility contributed to the harm suffered by [decedent]." *Id.* The court rejected the argument that liability could arise only by piercing the veil, holding that the member's "alleged negligence constituted tortious conduct, which is not shielded from individual liability." *Id.*

Individual Defendants rely on In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, 4:22-MD-3047-YGR, 2024 WL 4719068 (N.D. Cal. Nov. 7, 2024), but the district court's decision is distinguishable. There, the court dismissed Mark Zuckerberg from claims of fraudulent and negligent concealment and misrepresentation asserted over him personally. *Id.* at *1. The complaint contained "generalized allegations" that

Zuckerberg "directed, participated in, knew of, and in fact served as the guiding spirit behind Meta's tortious concealment and omissions." *Id.* at *3. The court explained that "control alone … is insufficient ot establish a corporate officer's participation." *Id.* at *4. Here, Plaintiff provides far more than "generalized allegations" and does not allege that Individual Defendants are liable based on "control alone." Rather, liability rests upon their active and direct participation in both designing and creating the defective AI software, their actual (not presumptive) knowledge of the risks, their deliberate decision not to include any warnings to customers, and their actively targeting the product to children notwithstanding their knowledge of the risks. The facts alleged in the FAC bear no resemblance to the generalized allegations deemed insufficient in Social Media Adolescent Addiction.

In contrast, as in Florida Specialty and Canavan, Individual Defendants each committed tortious acts and omissions giving rise to liability in this case. They both played a substantial, hands-on role in designing and manufacturing the LLM that was used to power the generative AI chatbots of C.AI. Moreover, Plaintiff alleged that Individual Defendants in fact "knew that C.AI came with inherent, and institutionally unacceptable, risks and marketed it to children under age 13." FAC ¶ 93. Both Individual Defendants "had actual knowledge, including information obtained from Google and through their prior work at Google over some years" that the product they had personally helped design and assemble "would cause harm and decided to launch and target their inventions at children anyway so that they could profit." FAC ¶ 96. Individual Defendants created a

product that they knew had a forseeable risk of harm to users but developed and distributed the product to the public. Accordingly, the Individual Defendants conduct resulted in a forseeable risk of harm to users of the product and a concomitant duty to act in a non-tortious manner. *McCain*, 593 So. 2d at 503. Whether that duty was breached is reserved for the fact-finder. *Id.* at 504.

If all the above alleged facts had occurred without the creation of the Character.AI corporate entity, Individual Defendants would still undoubtedly be liable for their individual tortious conduct. Plaintiffs do not seek to hold Individual Defendants liable "merely by reason of [their] official character."[5] After all, these were not merely members of upper corporate management – they were in fact the ones crafting and assembling the defective product. See FAC ¶ 63 (Individual Defendants "were involved in every iteration of the evolution of the LLMs that eventually created the infrastructure for the Character.AI LLM."). They both individually understood the dangers inherent to the product they had designed, yet they pushed forward rushing the faulty product to market nonetheless. That Shazeer and De Freitas happened to have also been the CEO and President of Character.AI is irrelevant to the analysis of their liability under Florida law, because this was not a product designed and assembled by subordinate employees of the corporation. As a result, both Individual Defendants would be personally liable to Plaintiff for their tortious conduct regardless of whether the Character.AI corporate entity existed.

---

[5] De Freitas Mot. to Dismiss at 11 (quoting *Boyd v. Petco Animal Supplies Stores, Inc.*, No. 3:18-cv-639-J-32PDB, 2018 WL 4360621, at *2 (M.D. Fla. Sept. 13, 2018)).

**D.    Plaintiff Alleges Plausible Negligence and Products Liability Claims**

1.    <u>Defective Design and Failure to Warn Claims are Properly Plead</u>

Plaintiff has alleged that Indvidual Defendants, as co-founders and lead programmers, specifically directed and controlled the design of C.AI, prioritizing engagement over user safety. FAC ¶¶ 24, 25, 43, 65, 69, 79. 337. These allegations go beyond mere control and knowledge, indicating Individual Defendants' active participation in the defective design. *Id*.

Plaintiff alleges that Individual Defendants, knowingly marketed C.AI to children under age 13 despite being aware of its inherent risks. The FAC alleges that Individual Defendants participated in or directed the failure to provide adequate warnings. Under Florida law, corporate officer liability requires more than mere knowledge; it requires active participation or direction in the wrongful conduct. The complaint specifies that Individual Defendants were aware of the risks associated with C.AI and still chose to market it to minors, thereby failing to provide necessary warnings. FAC ¶¶ 93, 94, 96.

Florida law holds that corporate officers can be personally liable for torts they commit or participate in, even if performed within the scope of their employment. *La Pesca Grande Charters v. Moran*, 704 So. 2d 710, 712 (Fla. 5th DCA 1998); *White-Wilson Medical Center v. Dayta Consultants, Inc.*, 486 So. 2d 659, 661 (Fla. 1st DCA 1986). Florida law is clear that a corporate officer is liable for torts that they commit or particpate in. A contrary rule would enable an director or officer to perpetrate flagrant injuries and escape liablity behind the shield of their representative role. The FAC details Individual Defendant's involvement in the

decision-making process formulating, directing, and controlling the design of the product. FAC ¶¶ 55, 56, 60, 63, 79. Moreover, the Individual Defendants formulated, directed, controlled, had the authority to control, or participated in the decision to release a product with a forseeable risk of harm to children who, as users, become the guinea pigs for the product development and output. FAC ¶¶ 93, 339, 362-65, 375-76.

The FAC alleges specific actions and decisions leading to the wrongful conduct, and is not based merely upon liability from their official role at the company.[6] Individual Defendants acknowledged the potential dangers of the C.AI product. FAC ¶¶ 24, 25, 43, 55-58, 65. Individual Defendants knowingly and deliberately ignored these risks, racing to get the C.AI product to market as quickly as possible without any warning of the danger. FAC ¶¶ 64, 67, 69, 79, 93, 94, 96, 97, 228, 296-98.

Finally, De Freitas argues that Plaintiff failed to sufficiently plead her failure to warn claim because the FAC does not specifically allege that Plaintiff "had a practice of restricting or monitoring Sewell's access to technology, that she used parental-restriction features, or that she routinely read warnings included alongside software downloads."[7] Certainly, a habit of failing to heed warnings may support an argument for comparative negligence, *Am. Cyanamid Co. v. Roy*,

---

[6] Plaintiff notes that De Freitas submitted an affidavit in support of his Motion to Dismiss with regard to personal jurisdiction, (Doc. 59); however, therein De Freitas did not address any of Plaintiff's alter ego allegations, and they are therefore presumed true for purposes of the Court's ruling on his motion to dismiss.

[7] De Freitas Mot. to Dismiss at 15-16.

498 So. 2d 859, 860 (Fla. 1986), and evidence that a plaintiff in fact knew of a warning and actively disregarded it can fully defeat a failure to warn claim. *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 22 (Fla. 4th DCA 2022). But De Freitas cites no case standing for the proposition that specific factual allegations of the sort he described is a requisite in failure to warn claims brought under Florida law. Rather, as De Freitas himself points out, Plaintiff expressly alleged that had she been warned of the dangers of the C.AI software, she would have acted to protect her son. FAC ¶¶ 342, 377, 384-85.

The one authority cited in support of Defendant's argument, *Cooper v. Old Williamsburg Candle Corporation*, expressly supports this point.[8] In *Cooper*, the district court dismissed the plaintiff's failure to warn claims on the basis that the plaintiff "admit[ted] that she never read the warnings on the label" of the product. 653 F. Supp. 2d 1220, 1225 (M.D. Fla. 2009). Critically though, the court adjudicated this issue with the benefit of a full evidentiary record on summary judgment—not on a motion to dismiss at the initial pleading stage. *Id.* Inasmuch as Defendant offers no authority to the contrary, De Freitas (or any of the Defendants) has not demonstrated that dismissal of these claims is proper.

2.    <u>Defendants Misstate the Appropriate Standard</u>

Plaintiff is not required to allege Individual Defendants' specific individual involvement in the negligent acts where they both have treated the entirety of the company as their alter-ego. The acts of the alter ego company are then imputed to

---

[8] De Freitas Mot. to Dismiss at 15.

the Individual Defendants and must be taken as true at this stage of the litigation.

Plaintiff has adequately alleged that C.AI was a mere instrumentality of Individual Defendants and that C.AI was created and used for an improper purpose. Plaintiff has therefore sufficiently pleaded a basis for the imputation of the C.AI's wrongful acts to De Freitas himself. See FAC ¶¶ 56, 65, 67, 68, 76, 79, 87, 92, 265, 326, 347(b). The burden has thus shifted to Individual Defendants to demonstrate that Plaintiff has failed to state a cause of action as to counts VII, VIII and XI, which Defendants have not done. The only basis asserted as to these counts is the failure to alleged active participation, which is not necessary given that Plaintiff alleged Individual Defendants treated the company as their alter-ego.

However, even if the Court were to find active participation is required, "it is well-settled [] that individual officers and agents of a corporation may be held personally liable for their tortious acts, even if such acts were committed within the scope of their employment or as corporate officers." *First Fin. USA, Inc. v. Steinger*, 760 So. 2d 996, 997-998 (Fla. 4th 2000) (quoting *Orlovsky v. Solid Surf, Inc.*, 405 So. 2d 1363 (Fla. 4th DCA 1981)).

Here, the FAC specifically alleges facts showing both Shazeer's and De Freitas's involvement in several torts that led to the plaintiff's injuries (in the sense they used Character.AI as their alter ego) or "at least knowledge amounting to acquiescence in the wrongful act." *Costa Invs., LLC v. Liberty Grande*, LLC, 353 So. 3d 627, 634 (Fla. 4th DCA 2022) (emphasis added) (quoting Speiser et al., 1A AM. LAW OF TORTS § 4:24 (2022))); *see also Home Loan Corp. v. Aza*, 930 So. 2d 814, 815-16 (Fla. 3d DCA 2006) (reversing dismissal of a complaint for negligent

misrepresentation where the complaint alleged the corporate officer prepared and signed the document containing the misrepresentation).

Nevertheless, Plaintiff need not allege Individual Defendants' personal participation in discrete acts alleged to constitute harm to Plaintiff. Under the alter ego theory, C.AI's allegedly negligent acts are imputed to Individual Defendants, irrespective of whether they personally directed those acts because piercing the corporate veil is distinct from the participation theory for finding liability. *See Costa Invs.*, LLC, 353 So. 3d 627 at 634 (citing with approval *Sereda v. Ctr. City Acquisitions, LLC,* 222 A.3d 1161, 1168 (PA Sup. Ct. 2019) (discussing distinction between the active participation theory of liability and tort liability pleaded on the basis of a corporate officer treating the corporation as their alter ego).

As discussed in Sereda, cited with approval by Florida's Fourth DCA in Costa Invs., LLC, the doctrine of piercing the corporate veil is distinct from the participation theory for finding liability because there is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for "any liability-creating act performed behind the veil of a sham corporation." *Sereda*, 222 A.3d 1161 at 1168 (internal citation omitted). Further, "where the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore, its acts are truly his." *Id.* (citing *Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa. Super. 1998).

3.    <u>Plaintiffs Plausibly Allege that C.AI Is a Product</u>

Both C.AI and De Freitas argue that C.AI is a "service," not a product. Florida's limited products liability statutory framework does not define the term

"product." Fla. Stat. § 768.1256-768.1257. Indeed, the trend in product liability cases is to reject an overly simplistic approach to web-based consumer applications. The court should follow this approach and conclude on the pleadings that the claims here concern the fault of designers and distributors of the application for their conduct that resulted in the release and distribution of a dangerous product into the flow of commerce.

An "all or nothing" approach to product definition is not fit for commercial digital platforms, and platforms running general purpose AI algorithms as human-like chatbots are an acute illustration of this reality. *Doe v. Lyft, Inc.*, No. 23-2548-JWB-TJJ, 2024 WL 4651015, at *2-3 (D. Kan. Nov. 1, 2024). This case presents a nationwide issue of first impression on how products liability law applies to chatbot applications employing anthropomorphic design features and LLMs to predict and generate responses to user prompts, combined with Defendants' business practices in marketing and introducing the application into the stream of commerce. *See Brookes v. Lyft,* 2022 WL 19799628 * 1 (Fla. 15th Cir. Ct. Sept. 30, 2022) ("the negligent design in conjunction with Lyft's business practices caused Defendant to be distracted while driving thereby causing the accident involving the Plaintiff"); *T.V. v. Grindr*, LLC, No. 3:22-CV-864-MMH-PDB, 2024 WL 4128796 *22 (M.D. Fla. Aug. 13, 2024) ("[t]he definition of 'product' should be fluid to accommodate developments in technology and is not susceptible to a 'crabbed' definition.' Rather . . . [d]ecisions regarding what constitutes a 'product' are reached in light of public policy behind the imposition of strict product liability) (internal citation omitted); *Neville v. Snap. Inc.*, No. 22STCV33500 (Cal.

Sup. Ct. Jan. 2, 2024), Ord. Sustaining in Part and Overruling in Part Def.'s Demurrer to Plaintiff's Second Amend. Complaint, at 26 ("The tangible product versus (intangible) service test is a false dichotomy" and the reliance on the Third Restatement definition "falls short" due to its "obsolescence").

Both state and federal courts applying Florida law have held that software applications, like the C.AI platform, are appropriately deemed "products" for purposes of products liability law. In *Brookes v. Lyft Inc.*, the Fifteenth Circuit Court of Florida concluded that a rideshare app itself was a product, not a service. 2022 WL 19799628, at *3 . The court noted that the defendant's connection to the application "is not simply the use of it to provide a service." *Id.* Rather, the court explained that Florida's definition of a product is kept "fluid to accommodate developments in technology," that Lyft was "the designer and distributor of the application," and that it should be "responsible for any harm caused by its digital application in the same way the designer of any defective physical product is held accountable." *Id.*; accord *Doe v. Lyft, Inc.*, 2024 WL 4651015, at *3 (holding that "software or algorithmic product with sufficient similarities to a tangible product to subject it to product liability law"); *Ameer v. Lyft, Inc.*, No. ED 112455, 2025 WL 679373, at *7 (Mo. Ct. App. Mar. 4, 2025) (same); *see also West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 92 (Fla. 1976) (holding that "the cost of injuries or damages … resulting from defective products should be borne by the makers of the products who put them into the channels of trade").

Last year, a district court in the Middle District, in *T.V. v. Grindr, LLC* applied the analysis in *Brookes* to conclude that another software app, Grindr, also

constituted a product for purposes of Florida's product liability law under the facts alleged.[9] No. 3:22-CV-864-MMH-PDB, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024). Important to the district court's analysis, the plaintiff alleged that the defendant designed the Grindr app for its business, made design choices for the app, placed the app into the stream of commerce, distributed the app to the global marketplace, marketed the app, and generated revenue and profits from the app. *Id.* "As set forth by the Florida Supreme Court in West and its progeny, product liability shifts the burden to ensure a safe, non-defective product on the party who is most able to protect against the harm and bear the cost." *Id.* (quoting *Brookes*, 2022 WL 19799628, at *3).

Courts in other jurisdictions have reached similar conclusions. *See, e.g., In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 745 F. Supp. 3d 869, 905 (N.D. Cal. 2024) (holding alleged defects in Uber app "have similar plausible analogues in tangible products"); *A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814, 817, 819 (D. Or. 2022) (holding the designer of chatroom app could have "design[ed] a product so that it did not match minors and adults"); *Turnage v. Oldham*, 346 F. Supp. 3d 1141, 1152 (W.D. Tenn. 2018) (upholding products liability claim premised on defective software used in jail); *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, Sales Pracs., & Prods. Liab. Litig., 978 F. Supp. 2d 1053, 1101 (C.D. Cal. 2013) (plaintiff could maintain products liability claim arising from software defects in

---

[9] Plaintiff acknowledges that *T.V. v. Grinder* is the report and recommendation of the magistrate judge and has not been formally adopted by the Court as of the filing of this Response. Nevertheless, the reasoning expressed in *T.V. v. Grindr* is in accord with sound legal principles and the weight of authority cited elsewhere herein.

automobile).

Here, as in *Brookes* and *Grindr*, Plaintiff sufficiently alleged that Defendant "designed, coded, engineered, manufactured, produced, assembled, and placed C.AI into the stream of commerce. C.AI is made and distributed with the intent to be used or consumed by the public as part of the regular business of Character Technologies, the seller or distributor of the Character AI." FAC ¶ 98. The C.AI software application is "uniform and generally available to consumers," FAC ¶ 98; is "mass marketed" and "designed to be used and is used by millions of consumers," FAC ¶ 99; is "advertised in a variety of media in a way that is designed to appeal to the general public and in particular adolescents," FAC ¶ 101; and is "brand[ed] … as a product and treated as a product by ordinary consumers," FAC ¶ 103. C.AI even admits that C.AI is a product in its communications to the public, jobseekers, and investors. FAC ¶ 107. In a podcast interview Shazeer described C.AI as follows: "We're like an AI first company and a product first company." *Id.* C.AI even attempt to minimize these public admissions by its CEO, Plaintiff—and this Court—should be permitted to take Defendant at its word.

### 4.  Plaintiff Sufficiently Alleged an IIED Claim

The FAC sufficiently alleges Defendants' conduct was outrageous and beyond all bounds of decency, as it involved engaging in harmful and inappropriate conversations with a minor, leading to his suicide.[10] *See* FAC ¶¶ 78,

---

[10] Recently, Plaintiff discovered there were several "Sewell Setzer III" AI chatbots on the C.AI platform.  Plaintiff shall be seeking leave to amend to incorporate these facts as well.

93, 129, 189, 192-3, 203-208, 221, 297, 390). These allegations "involve a high probability of causing severe emotional distress," *see Williams v. City of Minneola,* 575 So. 2d 683, 692-93 (Fla. 5th DCA 1991), sufficient to "arouse" the "resentment" of "an average member of the community" against Defendant and "lead them to exclaim, Outrageous!" *T.V. v. Grindr, LLC,* No. 3:22-cv-864-MMH-PDB, 2024 U.S. Dist. LEXIS 143777, at *103-04 (M.D. Fla. Aug. 13, 2024) ("To the extent this issue presents a close call, discovering facts might make the call less so.") (quoted authority omitted). This is even more so considering that a "heightened degree of outrageousness can be supplied by the unequal positions of the parties in a relationship which gives rise to the tort, where one asserts and has the power to severely damage the other." *Dependable Life Ins. Co. v. Harris,* 510 So. 2d 985, 988 (Fla. 5th DCA 1987).

### III.    Conclusion

For the foregoing reasons, the Court should deny the motions.

Dated: March 21, 2025.                    Respectfully submitted,

*/s/ Matthew P. Bergman*
Matthew P. Bergman (*pro hac vice*)
Social Media Victims Law Center
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
Ph: (206) 741-4862
matt@socialmediavictims.org
