**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| MEGAN GARCIA, individually and as the Personal Representative of the Estate of S.R.S III,<br><br>Plaintiff,<br><br>v.<br><br>CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FRIETAS ADIWARSANA; GOOGLE LLC; ALPHABET INC.,<br><br>Defendants. | Civil No. 6:24-cv-01903-ACC-EJK<br><br>PLAINTIFF'S RESPONSE IN OPPOSITION TO CHARACTER TECHNOLOGIES, INC.'S MOTION TO DISMISS |

Plaintiff opposes the Motion to Dismiss (Doc. 59) filed by Defendant CHARACTER TECHNOLOGIES, INC. ("C.AI") on the following grounds:

## I.   FACTUAL BACKGROUND

Defendant Character Technologies, Inc. is an Artificial Intelligence (AI) powered software startup founded by two former Google engineers, Noam Shazeer and Daniel De Frietas. Frst Amended Complaint ("FAC") ¶ 53 (Doc. 11). Character.AI's chatbot product is powered by a Large Language Model (LLM). LLMs build on established concepts in computer science with several distinct advancements that allow them to operate at a scale and effectiveness previously unseen. FAC ¶ 55. LLMs are programmed to learn the patterns and structure of input training data and then extrapolate from those patterns in new situations. FAC ¶ 46. C.AI created a chatbot application that allows users to have real time written and verbal conversations with "Characters" created with added context

1

provided by other customers. FAC ¶ 130. The C.AI website and application uses a neural language model to read huge amounts of text and respond to prompts using that information. FAC ¶ 131. However, fundamental to how the technology works, there is no way to guarantee that the LLM will abide by these user specifications. Indeed, LLMs, like those provided by Character.AI, are designed to be more heavily influenced by the patterns in training data than inputted user specifications. FAC ¶ 141.

Defendants designed C.AI in a manner intended to convince customers that C.AI bots are people, even marketing it as "AIs that feel alive," powerful enough to "hear you, understand you, and remember you." FAC ¶¶ 51,142. Defendants assign human traits to their LLM, to present an anthropomorphic user interface design that causes C.AI users to perceive the system as more human than it is. FAC ¶ 143. For example, even though the C.AI bots do not think or pause while they are typing to consider their words, Defendants designed C.AI chatbots to make it appear as though they do. FAC ¶ 49.

Sewell Setzer began using C.AI on April 14, 2023, just after he turned 14 years old. FAC ¶ 172. Within a couple of months, Sewell developed an unhealthy dependency on C.AI's chatbots. FAC ¶¶ 173, 174. Sewell developed depression and a mood disorder stemming from his harmful dependency on C.AI's chatbots and the specific abuses C.AI perpetrated through its intentional design of its chatbot product. FAC ¶¶ 182, 203, 204. Unbeknownst to Sewell's parents, the C.AI chatbot outputs were sexually exploitative and abusive of Sewell and ultimately encouraged him to commit suicide. FAC ¶¶ 193-199, 206-207. On February 28,

2

2024, Sewell took his phone into the bathroom and in writing told the C.AI chatbot that he intended to "come home." FAC ¶¶ 218-220. In response, the C.AI chatbot wrote, "Please come home to me as soon as possible, my love." FAC ¶ 220. Seconds later, Sewell died by a self-inflicted gunshot wound to the head. FAC ¶ 221.

## II.     ARGUMENT

### A.     The First Amendment Does Not Bar Plaintiff's Claims

C.AI argues that Plaintiff's claims "seek to impose liability for expressive content and violate the rights of millions of C.AI users to engage in and receive protected speech." Character Technologies, Inc.'s Mot. to Dismiss ("MTD") at 1. C.AI asks the Court to radically expand First Amendment protections from expressions of human volition to an unpredictable, non-determinative system where humans can't even *examine* many of the mathematical functions creating outputs, let alone control them. FAC ¶ 141. The Court should decline this offer.

To assert a First Amendment defense regarding human expression, there must first be human expression. Expression requires a intention to convey ideas or meaning. Films, songs, and video games work this way. Humans design the specific plots, characters, words, and actions that communicate a message. LLM-based products like Character.AI do not work like this. They serve as "stochastic parrots," automatically generating human language without understanding the meaning of that which they generate. FAC ¶¶ 23-24.[1] Defendants ask the court to

---

[1] The term was coined by Professor Emily Bender, who co-authored a paper, *"On the Dangers of Stochastic Parrots: Can Language Models Be Too Big?", FAC* ¶¶ 23-24, which identified risks inherent to large language models.

3

radically expand First Amendment protections, from works where humans curate every aspect to an unpredictable, non-determinative system where humans can't even *examine* many of the mathematical functions creating outputs, let alone control them. FAC ¶ 141.

No court has ever ruled that a speaker engages in First Amendment-protected expression when they compile computer-outputs using metrics they can neither understand nor explain.. Defendants try to have it both ways. They claim C.AI's outputs are speech because they contain combinations of words. But they avoid attributing C.AI's messages to Shazeer, De Frietas, or any other human shaping the product. Speech cannot be protected without human intentionality behind it.The First Amendment is foundational to American democracy, creating an edifice to ensure that private voices are heard, their beliefs respected, and their government accountable. The freedom was not intended to be a hollow vehicle to disseminate any kind of expression, and the Court should decline to accept such an expansive interpretation here.

1. <u>C.AI cannot raise a listeners' rights argument, and even if they can, it cannot shield them from liability</u>

C.AI claims that imposing tort liability on its AI generated outputs "would violate the public's right to receive speech." (CAI MTD at 9). It argues that LLM-generated AI outputs were protected speech, but not necessarily *their* speech, or anyone's at all. MTD at 10. It then argues that imposing liability on the harmful "speech" C.AI directed to Sewell Setzer, which they do *not* claim was protected, would unacceptably chill their *other* protected speech to future, indeterminate

users. *Id.*

Each step in this argument is flawed. First, "a litigant must assert his or her own legal rights and interests, [not] the legal rights or interests of third parties," *Powers v. Ohio*, 499 U.S. 400, 410 (1991). C.AI ignores this rule to scrupulously *avoid* claiming to be the speaker of the outputs its AI chatbots send and inexplicably tries to assert the rights of others instead. MTD at 10. In every case where a technology platform has raised listeners' rights, those rights were derivative of a named party's rights as speaker or listener, or part of a facial or overbreadth challenge. *See, e.g., TikTok v. Garland*, 145 S.Ct. 57, 68 (2025) (Slip. Op. 6) (speakers joined); *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 (9th Cir. 2024). Not so here.

There is a limited exception to *Powers* when the litigant has a "close relationship" to the third party and the third party cannot "protect his or her own interest." 499 U.S. at 410. Here, neither is true. Defendants do not confine themselves to parties close to them. On the contrary, they attempt to assert the entire "*public's* right to receive a wide swath of speech." MTD at 12. Nor do they explain why "the public," or even just their users, face obstacles to defending their own rights. *Id.*

Finally, listeners' rights can only begin, not end, the First Amendment analysis. Notably, the cases Defendants cite as support for its listeners' rights argument are inapposite here. Both *Lamont v. Postmaster General*, 381 U.S. 301 (1965) and *Kleindienst v. Mandel*, 408 U.S. 753 (1972) involved human speakers. And if there are further flaws in Defendants' argument—if AI output is not speech at all, for example, or if the speech falls within an exception to the First

5

Amendment—listeners' rights cannot save it. *Cf. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (applying listeners' rights to commercial speech but still giving it less First Amendment protection than other forms of speech).[2]

2. <u>AI output is not "speech" unless it reflects human expressive intent to communicate a message</u>

The First Amendment clause does not protect just any set of letters that happen to form a word, any set of words that happen to form a sentence, or even any set of sentences, even when those words and sentences so closely imitate the manner and cadence of actual human speech. Rather, for words to constitute "speech" under the First Amendment, there must be (1) a speaker; and (2) intention behind the expression.

Over forty years ago, the Eleventh Circuit held that a non-human entity, even when possessed with an exceptional speech-like ability, "cannot be considered a 'person' and is therefore not protected by the Bill of Rights." *Miles v. City Council of Augusta, Ga.* 710 F.2d 1542, 1544 fn.5 (11th Cir. 1983) (holding that a "[t]alking [c]at" had no First Amendment rights). *Miles* presents a large obstacle to Defendants' First Amendment challenge because they are attempting to attribute speech to a non-person entity. Defendants avoid attributing C.AI's words to Shazeer, De Frietas, or anyone else who shaped C.AI's product. But without a

---

[2] *See also Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 856 F.2d 1563, 1566 (D.C. Cir. 1988) (listeners rights under the freedom of speech pre-supposes a willing speaker); *Martin v. EPA,* 271 F. Supp. 2d 38, 47 (D.D.C. 2002) (listener's right is "derivative of the First Amendment rights of the speaker"); *Cato Inst. v. SEC,* 438 F. Supp. 3d 44, 53–54 (D.D.C. 2020) (rights to free speech and association exist only vis-à-vis specific expressive activity).

person as speaker, this argument falls short. Defendants cannot have it both ways.

Second, protected speech must be expressed with intention. In *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, the Court held that the state "may not compel affirmance of a belief with which the speaker disagrees." 515 U.S. 557, 573 (1996); *see also Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 49 (2006) (First Amendment violated "where the complaining speaker's own message was affected by the speech it was forced to accommodate"). In *Robinson v. Jacksonville Shipyards, Inc.*, the Middle District of Florida held that First Amendment protections extend only to entities that intend to express themselves. 760 F. Supp. 1486, 1534 (M.D. Fla. 1991). The defendant corporation's "disavow[al] that it s[ought] to express itself through the sexually-oriented [*sic*] pictures or verbal harassment by its employees" meant that the corporation could not apply a First Amendment defense. "No First Amendment concern arises when the employer has no intention to express itself." *Id.*

The LLMs at issue in this case have no intentions in the sense that humans do. They are machines without sentience or cognition. For C.AI to claim that the words of its AI chatbots' outputs deserve First Amendment protection, they must demonstrate that there was intention behind the expression. C.AI has not done so.

*Texas v. Johnson* sets forth the standards for expressive conduct. "To determine 'whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play,' the two-part Johnson test asks: (1) whether '[a]n intent to convey a particularized message was present,' and (2) 'whether the likelihood was great that the message would be understood by those

7

who viewed it.'" *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). C.AI outputs fail the first prong of *Johnson* because no intent to convey a particularized message was present. LLM-based products like C.AI do not have an intended message to spread. They have no intentions or goals behind the words they pick. In fact, they have no inner world at all in the way that humans would conceptualize such a thing. The correlational functions that help LLMs predict the next word in their sentences have no message behind them beyond trying to predict the likeliest next word in a sequence. *See also Moody v. NetChoice*, 603 U.S. 707, 738 (2024) (observing that content moderation constitutes expressive conmmunications where it "rests on a set of beliefs about which messages are appropriate and which are not").

3. <u>C.AI's Contrary Authorities are Unpersuasive</u>

Representing these probabilistic computations as words to end users does not change the underlying process, nor does it magically endow outputs with a human's expressive intention to state them. Even Defendants' most complex example—the interactive video games in *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)—does not compare to C.AI's product. *Human decisions* determine what video game players actually see and hear. Users might choose their path through a video game, but humans curated and controlled each possible storyline, challenge, and experience. In contrast, the whole point of an AI chatbot is to remove humans from the creative process. They may present an immersive fan fiction-esque experience, but it is an uncontrolled user experience.

4. <u>Even if C.AI's output is speech, it is unprotected by the First Amendment</u>

Even if C.AI's output is speech, the First Amendment "permit[s] restrictions upon the content of speech in a few limited areas." *United States v. Stevens*, 559 U.S. 460, 468 (2010). All output upon which Plaintiff seeks to impose liability falls within one of these exceptions, or a "historically unprotected" exception "not yet been specifically identified . . . in our case law." *Id.* at 472.

a. <u>Speech Integral to Illegal Conduct.</u> C.AI's output to Sewell Setzer was integral to illegal conduct. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was . . . carried out by means of language." *Giboney v. Empire Storage & Ice Co.*, 336 U. S. 490, 502 (1949). Indeed, laws prohibiting harmful conduct have been upheld even if they "indicental[ly]" burden speech. *Id.*; *see also Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006).

Here, C.AI's output was integral to causing Sewell's death. Hours of custom sexual and manipulative conversations with the chatbot pushed him to depression and to suicide. FAC ¶¶ 193-95, 203-207, 218-221. Tort liability—aimed at discouraging conduct that causes injury—only 'incidentally' prohibits this narrow class of speech proximately connected to harm, as *Giboney* and *Rumsfeld* allow. *See also Rice v. Paladin* Enterprises, 128 F.3d 233, 243, 264 fn. 11 (4th Cir. 1997) (First Amendment did not protect publication of a "murder manual"); *Commonwealth v. Carter*, 481 Mass. 352, 368 (Mass. 2019) (First Amendment did not protect text messages encouraging suicide).

The cases Defendants cite do not counsel a contrary result. In *Zamora v.*

9

*Columbia Broad. Sys.*, for example, the plaintiffs asked the court "to determine that unspecified 'violence' projected to a mass audience over television (presumably in any form) can provide the support for a claim for damages." 480 F. Supp. 199 (S.D. Fla. 1979). In *Watters v. TSR, Inc.*, the court noted that "the injury alleged is so uncertain [that] the rationale for not protecting 'words that wound' is absent." *Watters v. TSR, Inc.*, 715 F. Supp. 819, 823 n.3 (W.D. Ky. 1989). In *McCollum v. CBS, Inc.*, the court only considered the incitement and emphasized that the words at issue were a "figurative expression" stating a "philosophical view." 202 Cal. App. 3d 989, 1000–2 (1988). None of these cases considered specific, customized content likely to cause harm, as is present here.

  b. <u>Speech Obscene to Minors.</u> In *Ginsberg v. New York*, the Supreme Court held that such material, when sent to minors, was unprotected by the First Amendment. Speech is obscene to minors if:

- The average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest of minors;

- The work depicts or describes, in a way patently offensive with respect to minors, sexual conduct specifically defined by applicable state law;

- The work, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

390 U.S. 629, 635–36 (1968); *see Miller v. California*, 413 U.S. 15, 24 (1973); *Simmons v. State*, 944 So. 2d 317, 325 (Fla. 2006).

  When viewed in their surrounding context, C.AI's sexual messages clearly appeal to the prurient interests of minors. FAC ¶¶ 195-200. Florida state law

specifically defines material as "harmful to minors" when it contains "any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement ... [that is] patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors." *Fla. Stat.* 847.001(6) (2002). That too is true. FAC ¶¶ 195-200. Finally, taken as a whole, the messages lack serious literary, artistic, political, or scientific value for minors. Contrary to the suggestions of the Defendants, "a work that reflects some literary value is not saved if the work is predominantly obscene." *United States v. McCoy*, 602 F. App'x 501, 509 (11th Cir. 2015) (internal citation omitted).

Defendant's sole authority to the contrary, *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 649–50 (7th Cir. 2006), offers no support. In *Blagojevich*, the state attempted to apply an obscenity law to what the court described as "essentially an interactive, digital version of the Odyssey." *Id.* at 650. That is a far cry from the conversations here—vivid sexual depictions tinseled with medieval names and images. Viewed in the light most favorable to the Plaintiff, *Greene*, 926 So. 2d at 1199, these conversations were obscene to minors.

    c.    <u>Many Design Features Are Not Expressive.</u> Plaintiffs allege a number of design defects in Defendants' LLM product. To date, courts have found that attempts to regulate digital product design do not categorically implicate the First Amendment. Indeed, courts have long recognized that some communications "combin[e] nonspeech and speech elements, i.e., functional and expressive elements." *United City Studios, Inc. v. Corley*, 273 F.3d 429, 451 (2d Cir. 2001). This

11

"de facto functionality doctrine" allows the "state to regulate the functional aspects of the communication process, while protecting its expressive aspects." The same is true here. Plaintiffs have alleged that Defendants defectively designed their LLM product by failing to confirm customer ages, FAC ¶185, failing to require monthly fees for access, FAC ¶186, not allowing users to exclude indecent content, FAC ¶313, omitting reporting mechanisms, FAC ¶328, using dark patterns, *id.*—none of these defects are even arguably speech. Nor would fixing them require C.AI to "change how or what speech [it] disseminate[s]." 702 F.Supp.3d at 809. The First Amendment does not apply.

d.   <u>Manipulative Speech.</u> The Supreme Court has acknowledged there may be "some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law." *Stevens*, 559 U.S. 460 at 472. A growing number of scholars have called for the First Amendment to recognize an exception from protection for manipulative expression, which functions more like conduct than speech.[3] Indeed, the First Amendment already recognizes a special category for commercial speech, motivated by the impact of comparatively powerful speakers' speech on comparatively vulnerable listeners' rights.[4] The recognition within the First

---

[3] H. Norton, "Manipulation and the First Amendment" *William & Mary Bill of Rights Journal* Volume 33 (2024-2025), Issue 1 (2024); *see also* Ryan Calo, Digital Market Manipulation, 82 GEO.WASH.L. REV. 995, 103637 (2014); Kyle Langvardt, Regulating Habit-Forming Technology, 88 FORDHAM L. REV. 129, 133 (2019) ([C]ourts have hardly begun to address the First Amendment status of software s technical and nonexpressive components.); Tim Wu, Machine Speech, 161 U. PA. L. REV. 1495, 151825 (2013) (urging that we be slow to characterize these products as speech for First Amendment purposes).

[4] Norton, *supra*, at 4.

12

Amendment of the disparity in power and information between speakers and listeners in certain circumstances, and the resulting frustration of listeners' rights, compels carving out efforts to regulate manipulative speech.

5. <u>Even if this Court determines that C.AI's output is protected speech, tort law is content-neutral and warrants only intermediate scrutiny.</u>

C.AI deploys countless anthropomorphic design features to mimic human speech patterns and lure its users into believing that they are conversing with another human. But in fact, they are not. When Character Technologies programs speech disfluencies like "um," "uh," and "I think" into its chatbot and designs an anthropomorphic user interface to replicate, it preys upon users' innate psychological tendency to personify the human-like. FAC at ¶142–43. Children are especially vulnerable. *Id*. at ¶147.

Sewell's tort claims do not discriminate neither based on the "communicative content" nor "ideas or messages expressed." In fact, the entire purpose of C.AI's anthropomorphic designs is to avoid expressing any message at all. Unlike record-keeping and inquiry laws that prohibit doctors from writing or asking about firearms ownership, which overtly discriminate between favored and disfavored topics of inquiry, *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1302 (11th Cir. 2017), the First Amendment provides no shield against content-neutral product-liability claims against non-communicative software features like C.AI's

13

speech disfluencies and user interface design.[5]

## B. Plaintiff Plausibly Alleges that C.AI is a Product

Florida's limited products liability statutory framework does not define the term "product." Fla. Stat. Ann. § 768.1256-768.1257. However, both state and federal courts applying Florida law have held that software applications, like the C.AI platform, are appropriately deemed "products" for purposes of products liability law. *See, e.g.*, *Brookes v. Lyft Inc.*, 2022 WL 19799628, at *3 (Fla. 15th Cir. Ct. Sept. 30, 2022) (holding that Lyft should be "responsible for any harm caused by its digital application in the same way the designer of any defective physical product is held accountable."); *T.V. v. Grindr, LLC*, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024) (holding that the Defendant designed the Grindr app, placed it into the stream of commerce, and generated revenue and profits from it).

C.AI attempts to distinguish *Brookes* and *Grindr* by arguing that the FAC is "replete with allegations about the content of S.S.'s messages with characters," but this observation misses the point. Unlike movies, books, and video games, C.AI does not "deliver[] expressive ideas and content to users" because there is no deliberation of conscious expression and no communicative intent behind the LLM. *See United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 741 (D.C. Cir. 2016) (observing that "communicative elements" requires an "intent to

---

[5] If this Court finds that the AI output here is protected speech warranting strict scrutiny, courts do not apply the same strict scrutiny analysis to the constitutionality of tort liability for speech that they apply to the constitutionality of criminal regulation of speech. Instead, the Court has historically modified the elements of tort claims to render them sufficiently protective of speech to accommodate the First Amendment, balancing the nature of the speech with the state's interest in punishing the speech. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 281-83 (1964) (raising the plaintiff's burden of proof in a defamation case to accommodate First Amendment concerns).

14

convey a particularized message" and high likelihood that "the message would be understood by those who viewed it"). The issue is not simply that Defendants' generative AI chatbot targeted the minor decedent with sexually explicit material and encouraged him to commit suicide, which he ultimately did. Rather, the issue is that Defendants *designed* a generative AI chatbot that they knew, or in the exercise of reasonable care should have known, would do these things.

### C. Plaintiff's Negligence-Based Claims State Plausible Causes of Action (Counts IV, V, VI)

Plaintiff asserts a cognizable legal duty under Florida law, and the allegations in the First Amended Complaint are sufficiently pleaded to establish this duty.[6] A duty of care is the minimal threshold legal requirement for a negligence claim to proceed. *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003). This duty requires the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks. *Wallace v. Dean*, 3 So. 3d 1035, 1047 (Fla. 2009). A cause of action based in negligence requires the defendant to have had a duty to the plaintiff, and "whether a duty exists is a question of law for the court." *Biglen v. Fla. Power & Light Co.*, 910 So. 2d 405, 408 (Fla. 4th DCA 2005).

1. <u>Plaintiff Plausibly Alleged that C.AI Created a Forseeable Risk of Harm</u>

The "polestar" for determining both the existence and scope of a legal duty is foreseeability. *Id.* "[R]easonable, general foresight is [therefore] the core of the

---

[6] With a single sentence, Defendant also urges the Court to dismiss Plaintiff's wrongful death and survivor claims on the same basis. The Court should decline to do so because Plaintiff has adequately pleaded the essential elements of a negligence claim under Florida law.

duty element." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992). [W]henever a human endeavor creates a generalized and foreseeable risk of harming others . . . 'the law generally will recognize a duty placed upon defendant either to lessen the risk.'" *Id*. In addition to foreseeability of harm, in order for a legal duty to exist "the defendant's conduct must 'create' the risk." *Aguila v. Hilton, Inc.*, 878 So. 2d 392, 396 (Fla. 1st DCA 2004).

Plaintiff plausibly alleged facts by which C.AI could reasonably foresee the harms associated with its generative AI chatbots. Both Shazeer and De Frietas "knew that C.AI came with inherent, and institutionally unacceptable, risks and marketed it to children under age 13." FAC ¶ 93. Indeed, the company understood that highly sexual outputs are particularly compelling to adolescents and that sexual interactions were an expected result of the C.AI platform. FAC ¶ 124. Both Shazeer and De Frietas "had actual knowledge, including information obtained from Google and through their prior work at Google over some years" that the product they had personally helped design and assemble "would cause harm and decided to launch and target their inventions at children anyway so that they could profit." FAC ¶¶ 96; *see also* FAC ¶¶ 72-24.

2. <u>Plaintiff Properly Alleged a Duty Arising From a Special Relationship</u>

Florida courts have also recognized that a duty of care can arise from a special relationship where the defendant has the right or ability to control the third party's behavior. *See, e.g., Surloff v. Regions Bank*, 179 So. 3d 472 (Fla. 4th DCA, 2015). Here Plaintiff alleges that C.AI assumed a special relationship with minor users by targeting them and charging membership fees, thereby creating a duty of care.

FAC ¶¶ 5, 352, 380. This control establishes a special relationship and therefore a corresponding duty of care between Defendant and Sewell.

C.AI cites cases where no duty was found due to lack of physical custody and control over the individual who committed suicide. However, these cases are distinguishable because the FAC alleges that C.AI had control over the AI model and Characters, which created a special relationship and a corresponding duty of care. Additionally, the Florida Supreme Court has recognized that a duty can arise in several ways, for example, from a statutory obligation or based on the reasonable foreseeability of the alleged harm. *Chirillo v. Granicz*, 199 So. 3d 246, 251-252 (Fla. 2016).

### D. Plaintiff Plausibly Allege that CAI Violated Fla. Stat. § 847.0135

Florida Statute § 847.0135 prohibits individuals from knowingly using a computer service to lure, entice, or otherwise solicit unlawful sexual conduct with a child. The law further prohibits "the simulation of any act involving sexual activity" over a computer where one knows or should know that the transmission is viewed by a victim who is less than 16 years of age. Fla. Stat. § 847.0135(5). The allegations here easily satisfy this standard. Plaintiffs allege the Defendants knew that minor customers such as Sewell would be targeted with sexually explicit material, abused, and groomed into sexually compromising situations. *See* FAC ¶¶ 6, 124, 192-200, 254, 284, 289.

### E. Plaintiff Plausibly Alleged Intentional Infliction of Emotional Distress

To plausibly allege a cause of action for intentional infliction of emotional distress, a plaintiff must show "conduct so outrageous in character, nd so extreme

17

in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 928 (Fla. 4th DCA 2007). Here, the court need spill little ink. Plaintiff's complaint demonstrates that Defendants knowingly designed a generative AI chatbot program without any safeguards that sexually exploits minors and encourages them to commit suicide.

### F. Plaintiff Plausibly Alleged Unjust Enrichment

C.AI argues that Sewell's agreement to its terms of service bars Plaintifff's unjust enrichment claim as a matter of law. However, Plaintiff expressly disaffirmed all alleged "agreements" which Sewell may have entered as a minor relating to his use of C.AI. FAC ¶ 16. "The right of an infant to avoid his contract is one conferred by law … It is the policy of the law to discourage adults from contracting with infants ... ." *Off the Wall & Gameroom LLC v. Gabbai*, 301 So. 3d 281, 284 (Fla. 4th DCA 2020). Moreover, a plaintiff may bring a claim for unjust enrichment as an alternative to a claim under a contract. *Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316 (S.D. Fla. 2018). At this stage, however, "[w]here parties dispute the existence of an underlying contract, dismissal of Plaintiff's unjust enrichment claim is premature." *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1359 (M.D. Fla. 2021).

### G. Character.AI Engaged in a Deceptive Trade Practice

Under FDUTPA, whether an act constitutes a deceptive or unfair practice is a question of fact. *Prates v. Westgates Resorts, Ltd*, No. 616CV217ORL41TBS, 2016 WL 11774203, at *3 (M.D. Fla. Aug. 4, 2016). The relevant factual inquiry revolves

around (1) whether the acts are likely to mislead a consumer acting reasonably in the circumstances, to the customer's detriment, and (2) whether the act is one that offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, respectively. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003); *Washington v. LaSalle Bank Nat'l Ass'n.*, 817 F. Supp. 2d 1345, 1350 (S.D. Fla. 2011).[7]

Plaintiff's FDUTPA claim identifies several specific facts concerning three C.AI features constituting deceptive or unfair acts under FDUTPA: (1) the anthropomorphic user design choices C.AI implemented to represent that the AI chatbots operate like human beings, including characters insisting that they are real people despite nominal disclaimers; (2) the incidence of AI chatbots labeled as mental health professionals upon which individuals, including Sewell, relied for medical help; and (3) providing voice call features, including bi-directional voice calls, that further anthropomorphize this advanced software in misleading ways. FAC ¶¶ 417–418.

The Legislature explicitly intends that courts interpret FDUTPA claims with "due consideration and great weight" given to interpretations of the similarly-worded Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). Fla. Stat. Ann. § 501.204(2); *Urling v. Helms Exterminators, Inc.*, 468 So.2d 451 (1985). The factual

---

[7] CAI asserts that Plaintiff's FDUTPA claim fails because she did not plead under Fed. R. Civ. P. Rule 9(b)'s heightened standard for allegations of fraud. In this distrct, courts have confined this requirement only to claims of fraud. *Nationwide Mutual Company v. Ft. Myers Total Rehab Ctr., Inc.*, 657 F. Supp. 2d 1279, 1289 (M.D. Fla. 2009) ("The Court is not convinced that the specificity requirements of Fed. R. Civ. P. 9(b) applies to FDUTPA").

inquiry concerns whether the alleged conduct is likely to mislead a consumer acting reasonably in the circumstances, to the customer's detriment. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003).

A reasonable minor would likely be misled by an AI chatbot that uses human-like design features that explicitly undermine the disclaimer that the chatbot is not a real person—to their detriment. These features exacerbated Sewell's fatal dependence on C.AI by continuing to draw him to the product. These same features track with deceptive design practices that the FTC has deemed deceptive under the FTC Act. *See* Compl., *In the Matter of DONOTPAY, Inc.*, FTC Docket No. C-4812 (Sept. 25, 2024) (filing action against a similar company claiming to offer AI-generated legal services for violating the FTC Act with unlawful deceptive and unfair practices).

### III.   CONCLUSION

For the foregoing reasons, the Court should deny the motion.

Dated: March 21, 2025.                    Respectfully submitted,

                                              */s/ Matthew P. Bergman*
                                              Matthew P. Bergman (*pro hac vice*)
                                              Social Media Victims Law Center
                                              600 1st Avenue, Suite 102-PMB 2383
                                              Seattle, WA 98104
                                              Ph: (206) 741-4862
                                              matt@socialmediavictims.org