**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| MEGAN GARCIA, individually and as the Personal Representative of the Estate of S.R.S III, <br><br> Plaintiff, <br> v. <br><br> CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FREITAS ADIWARSANA; GOOGLE LLC; ALPHABET INC., <br><br> Defenkdants. | Civil No. 6:24-cv-01903-ACC-EJK <br><br> PLAINTIFF'S RESPONSE IN OPPOSITION TO GOOGLE LLC'S MOTION TO DISMISS |

Plaintiff opposes the Motion to Dismiss (Doc. 61) filed by Defendants GOOGLE LLC and ALPHABET INC. ("Google") on the following grounds:

## I.    INTRODUCTION

Several years back, Google found itself falling behind in the race to develop generative AI technology. Constrained by its own safety and fairness policies, Google could only watch as competitors like Open AI prepared to bring their own AI products to market. To meet this existential market threat, Google supported Noam Shazeer and Daniel De Freitas to develop Large Language Models (LLMs), but those designs lacked the ethical and practical guardrails Google's brand publicly required. Marketing the generative AI technology Shazeer and De Freitas developed posed an unacceptable brand safety risk, yet failing to do so meant that Google could potentially lose its competitive edge in the newly emerging AI marketplace. Google found an elegant solution to this problem.

1

Shazeer and De Freitas decided to leave the company to begin a new alter-ego startup, Character.AI, through which they completed the design, development, and distribution of the C.AI product. At the same time, Google entered into a "partnership" with C.AI, ensuring brand protection while providing financial resources, personnel, intellectual property, and especially direct cloud support that C.AI deemed to be "the lifeblood" of the defective product at issue in this case.

Google contends that it "had no role in that tragedy and does not belong in this case." Google Mot. to Dismiss ("MTD") at 1. It further claims that the First Amended Complaint ("FAC") is "bereft of any factual allegations creating a plausible, or even conceivable, basis for treating Google as the co-creator of C.AI's chatbot service. MTD at 8. On the contrary, there are voluminous factual allegations in the FAC specific to liability for Google.[1]

## II. FACTUAL BACKGROUND

**A. How the Technology Works**

At its core, the product at question comprises two underlying components which are inextricably linked, an app that users engage with and an AI model that

---

[1] Defendants also asserts that the FAC utilizes a "shotgun pleading" approach that "fail[s] … to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." MTD at 7-8 (quoting *Luiggi v. Harlem Heights Leasing LLC*, 2024 U.S. Dist. LEXIS 167237, at *6 (M.D. Fla. Sept. 16, 2024)). This, too, is inaccurate. While the basis for legal liability is set forth collectively as to some or all defendants, FAC ¶¶ 325-427, the factual allegations are uniquely specific as to each Defendant's conduct. From those factual allegations, Google can plainly understand the basis for which liability is asserted. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1325 (11th Cir. 2015) ("A dismissal under Rules 8(a)(2) and 10(b) is appropriate where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'" (internal citation omitted) (emphasis in original)).

ingests user inputs and outputs responses. FAC ¶¶ 45-49. An AI model is a program or algorithm that ingests collections of data (called datasets) to determine certain patterns in the data and output predictions based on those patterns. FAC ¶¶ 32-33. The app acts as the product interface, giving users access to specific character chats or the opportunity to "create" new characters. FAC ¶¶ 132, 150. Character information, user-generated text, and other data combine to formulate the inputs to the AI model. With this information, the model generates outputs based on its "learned" patterns that are fed back to the user through the app interface. FAC ¶ 141.

Character.AI's product is unique from many other startups, developing most components of their companion chatbot product in-house, including both the app and the AI model, calling themselves a "full stack company." FAC ¶105-07. Many developers rely on open source models or paid access to models from high profile developersthat have already been "pre-trained," focusing their limited resources on tailoring the model for their specific use case. FAC ¶¶105-06. Instead, Character.AI developed a fully integrated app and built an AI model from scratch, combining to form a complete product. This process comes at great expense, with top end models costing millions of dollars to develop and requiring cloud computing resources from providers such as Google. FAC ¶¶40,45.

The foundational underpinning of a generative AI product, like Character.AI's, is an LLM. LLMs build on established concepts in computer science with several distinct advancements that allow them to operate at a scale and effectiveness previously unseen. FAC ¶55. The process of building a LLM is

3

largely influenced by the several key design features discussed below.

1. <u>Model Architecture</u>

In the landmark paper *Attention is All You Need*, Shazeer and his co-authors at Google advanced a new approach to AI development. FAC ¶54 n.13. They advocated for attention mechanisms, which allow models to represent some notion of sentence context. They also proposed further advances, such as "self-attention," which allows the model to weigh the importance of every word in the sentence relative to other words, then process the sentence, as opposed to processing each word sequentially. *Id.*

Shazeer and his colleagues combine these techniques to formulate the transformer, a new model architecture. FAC ¶¶ 54, 56. This represented a significant step change in AI and language model capabilities, rapidly adopted as the industry standard and widely believed to be one of the most consequential developments leading to modern generative AI. FAC ¶ 54 n.13. The development of the transformer was critical to the the Language Model for Dialogue Applications (LaMDA) chatbot. FAC ¶¶ 56-60.

Shazeer continued to develop other consequential model architectures at Google, such as the Mixture of Experts approach. FAC ¶ 54 n.13. This technique breaks a model up into multiple neural networks, each with their own "expertise," depending on the type of knowledge or task at hand. This approach has led to significant improvements in model efficiency. *Id.*

2. <u>The collection and curation of training datasets</u>

Most LLM developers will focus on the collection of a variety of types of

data to build upon the general purpose nature of pre-training their model. FAC ¶264. Others will focus on specific types of data in order to optimize their performance for specific tasks. For example, in the development of the chatbot, Meena, Adiwardana and his fellow Google engineers curated a set of 40 billion words from social media conversations, in order to replicate "human-like multi-turn conversation." FAC ¶55 n.14. Character.AI has prioritized the collection of its user chats, giving it access to an endless stream of conversational data. FAC ¶¶105, 264. The pressures to accumulate more expansive datasets have led companies to take unethical and sometimes illegal shortcuts. FAC ¶49 n.12.

3. Model pre-training

Model pre-training is a process by which patterns and correlations are identified in data, forming the layers of the neural network in accordance with the model architecture. The objective of model pre-training is usually some sort of next word prediction—the model is provided with a set of text and trained to produce what comes next. FAC ¶¶ 37-38. In doing so, it "learns" the patterns in its training data. *Id.* Large quantities of human-written text allow models to learn the patterns of human communication and conversation, an explicit goal of training Meena, LaMDA, and Character.AI. FAC ¶46. Importantly, the model generates responses based on patterns—it is not governed by explicit rules or ideologies. FAC ¶ 37. Patterns expressed in the training data, including toxicity or sexually explicit content, will be replicated in the outputs of the model. FAC ¶ 168.

4. Model fine-tuning

The output of the model from pre-training is a functional large language

model; however, they tend to have several notable shortcomings that are addressed with further steps, collectively referred to as fine tuning. *See, e.g.,* FAC ¶ 56 n.20. For example, they usually do not follow directions well (addressed with something called "instruction tuning") or they may produce harmful or not very useful outputs (addressed with forms of model alignment). FAC ¶ 168. Fine-tuning is necessary to exhibit the qualities people expect in a high-performance AI product, such as creativity and accuracy of answers, ability to follow instructions, and not perpetuating toxic or illegal content. FAC ¶ 56 n.20.

5. Prompting

Prompting is the process by which inputs are fed to the LLM to generate outputs. FAC ¶ 131. This includes the user's input text, but it often includes other developer-produced text. Character information and backstory, for example, likely make up a portion of a system prompt in the case of Character.AI. FAC ¶¶ 132-34. At this stage, users can provide information that guides the chatbot's behavior. This can include sample conversations, character name, a tagline, or other details. *Id.*

B. Google's Role in the Development of Character.AI

Defendants Noam Shazeer and Daniel De Freitas, co-founders of Character.AI, were both high-ranking Google employees working on AI technology and associated LLMs. FAC ¶ 24, 25. As stated above, De Freitas developed a neural network-powered chatbot named Meena. FAC ¶ 25, 55. This chatbot, renamed LaMDA was built on Shazeer's transformer technology. FAC ¶ 56. Google considered releasing LaMDA to the public but again decided against

doing so, based in part on public controversy surrounding concerns raised by Google's own employees: several AI ethics researchers who sounded alarms regarding AI models generally, and the LaMDA model in particular, and an engineer who publicly suggested that LaMDA became sentient. FAC ¶ 57, 58.

Despite Google's clear reservations, Sundar Pichai, CEO of both Alphabet and Google, encouraged both Shazeer and De Freitas to stay and continue developing the technology underlying the LaMDA model. FAC ¶ 60. Google insiders reported that Shazeer and De Freitas began working on a separate startup—while still at Google—using similar technology to LaMDA and Meena. FAC ¶ 60.

Between 2019 through 2022, there arose a "surge in generative AI models, with competitor Open AI releasing in limited form its own version of an AI chatbot." FAC ¶ 61. As a result, Google faced "being left behind in the generative AI race" as a result of its professed commitment to safety and fairness. FAC ¶ 61. Yet at the same time, the company could not undertake the brand safety risks associated with releasing the LaMDA software under its own name. FAC ¶ 62. So Shazeer and DeFreitas left to develop their AI product outside the company's structure, but with the full support of Google and in order for Google to be able to benefit from their technology." FAC ¶ 67.

Despite the branching off and start-up of the Character.AI company, Google supported C.AI by contributing "financial resources, personnel, intellectual property, and AI technology to the design and development of C.AI." FAC ¶ 68. While Google argues its contributions were made pursuant to "arms length" deals,

7

that is a material and disputed question of fact. *See* FAC ¶¶ 67-68, 70-72, 75-77. As early as Q4 2022, Google considered C.AI to be "a leader in the generative AI space, despite the fact that C.AI had only just launched its product." FAC ¶ 70. By the Spring of 2023, Google had expended significant resources into "assessing the user experience on Character.AI" and knew that the software "appealed to younger users," and "compared its engagement potential to that of social media engagement." FAC ¶ 72, 74.

By May 2023, the time had come for Google to see a return on its investment. C.AI entered into a public partnership with Google Cloud services for access to its technical infrastructureFAC ¶ 75. This partnership drove "topline revenue growth for Google," giving it a competitive edge over Microsoft, and carried a monetary value of "at least tens of millions of dollars' worth of access to computing services and advanced chips." FAC ¶75. At the Google I/O that same month, a Google executive announced this partnership with Character.AI, stating that Google would be investing "the world's most performant and cost-efficient infrastructure for training and serving [Character's] models" and that the companies would be combining their AI capabilities. FAC ¶ 76.

In August 2024, Shazeer and De Freitas returned to Google after receiving $2.7 billion for the LLM that they first began developing at Google years earlier. FAC ¶ 81. This method of acquiring top talent, licensing the model to competitive investors, and leaving behind a shell corporation has become a new pattern across the AI industry, referred to as acquihire deals, which oversight agencies categorize as a merger in substance if not in form. FAC ¶¶ 81, 87, 106. Google, meanwhile,

8

obtained the benefit of its deal. Under the deal, Google licensed C.AI's models, developed with user's data embedded within the model. FAC ¶ 84.

### III.   ARGUMENT

### A.   Plaintiff Plausibly Alleges that Google is a Co-Manufacturer of C.AI

Under Florida law, a component part manufacturer is liable for harm caused by a finished product under two circumstances:

(a)   The component itself is defective, and the defect causes the harm; or

(b)   The manufacturer of the component "substantially participates in the integration of the component into the design of the product," which such integration results in the product being defective and that defect causing harm.

*Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So. 2d 1133, 1141 (Fla. 4th DCA 2002) (citing Restatement (Third) of Torts: Products Liability § 5).

Here, the FAC plausibly alleges that Google "substantially participate[d] in the integration of [its] component[s] into the design" of C.AI. *Scheman-Gonzalez*, 816 So. 2d at 114; *see also Bearint v. Johnson Controls, Inc.*, No. 8:04CV-1714-T-17MAP, 2006 WL 1890186, at *5 (M.D. Fla. July 10, 2006) (finding "sufficient evidence to possibly support a finding that the component is defective"). Plaintiff alleges that "Google contributed . . . intellectual property, and AI technology to the design and development of C.AI" and that "C.AI was designed and developed on Google's architecture." FAC ¶ 68. Plaintiff's factual allegations specifically refer both to post-departure Google contributions – which Plaintiffs allege to have not been the result of arms' length agreements – and to the Meena model and its later iteration, LaMDA, both of which were developed by De Freitas while a Google

9

employee. These models served as the defective component parts used to develop the C.AI LLM infrastructure. FAC ¶ 63 (alleging that "the model underlying Character.AI was invented and initially built at Google").

Google and C.AI's integrative design partnership is described in Plaintiff's well-pled allegations and in the public statements of company leadership. In 2023, Google Cloud CEO Thomas Kurian characterized C.AI as a "partner" and described Google's substantial participation in C.AI's operations. FAC ¶ 76 n.41. C.AI founding engineer Myle Ott further confirmed the integration of Google's technology in the design of the C.AI Product:

> We post all of our product infrastructure on Google Cloud, increasingly using Google's accelerators—GPUs and TPUs—to continue to serve our products to a growing community. So yeah, without accelerators, there wouldn't be a product. GPUs are the lifeblood of our product.

FAC ¶ 77 n.42. Google's treatment of C.AI as a partner, rather than a competitor; its deliberate characterization of the relationship with C.AI as a "partnership"; the development of C.AI by Shazeer and De Freitas on LLM infrastructure taken from Google (presumably with permission); and C.AI's characterization of Google's technology as "the lifeblood of our product" provide a plausible basis for the Court to conclude that Google "substantially participate[d] in the integration of [its] component into the design of the product." *Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So2d at 1141. Plaintiff thus plausably alleged that Google is a co-creator of the C.AI software or, at the least, a manufacturer of the defective LLM utilized in the C.AI generative AI chatbots that ultimately caused the harms alleged.

To the extent Defendant protests that Plaintiff's allegations take the public

statements of C.AI and Google representatives "out of context," it is welcome to argue that point at trial. But upon a Rule 12(b) motion, the addition of Defendant's own "context" to the factual allegations is insufficient to justify dismissal. Here, Plaintiff's factual allegations are not mere "[t]hreadbare recitals of the elements of a cause of action," *Ashcroft v. Iqbal*, 556 U.S. 662, 678(2009), nor can they be described reductively as simple "rhetoric." MTD at 9. Rather, Plaintiff's factual allegations set forth a series of actions and decisions by Google that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

**B.     Google's Internal Testing, Infrastructural Support, and Involvement as Investor and Public Partner are Sufficient to Support a Claim for Aiding and Abetting C.AI's Tortious Conduct**

Google claims it engaged in arms-length transactions with C.AI, but this is a disputed issue of fact. On the contrary, Google aided and abetted C.AI's negligence and strict product liability violations and is therefore liable for the harms resulting from C.AI's AI chatbots. The elements of an aiding and abetting claim are: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and [abettor]; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence v. Bank of America, N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (citations omitted). The U.S. Supreme Court in *Twitter, Inc. v. Taamneh* understood the actual knowledge and substantial assistance elements "as working in tandem, with a lesser showing of one demanding a greater showing of the other." 598 U.S. 471, 491–92 (2023).

As an initial matter, Google misrepresents the law on aiding and abetting liability, arguing that there is a categorical exclusion of non-intentional torts (negligence, strict liability) from aiding and abetting claims. MTD at 20. Contrary to Google's position, the Restatement (Second) of Torts § 876, which Google cites, explicitly provides that aiding and abetting liability can attach "when [the underlying tort] is merely a negligent act." Restatement (Second) of Torts § 876 cmt (d) (1979); *see Kilgus v. Kilgus*, 495 So.2d 1230, 1231 (Fla. Dis. Ct. App. 1986) (citing the Restatement approvingly and focusing inquiry on substantial assistance rather than the nature of the underlying tort); *see also Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1247 (M.D. Fla. 2013) (considering the commentary on the Restatement and deciding knowledge of the underlying tort, regardless of intention, is the relevant inquiry). It is clear that product liability claims can constitute the underlying tort necessary for the first element of aiding and abetting claims.

    1.    <u>Google Had Actual Knowledge of the Underlying Violations.</u>

Florida law requires "actual knowledge" of the underlying tort. *Wiand*, 938 F. Supp. 2d at 1247. At the motion to dismiss stage, all that is needed are "specific facts that give rise to a strong inference of actual knowledge." *Lamm v. State Street Bank & Trust Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012). While demonstrating a strong inference of actual knowledge is necessary, the actual knowledge element may be established through circumstantial evidence. *FW Distributing, LLC v. J.P. Morgan Chase, N.A.*, 2024 WL 4665255, at 7 (S.D. Fla. 2024).

Circumstantial evidence includes "internal report[s]" regarding the

underlying tort. *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 995 (11th Cir. 2014). Similarly, continuing to provide ordinary business services after conducting an "investigation" into an underlying tort is a sufficient showing of actual knowledge through circumstantial evidence. *Lesti v. Wells Fargo, N.A.*, 960 F. Supp. 2d 1311, 1325 (M.D. Fla. 2013). Google conducted internal reports on the predecessor LLMs and infrastructure at the heart of C.AI. FAC ¶¶ 55–56. The reports alerted Google to the safety issues regarding the technology. *Id*. Google ethicists investigated the technology and sounded alarm bells, only to be promptly fired by Google. FAC ¶ 57. These reports and investigations gave Google actual knowledge of the defective, unsafe product at the core of C.AI—a LLM that Google had refused to deploy under their own brand name. FAC ¶ 62. While the full scope of these internal investigations is "peculiarly within the possession and control of the defendant," the facts pled here allow for a strong inference of actual knowledge of the underlying defective product. *See Belik v. Carlson Travel Grp., Inc.*, 864 F. Supp. 2d 1302, 1311 (S.D. Fla. 2011).

Google relies on *Taamneh* to its detriment, as the case supports a finding of actual knowledge here. *Taamneh* involved victims of an ISIS attack suing tech platforms like Twitter over their hosting, promoting, and monetizing ISIS content. Importantly, Twitter never "culpably associated themselves with" the ISIS attack nor "sought by their action to make it succeed." 598 U.S. at 498. The relationship between Twitter and ISIS was "arm's length, passive, and largely indifferent" and consisted of "distant inaction." *Id*. at 500–01. The facts alleged by Plaintiff could not be more different. Google intentionally, culpably associated with C.AI through

13

various business transactions and public statements espousing close partnership. These transactions and public statements, including vocal support from Google's CEO, FAC ¶ 76, and infrastructural investments, FAC ¶ 75, were not available to every Google customer, unlike the algorithmic recommendations in *Taamneh*. *Id.* at 499. This affirmative conduct and association between Google and C.AI is a far cry from the "distant inaction" in *Taamneh*. As alleged in the FAC, Google "sought by their action to make [the underlying tort] succeed" given the context of the ever-intensifying race for A.I. dominance among tech giants. FAC ¶ 61.

Furthermore, Google distorts the meaning of actual knowledge. MTD at 20. The Court in *Taamneh* clarified that "aiding and abetting does not require the defendant to have known 'all particulars of the primary actor's plan.'" *Taamneh*, 598 U.S. at 495 (citing Restatement (Third) of Torts: cmt c, p. 104 ). Indeed, the Court went on to state that "even more remote support can still constitute aiding and abetting in the right case." *Id.* at 496. Florida courts embrace this notion, highlighting that actual knowledge "may be alleged generally" so long as specific facts alleged allow for a "strong inference of actual knowledge." *Lamm*, 889 F. Supp. 2d at 1332; *see also* Fed. R. Civ. P. 9(b). At this stage, Plaintiff need not allege facts so specific as to show Google knew every single one of C.AI's functionalities, design choices, and business model. It is sufficient to show that Google "possessed a unique understanding of the [generalized] risks," FAC ¶ 65, borne from Google's internal development, testing of the underlying LLM. Indeed, a research paper from Google, reviewing years of previous research, identified in detail the harms

14

of an AI model like that of Character.AI. [2]

The Seventh Circuit's decision in *G.G. v. Salesforce.com, Inc.* is also relevant. There, Salesforce provided custom software to help Backpage—a site used for sex trafficking—operate, manage relationships, and market itself. 76 F.4th 544, 550 (7th Cir. 2023). The Court denied Salesforce's motion to dismiss an aiding and abetting claim, in part due to the evidence of Salesforce's knowledge. Specifically, the Seventh Circuit cited the "nationwide news coverage" regarding Backpage's involvement in sex trafficking as a major basis for inferring knowledge. 76 F.4th at 555. By the time of the $2.7 billion acquihire deal and Sewell's tragic death, reporting was available on the dangerous nature of the C.AI chatbots—their sexualized messages, their grooming and isolation, and their reality-piercing ability. Google's own researchers warned of the dangers of human-like AI bots, confirming that children "can be more easily persuaded and manipulated than adults." Combining this publicly available information with the previous in-house investigations and subsequent close business relationship between C.AI and Google gives rise to a strong inference of actual knowledge sufficient to warrant further development of the record through discovery. *Id.* at 550.

2. <u>Google Provided Substantial Assistance to the Underlying Violations.</u>

Courts have routinely considered six factors established in *Halberstam v. Welch* to determine if an alleged aider and abettor rendered substantial assistance

---

[2] Maggie Harrison Dupré, *Before Google Was Blamed for the Suicide of a Teen Chatbot User, Its Researchers Published a Paper Warning of Those Exact Dangers*, Futurism (Mar. 18, 2025), https://futurism.com/google-suicide-teen-research ("'A user,' the Google researchers cautioned, could be 'persuaded to take their own life'"), citing the paper (https://arxiv.org/pdf/2404.15058) referenced at FAC ¶ 146 n.79 .

15

to the tortfeasor. 705 F.2d 472 (D.C. Cir. 1983); *see* Restatement § 876(b), comment d; *see also Doe v. Drummond Co., Inc.*, 782 F.3d 576, 608-09 (11th Cir. 2015) (applying the *Halberstam* and Restatement standards of knowingly providing substantial assistance in aiding and abetting analysis) (internal quotations omitted). The factors are (1) the nature of the act encouraged, (2) the amount of assistance given, (3) The defendant's absence or presence at the time of the tort, (4) his relation to the tortious actor, (5) the defendant's state of mind, and (6) duration of the assistance provided. (internal quotations removed). *Halberstam*, 705 F.2d at 484. The Supreme Court has made clear in its application that there is no "one size fits all" approach to determining aiding and abetting liability; the *Halberstam* factors must be weighed against the facts at hand. *Taamneh*, 598 U.S. at 487.

In *Halberstam*, a serial burglar's domestic partner, who did taxes, bookkeeping, and laundered stolen goods for the burglar's "business," was held liable for a murder during a burglary. The court stated that the partners' "activities were symbiotic" such that they were "pursuing the same object by different but related means." 705 F.2d at 487. Google and C.AI had such a relationship, whereby C.AI would not have been able to launch its LLM product to market, or sustain its operations, without Google. As alleged in the FAC, not only did C.AI rely on predecessor technology that had been developed by its co-founders while still at Google (FAC ¶¶ 60-65), it also required the massive inputs of computer capacity and cloud services in order to sustain its operations and grow its reach amongst users (FAC ¶¶ 75-77). Google, with actual and/or inferred knowledge of the risks of the C.AI LLM model, nevertheless consciously and culpably furthered C.AI's

16

tortious actions by encouraging development of its dangerous LLM, providing advanced computing capacity and marketing strategy for the chatbot, and eventually engaging in a license for the defective product. Since the product's early development, both Google and C.AI's conscious object was to fast-track the underlying LLM to "be a leader in the generative AI space." ¶ 70. Shazeer and De Freitas knew that C.AI could not operate solely through their startup; their departure from Google was in name only. FAC ¶ 91-92.

Unlike defendants in *Taamneh*, Google did more than merely "[stand] back and watch[]." *Id.* at 499. Instead, Google provided preferential access to cloud computing services, chips, and processors – services that are not "generally available to the internet-using public with little to no front-end screening by defendants." *Id.* at 498. Time and again, Google publicly associated itself with C.AI, developed a partnership with the company, and sought by its actions to make the defective product succeed. *Id.* (citing *Nye & Nissen*, 336 U.S., at 619) (internal quotations omitted). Around Q4 2022, Google's then-counsel Kent Walker ordered "safety executives at Google to fast-track AI projects" as a "company priority." FAC ¶ 71. In May 2023, Google Cloud CEO proudly boasted about Google and Character.AI's newly sealed partnership, "combining their AI capabilities." FAC ¶76. Around the same time, a C.AI Founding Engineer proclaimed on a promotional video that C.AI "wouldn't be a product" had Google not provided them with everything they needed to succeed. FAC ¶ 77.

Google's relationship with C.AI is akin to the defendant's relationship with Backpage in *Salesforce*. Unlike the passive defendants in *Taamneh*, Salesforce's

17

support of its client Backpage was "direct, active, and substantial." *Salesforce.com*, 76 F.4th at 564. Through consultations with Backpage's CEO, Salesforce provided "new software, marketing technology, and personalized operational support" to help Backpage "transform[] from a small… company" to the "dominant force in online sex trafficking." *Id.* at 550 (internal quotations omitted). Google's assistance to C.AI culminated in an unprecedented valuation of "$1B before considering any revenue." FAC ¶ 77.

Even if Google provided ordinary business services to C.AI, those services, in aggregate can and did rise to the requisite level of substantial assistance. *See Salesforce.com, Inc.*, 76 F.4th at 561. Defendants mischaracterize the legal standard for aiding and abetting liability as well as how its application in *Taamneh* relates to the present set of facts. Although it is true that courts have been wary of overbroad applications of aiding and abetting liability, the Supreme Court has made clear that "aiding and abetting does not require any agreement with the primary wrongdoer to commit wrongful acts." *Taamneh*, 598 U.S. at 489–90.

### C. Plaintiff Plausibly Alleges that Google Proximately Caused Sewell Setzer's Injuries

Plaintiff has met her burden to allege Google's tortious acts and omissions proximately caused Sewell Setzer's death. The facts demonstrate that Google contributed financial resources, personnel, intellectual property, and AI technology to the design and development of C.AI. FAC ¶ 68. Google's provision of critical cloud services and GPUs were considered to be "the lifeblood" of C.AI, without which there "would be no product." FAC ¶ 77 n.42. And Plaintiff alleged

18

that Google **in fact knew** about the risks of harm to customers from the LLM used to power the generative AI chatbots of C.AI. "[W]here reasonable persons could differ as to whether the facts establish proximate causation—i.e., whether the *specific* injury was genuinely foreseeable or merely an improbable freak—then the resolution of the issue must be left to the fact-finder." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 504 (Fla. 1992).

### D.     Plaintiff Plausibly Alleges that Google Was Negligent

Google's sole argument as relates to Plaintiff's negligence claim is to state that the cause of action refers to C.AI's alleged activity. FAC ¶¶ 361-371. Yet C.AI's negligence was facilitated by the concurrent negligence of Google. Any argument that C.AI is a service and not a product easily fails. Courts have routinely held that software and apps like the LLMs and AI chatbots at issue in this case constitute products under Florida law. *See, e.g., Brookes v. Lyft Inc.*, 2022 WL 19799628, at *3 (Fla. 15th Cir. Ct. Sept. 30, 2022); *T.V. v. Grindr, LLC*, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024).

### E.     Google Was Unjustly Enriched by Data Obtained from Minor Children Using a Dangerous and Deceptive Product

Plaintiff has alleged sufficient facts at this stage to support her claim against Google. Specifically, Plaintiff alleged that Google licensed Character.AI's models, which were developed with C.AI users' data - plausibly including Sewell's data. Plaintiff has raised a question of fact as to whether Google has direct access to C.AI user data, including Sewell's data, which would be a conferral of considerable benefit to the company. FAC ¶¶ 51, 63, 68, 70, 72–78, 80, 82, 84–86, 89–90, 92, 94–

19

97, 408. Further, Google was conferred a benefit, even if indirectly, by accessing the models which were built and trained on C.AI user data. At this preliminary stage, factual questions remain concerning what and how user data was retained and used by Google and the extent to which its models were developed through this data that warrant further development through discovery.

F. **Google Engages in a Deceptive Trade Practice**

Plaintiff has raised sufficient facts to claim relief under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). FAC ¶¶ 414–419. A reasonable minor would likely be misled by an AI chatbot using human-like design features that explicitly undermines the disclaimer that the chatbot is not a real person—to their detriment. *See PNR, Inc. v. Beacon Property Management, Inc.*, 842 So. 2d 773, 777 (Fla. 2003). This is especially so where conduct harms individuals based on protected status or diminished capacity. See Compl., *Fed. Trade Comm'n v. NGL Labs, LLC*, No. 2:24-cv-5753 at 24–25 (C.D. Cal. July 9, 2024).

## IV.     CONCLUSION

For the foregoing reasons, the Court should deny the motions

Dated: March 21, 2025.                    Respectfully submitted,

/s/ *Matthew P. Bergman*
Matthew P. Bergman (*pro hac vice*)
Social Media Victims Law Center
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
Ph: (206) 741-4862
matt@socialmediavictims.org

20