# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

MEGAN GARCIA, individually and as the
Personal Representative of the Estate of
S.R.S. III,

       Plaintiff,

v.

CHARACTER TECHNOLOGIES, INC.;
NOAM SHAZEER; DANIEL DE
FRIETAS ADIWARSANA; GOOGLE
LLC, ALPHABET INC.,

       Defendants.

Civil No: 6:24-cv-01903-ACC-EJK

---

**BRIEF OF ENCODE AI CORPORATION, DESIGN IT FOR US, AND
YOUNG PEOPLE'S ALLIANCE AS *AMICI CURIAE* SUPPORTING THE
PLAINTIFF AND OPPOSING THE DEFENDANTS' MOTIONS TO DISMISS**

Heidi Mehaffey
(Fla. Bar No. 118806)
Mehaffey, P.A.
813 Orchid Drive
Plantation, FL 33317
heidi@mehaffeypa.law

Vivek Krishnamurthy
(*pro hac vice* pending)
University of Colorado Law School
2450 Kittredge Loop Dr | 404 UCB
Boulder, CO 80309
vivek.krishnamurthy@colorado.edu

*Counsel for Amici Curiae*

## Table of Contents

STATEMENT OF INTEREST ..................................................................................... 1

SUMMARY OF ARGUMENT .................................................................................... 3

ARGUMENT ............................................................................................................... 4

I.   LLM Outputs Lack the Essential Characteristics of Constitutionally Protected
     Speech. ................................................................................................................ 4

     A.  How LLMs Generate Text: Technical Reality vs. Public Perception. ........... 5

     B.  LLM Outputs Lack the Expressive Intent Required for Constitutional
         Protection. .................................................................................................... 8

         1. Copyright Law Confirms that LLM Outputs Are Not Speech. ................ 11

         2. Human Prompting Does Not Transform LLM Outputs into Protected
            Speech. ................................................................................................... 12

II.  First Amendment Jurisprudence Recognizes the Right of Vulnerable Listeners
     to be Protected from Harmful Speech. ............................................................. 13

     A.  Encouraging Suicide Falls Outside First Amendment Protection. ............. 15

     B.  Children Merit Special Protections Under the First Amendment. ............. 16

III. The Unique Characteristics of LLMs Justify Different Regulatory Approaches
     than for Human-Generated Speech. ................................................................. 18

IV.  Non-Expressive Design Elements Lack First Amendment Protection. ............. 19

V.   Further Factual Discovery is Warranted in This Case of First Impression. ....... 21

CONCLUSION ......................................................................................................... 22

CERTIFICATE OF SERVICE ................................................................................... 24

## Table of Authorities

**Cases**

*Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986)..............................................21

*Brandenburg v. Ohio,* 395 U.S. 444 (1969)................................................................15

*Brown v. Entertainment Merchants Assoc.,* 564 U.S 786 (2011) ....................................8

*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884).....................................11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557 (1980).
...............................................................................................................................14

*Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942)..................................................15

*Commonwealth v. Carter,* 115 N.E.3d 559 (Mass. 2019) ................................... 15, 16

*Erznoznik v. City of Jacksonville,* 422 U.S. 205 (1975)................................................18

*F.C.C. v. Pacifica Found.,* 438 U.S. 726 (1978) ................................................ 17, 21

*Friedman v. Rogers,* 440 U.S. 1 (1979) ....................................................................14

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974) ......................................................14

*Ginsberg v. New York,* 390 U.S. 629 (1968). ..................................................... 16, 21

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557
(1995)..............................................................................................................20

*In re Coordinated Proceeding Special Title Rule 3.550 Soc. Media Cases,* 2023 Cal. Super.
LEXIS 76992....................................................................................................20

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.,* 702 F. Supp. 3d 809
(N.D. Cal. 2023) ....................................................................................... 20, 22

*Katz v. United States.,* 389 U.S. 347 (1967) ..............................................................10

*Lochner v. New York,* 198 U.S. 45 (1905) ..................................................................2

*McCollum v. CBS, Inc.,* 202 Cal. App. 3d 989 (Cal. Ct. App. 1988) .........................16

*Miller v. California,* 413 U.S. 15 (1973)....................................................................15

*Moody v. NetChoice, LLC,* 603 U.S. 707 (2024) ..............................................3, 20, 22

*Morse v. Frederick,* 551 U.S. 393 (2007) ...................................................................21

*Naruto* v. *Slater,* 888 F.3d 418 (9th Cir. 2018) .........................................................11

*New York v. Ferber,* 458 U.S. 747 (1982)...................................................................15

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .........................................................15

*Riley v. California*, 573 U.S. 373 (2014)....................................................................17

*Roberts v. U.S. Jaycees,* 468 U.S. 609 (1984). ............................................................8

*Spence v. Washington,* 418 U.S. 405 (1974) .................................................................9

*Stanley v. Georgia,* 394 U.S. 557 (1969)....................................................................13

*Thaler v. Perlmutter,* No. 23-5233, 2025 WL 839178 (D.C. Cir. Mar. 18, 2025)........11

*United States v. Stevens,* 559 U.S. 460 (2010)............................................................15

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976)...........................................................................................................14

*Virginia v. Black,* 538 U.S. 343 (2003)......................................................................15

*Wollschlaeger v. Florida*, 848 F.3d 1293 (11th Cir. 2017) (en banc).............................8

**Legal Scholarship**

Cass R. Sunstein, *Artificial Intelligence and the First Amendment,* 92 GEO. WASH. L.
REV. 1207 (2024). ......................................................................................8

Eugene Volokh, *In Defense of the Marketplace of Ideas / Search for Truth as a Theory of
Free Speech Protection,* 97 VA. L. REV. 595 (2011) ................................................9

Harry Surden, *ChatGPT, Large Language Models, and Law,* 92 FORDHAM L. REV. 1943
(2024)....................................................................................4, 5, 6, 7

Helen Norton, *Truth and Lies in the Workplace: Employer Speech and the First
Amendment,* 101 MINN. L. REV. 31 (2016) .......................................................18

Karl M. Manheim & Jeffery Atik, *AI Outputs and the Limited Reach of the First
Amendment,* 63 WASHBURN L.J. 159 (2024).................................................... 9, 10

Karl M. Manheim & Jeffery Atik. *AI Outputs and the First Amendment* (Loyola Law
School, Los Angeles Legal Studies Research Paper No. 2023-20) (2023);
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4524263 ............. 10, 12, 13

RonNell Andersen Jones, *Press Speakers and the First Amendment Rights of Listeners,* 90
U. COLO. L. REV. 499 (2019) .......................................................................13

Toni M. Massaro, Helen Norton, & Margot Kaminski, *SIRI-OUSLY 2.0: What
Artificial Intelligence Reveals about the First Amendment,* 101 MINN. L. REV. 2481
(2017)....................................................................................14

**Other Authorities**

Abdallah Ashraf, *Tokenization in NLP: All You Need to Know*, MEDIUM (Jan. 30,
2024), https://medium.com/@abdallahashraf90x/tokenization-in-nlp-all-you-
need-to-know-45c00cfa2df7. ..............................................................6

Andrew R. Chow, *AI Companion App Replika Faces FTC Complaint*, TIME (Jan. 28,
2025, 7:00 AM) https://time.com/7209824/replika-ftc-complaint/....................2

Apple Intelligence, Apple, https://www.apple.com/apple-intelligence/...............17

Arjun Kharpal, *Artificial Intelligence is Not Yet Smart as a Dog*, CNBC (updated Jun. 15, 2023, 10:48 AM), https://www.cnbc.com/2023/06/15/ai-is-not-even-at-dog-level-intelligence-yet-meta-ai-chief.html ...............................................................9

ARVIND NARAYANAN & SAYASH KAPOOR, AI SNAKE OIL: WHAT ARTIFICIAL INTELLIGENCE CAN DO, WHAT IT CAN'T, AND HOW TO TELL THE DIFFERENCE (2024).............................................................................................................4

Charlotte Engrav, *AI Can Generate Recipes That Can Be Deadly*, NPR (Sept. 23, 2024, 5:00 AM), https://www.npr.org/2024/09/23/g-s1-23843/artificial-intelligence-recipes-food-cooking-apple...............................................................7

DAVID FOSTER, GENERATIVE DEEP LEARNING: TEACHING MACHINES TO PAINT, WRITE, COMPOSE, AND PLAY (2d ed. 2023).......................................................6

Letter from Suzanne V. Wilson, Gen. Couns. & Assoc. Reg. of Copyrights, U.S. Copyright Off., to Tamara Pester, Esq., Couns. to Jason M. Allen regarding registration of work "Théâtre D'opéra Spatial" (Sept. 5, 2023), https://www.copyright.gov/rulings-filings/review-board/docs/Theatre-Dopera-Spatial.pdf ....................................................................................................12

Noam Chomsky, Ian Roberts & Jeffrey Watumull, *The False Promise of ChatGPT*, N.Y. TIMES (Mar 8, 2023), https://www.nytimes.com/2023/03/08/opinion/noam-chomsky-chatgpt-ai.html. ..................................................................................................................4

Panos Panay, *Introducing Alexa+, the Next Generation of Alexa*, AMAZON (Feb. 26, 2025) https://www.aboutamazon.com/news/devices/new-alexa-generative-artificial-intelligence .......................................................................................17

Ryan Whitham, *End of Life: Gemini will completely replace Google Assistant later this year*, ARS TECHNICA (Mar. 14, 2025, 3:00 pm), https://arstechnica.com/google/2025/03/end-of-life-gemini-will-completely-replace-google-assistant-later-this-year/ ..........................................................17

Yi Dong et al., *Building Guardrails for Large Language Models* (Feb. 2, 2024), https://arxiv.org/html/2402.01822v1 ..............................................................19

## STATEMENT OF INTEREST

*Amici curiae* are organizations that represent young people in public, legislative, and judicial forums regarding the appropriate regulation of technologies incorporating generative artificial intelligence ("GenAI")—including large language models ("LLMs") such as OpenAI's ChatGPT, Google's Gemini, and Microsoft's Copilot. Each individual *amicus* possesses extensive technical and legal experience regarding the appropriate regulation of such systems. *Amici* are therefore well-situated to advise this Honorable Court in this case of first impression on the long-term implications of its decision for young people and for American society at large.

*Amicus* **Encode AI Corporation ("Encode")** is America's leading youth voice advocating for bipartisan policies to support human-centered AI development and U.S. technological leadership. Encode has secured landmark victories in Congress, from establishing the first-ever AI safeguards in nuclear weapons systems to spearheading federal legislation against AI-enabled sexual exploitation. Working with lawmakers, industry leaders, and national security experts, Encode champions policies that maintain American dominance in artificial intelligence while safeguarding national security and individual liberties.

*Amicus* **Design It For Us** is a youth-led coalition comprised of people between the ages of 18 and 26 that advocates for safer online platforms and social media. Following its success in securing the unanimous passage of the California Age-Appropriate Design Code by the California Assembly and Senate, Design It For Us aims to drive

and achieve key policy reforms to protect kids, teens, and young adults online through the mobilization of youth activists, leaders, and voices.

*Amicus* **Young People's Alliance** is a youth-led advocacy organization working to ensure that policies affecting young people include their perspectives. With teams on Capitol Hill, in state legislatures, and across 26 campuses, the Alliance has worked to advance the regulation of manipulative design practices by social media companies and the developers of AI chatbots that harm young people—including by filing a complaint with the Federal Trade Commission seeking an investigation into unfair and deceptive trade practices by an AI chatbot company.[1]

As representatives of young people born and brought up in a digital age, *Amici* have a special interest in the First Amendment defenses raised by the Defendants. Accepting the Defendants' notion that the First Amendment categorically bars liability for harms stemming from the outputs of LLMs risks repeating the mistakes of *Lochner v. New York*[2] by stalling the development of the law in this field for decades to come—without even the benefit of a fully developed factual record. Correspondingly, *Amici* support the Plaintiff in her responses in opposition, (ECF Nos. 84, 85, 86) and urge this Court to deny the Defendants' Motions to Dismiss (ECF Nos. 59, 61, 63, 65). So ruling

---

[1] Andrew R. Chow, *AI Companion App Replika Faces FTC Complaint*, TIME (Jan. 28, 2025, 7:00 AM) https://time.com/7209824/replika-ftc-complaint/.

[2] 198 U.S. 45 (1905).

would ensure that the "fact intensive" and "function by function" analysis deserved by this First Amendment case of first impression can take place.[3]

## SUMMARY OF ARGUMENT

The textual outputs of large language models (LLMs), such as those generated by Character AI's chatbot, are not "speech" within the meaning of the First Amendment because they lack human intent and expressive purpose. LLMs do not think and feel as humans do; rather, they generate text through statistical methods based on patterns found in their training data. As such, their outputs should not be treated as constitutionally protected speech.

Just as copyright law excludes non-human-generated content from protection on similar grounds, the First Amendment should not be extended to treat the outputs of LLMs as protected speech. To do so would erode the ability of courts and legislatures to address the distinctive manner in which LLMs and other generative AI systems generate harms—and the fact that such harms can only be remedied by design interventions.

To the extent that First Amendment interests are implicated by this case, they require a fact-intensive inquiry that cannot be accomplished at the motion to dismiss stage. Without the benefit of a factual record, it would be premature—and doctrinally inappropriate—for the Court to dismiss this case on First Amendment grounds.

---

[3] *Moody v. NetChoice, LLC*, 603 U.S. 707, 747 (2024) (Barrett, J., concurring).

## ARGUMENT

## I.  LLM Outputs Lack the Essential Characteristics of Constitutionally Protected Speech.

Large language models ("LLMs") power the textual output of chatbot applications such as the one developed by defendant Character Technologies, Inc. ("Character AI" or "C.AI") that is at the heart of these proceedings.[4] LLMs, in turn, are one species in a family of generative artificial intelligence technologies ("GenAI") which can generate images, videos, and music in response to prompts entered by a user.[5]

LLMs generate "seemingly humanlike language and thought,"[6] leading many to believe that the applications with which they are interacting can engage in understanding, reasoning, or even intentional behavior. Such perceptions are false, however, as LLMs are advanced text prediction systems that generate text one word at a time.[7] They do so by selecting the next word from a set of statistically most likely next words, based on patterns identified from their training data.[8] As explained below, the lack of human intentionality underlying the generation of outputs by LLMs and

---

[4] *See* First Amended Complaint ¶ 130 (noting "C.AI is a chatbot application that allows customers to have conversations with C.AI's LLM, manifested in the form of 'Characters' created with added context provided by other customers.").

[5] *See generally* ARVIND NARAYANAN & SAYASH KAPOOR, AI SNAKE OIL: WHAT ARTIFICIAL INTELLIGENCE CAN DO, WHAT IT CAN'T, AND HOW TO TELL THE DIFFERENCE Ch. 4 (2024) ch. 4 (2024).

[6] Noam Chomsky, Ian Roberts & Jeffrey Watumull, *The False Promise of ChatGPT,* N.Y. TIMES (Mar 8, 2023), https://www.nytimes.com/2023/03/08/opinion/noam-chomsky-chatgpt-ai.html.

[7] Harry Surden, *ChatGPT, Large Language Models, and Law,* 92 FORDHAM L. REV. 1942, 1949 (2024) ("LLMs are AI systems that are designed to understand and generate human language (as opposed to AI systems specialized for other tasks, such as driving cars or detecting fraud.)").

[8] *Id.* at 1951.

other GenAI technologies renders them ineligible for protection as speech under the First Amendment.

### A. How LLMs Generate Text: Technical Reality vs. Public Perception.

LLMs are built to identify patterns in massive amounts of text.[9] They do not "learn" in the way humans do, but are "trained" by ingesting vast amounts of text to identify what words and phrases commonly appear together.[10] For example, since the phrase "Today, I walked my dog" is far more common than the phrase "Today, I walked my iguana" in human language, an LLM asked to complete the phrase "Today, I walked my…" is far more likely to produce "dog" rather than "iguana" based on the frequency with which these words tend to appear next to each other. However, this does not mean the LLM "understands" what it means to walk a dog, or what a dog is, "in ways that are comparable or analogous to human cognitive understanding."[11] Rather, LLMs produce "statistical outputs that are responsive given the input and often approximate what a similarly situated person, who did understand the input at a cognitive level, would produce in response."[12]

LLMs generate output using a technique called *tokenization*, where text is broken into small pieces ("tokens") and converted into numerical values that the LLM can

---

[9] *Id.* at 1949.

[10] *Id.* at 1954-55.

[11] *Id.* at 1942 n.4.

[12] *Id.*

manipulate mathematically.[13] Instead of reading words the way humans do, LLMs process long sequences of numbers that represent relationships between words.[14] The LLM then uses probability calculations to predict the next most likely token in a sentence.[15] For instance, if given the phrase "The dog chased the…" as an input, an LLM might determine that "cat" is the most likely next word 50% of the time, followed by "mailman" 20% of the time, by "squirrel" 10% of the time, and so forth. The LLM cannot evaluate whether its choice is factually accurate, only whether it aligns with the statistical patterns found in its training data.[16]

When a user submits a prompt to an LLM, as in the case of a conversation with the Character AI chatbot, the LLM treats this input as the beginning of a text sequence.[17] It then generates a response using "conditional probability," which involves repeatedly predicting the next most likely token based on the prompt itself, statistical associations contained in the LLM's training data, and each previously generated token in the response.[18] The user's prompt establishes a context that influences which statistical patterns the LLM draws upon.[19] For instance, if prompted

---

[13] DAVID FOSTER, GENERATIVE DEEP LEARNING: TEACHING MACHINES TO PAINT, WRITE, COMPOSE, AND PLAY 146-49 (2d ed. 2023).

[14] Abdallah Ashraf, *Tokenization in NLP: All You Need to Know*, MEDIUM (Jan. 30, 2024), https://medium.com/@abdallahashraf90x/tokenization-in-nlp-all-you-need-to-know-45c00cfa2df7.

[15] Surden, *supra* note 7, at 1954.

[16] *Id.* at 1955-56.

[17] *Id.* at 1954.

[18] *Id.* at 1955-56.

[19] *Id.* at 1954.

with "give me a recipe for a chocolate ganache cake," the LLM will activate patterns related to recipes and dessert ingredients because these tokens frequently appear together in its training data. The LLM can't appreciate—as we humans do—what chocolate cake is, how delicious it can be, or just how frustrating it can be to make the perfect ganache. That said, LLMs can recognize the statistical relationships between words in recipes contained in its training data and—in response to a prompt seeking a recipe—produce an output using the iterative token-by-token, word-by-word process described above. This lack of human-like cognitive understanding is why recipes generated by LLMs can range from delicious to unappetizing to toxic.[20]

Experts often describe LLMs as sophisticated autocomplete systems because they generate text based on statistical patterns.[21] While their outputs read coherently, this is only because LLMs produce outputs by predicting which words are likely to appear next to each other in a sequence.[22] Unlike human speakers, LLMs do not have thoughts, beliefs, or feelings, nor do they have an internal sense of purpose;[23] they merely string together words in a way that appears meaningful to the human reader.[24]

---

[20] Charlotte Engrav, *AI Can Generate Recipes That Can Be Deadly,* NPR (Sept. 23, 2024, 5:00 AM), https://www.npr.org/2024/09/23/g-s1-23843/artificial-intelligence-recipes-food-cooking-apple (noting how an LLM produced a recipe for a beverage containing bleach and ammonia, the mixture of which creates deadly chlorine gas).

[21] Surden, *supra* note 7, at 1942 n. 4.

[22] *Id.* at 1959-61.

[23] *Id.* at 1949.

[24] *Id.* at 1960.

### B.  LLM Outputs Lack the Expressive Intent Required for Constitutional Protection.

The fact that LLMs lack consciousness or human-like understanding of what they are outputting has significant implications for how such outputs should be treated under the First Amendment. "Speech is speech," states Character AI in its Motion to Dismiss,[25] suggesting that the differences between the outputs of its LLM and "conversations with fictional characters or real users in … other media are 'more a matter of degree than of kind' for First Amendment purposes."[26] Yet no American court has so held, as this is a case of first impression regarding what, if any, First Amendment protections should be extended to the outputs of an LLM. Indeed, as Professor Cass Sunstein noted in an article published in December 2024, "it remains an unanswered question whether the First Amendment protects the rights of human viewers, listeners, and readers, seeking to see, hear, or read something from AI."[27]

Nor does Character AI's characterization regarding the relationship between LLM outputs and the First Amendment withstand scrutiny. For more than two centuries, the First Amendment has protected the speech of human individuals and groups[28] on the theory that it serves fundamental human interests such as the search for truth and

---

[25] Character AI Motion to Dismiss, ECF No. 59, at p. 7 (quoting *Wollschlaeger v. Florida*, 848 F.3d 1293, 1307–11 (11th Cir. 2017) (en banc)).

[26] *Id.* citing *Brown v. Entertainment Merchants Assoc.,* 564 U.S 786, 798 (2011).

[27] Cass R. Sunstein, *Artificial Intelligence and the First Amendment,* 92 Geo. Wash. L. Rev. 1207, 1207 (2024).

[28] *See, e.g., Roberts v. U.S. Jaycees,* 468 U.S. 609, 617-18 (1984) (recognizing "a right to associate for the purpose of engaging in those activities protected by the First Amendment….").

democratic self-governance.[29] As the Supreme Court recognized in *Spence v. Washington,*[30] nonverbal actions are protected by the First Amendment as expressive conduct so long as "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it."[31]

Yet the outputs of LLMs are not the product of a sentient being with expressive intent. Indeed, in the view of the chief AI scientist at Meta—the parent company of Facebook, Instagram, and WhatsApp—dogs have a far greater capacity to think and express themselves than do today's LLMs.[32] Given that the text generated by an LLM is nothing more than the output of an automated system performing probabilistic calculations, its outputs should not be treated as protected speech under the First Amendment.

LLM outputs might constitute *communication*, but not all communication qualifies as speech under the First Amendment.[33] As Professors Karl Manheim and Jeffery Atik have explained, communication is a broad concept that includes the exchange of information between a sender and a receiver. Speech, however, is a subset of

---

[29] Eugene Volokh, *In Defense of the Marketplace of Ideas / Search for Truth as a Theory of Free Speech Protection,* 97 VA. L. REV. 595 (2011).

[30] *Spence v. Washington,* 418 U.S. 405 (1974).

[31] *Id.* at 410-11 (1974).

[32] Arjun Kharpal, *Artificial Intelligence is Not Yet Smart as a Dog*, CNBC (updated Jun. 15, 2023, 10:48 AM), https://www.cnbc.com/2023/06/15/ai-is-not-even-at-dog-level-intelligence-yet-meta-ai-chief.html.

[33] Karl M. Manheim & Jeffery Atik, *AI Outputs and the Limited Reach of the First Amendment,* 63 WASHBURN L.J. 159, 161 (2024) [hereinafter Manheim & Atik—Washburn].

communication that requires both a speaker's intent to express a message *and* a listener's understanding that the source is communicating something,[34] such as an offer, fact, opinion, idea, or emotion. Without expressive intent, communication cannot be protected speech under the First Amendment.[35]

This principle applies to LLMs, which do not have subjective intent or autonomy in their outputs. Unlike a human author composing a political essay or a songwriter crafting lyrics to convey emotion—or even a horse whinnying in delight—an LLM does not "think" or "intend" anything. Instead, it generates text based on probabilistic predictions of the next most likely word, without regard for meaning, purpose, truth, or harm. This makes LLM outputs fundamentally different from human speech or the vocalizations of animals.

The First Amendment, like all constitutional rights, exists to protect the rights of people.[36] Speech is protected because it reflects an individual's thoughts, creativity, or beliefs. However, machine-generated outputs that lack human intention cannot be said to express any individual's thoughts, making them ineligible for First Amendment protection as speech.

---

[34] Karl M. Manheim & Jeffery Atik. *AI Outputs and the First Amendment* 1 (Loyola Law School, Los Angeles Legal Studies Research Paper No. 2023-20) (2023); https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4524263 [hereinafter Manheim & Atik—Research Paper].

[35] Manheim & Atik—Washburn, *supra* note 33, at 164.

[36] Cf. *Katz v. United States,* 389 U.S. 347, 351 (1967) ("The Fourth Amendment protects people, not places.").

*1.   Copyright Law Confirms that LLM Outputs Are Not Speech.*

The treatment of content generated by automated systems under copyright law is instructive of whether LLM outputs can be speech under the First Amendment. As demonstrated below, the law has long held that creative works must be authored by human beings to qualify for copyright protection, among other conditions.

The Supreme Court first articulated the requirement of human authorship in 1884, when it held that copyright law protects creative works only when they reflect human intellectual conception.[37] The Court ruled that a photographer's choices in composing a portrait of the author of *A Picture of Dorian Gray*, such as arranging Oscar Wilde's pose and choosing how he was lit, demonstrated sufficient creativity to qualify for copyright protection.[38] The key was that the photograph of Wilde was the product of human decision-making and artistic intent, rather than of a mere mechanical process.[39]

This principle has been reaffirmed in modern cases. In *Naruto v. Slater,* the Ninth Circuit denied copyright protection for a photograph taken by a monkey of itself, holding that copyright law requires a human creator.[40] As recently as March 18, 2025, the D.C. Circuit upheld the Copyright Office's rejection of a registration request for an image generated by an AI system, reaffirming that human authorship is a necessary condition for copyrightability.[41] Even when a human revised a prompt not once, nor

---

[37] *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884).

[38] *Id.* at 60.

[39] *Id.* at 59, 61.

[40] *Naruto* v. *Slater,* 888 F.3d 418, 426 (9th Cir. 2018).

[41] *Thaler v. Perlmutter,* No. 23-5233, 2025 WL 839178, at *4 (D.C. Cir. Mar. 18, 2025).

twice, but *624 times* to refine a generative AI output, the Copyright Office Review Board found that such involvement does not meet the threshold for authorship when the traditional elements of creative expression originate from an AI, rather than a human.[42]

These decisions make clear that AI-generated content does not qualify as human-authored expression, even when some level of human input is involved. The refusal of courts and tribunals to recognize AI-generated works as protectable expression in copyright law strongly suggests that AI outputs should not be treated as speech under the First Amendment either.[43] Just as copyright law ensures that only human-created works receive legal recognition, the First Amendment should remain grounded in protecting speech that originates from an individual's intentional expression.

2. *Human Prompting Does Not Transform LLM Outputs into Protected Speech.*

Some may argue that human prompts transform LLM outputs into protected speech. This argument fails, however, because LLMs produce unpredictable, autonomous outputs that cannot be attributed to human direction.[44] Professors Manheim and Atik explain this point by considering whether a student's answer to a

---

[42] *See* Letter from Suzanne V. Wilson, Gen. Couns. & Assoc. Reg. of Copyrights, U.S. Copyright Off., to Tamara Pester, Esq., Couns. to Jason M. Allen regarding registration of work "Théâtre D'opéra Spatial" (Sept. 5, 2023), at 2, 4-7 https://www.copyright.gov/rulings-filings/review-board/docs/Theatre-Dopera-Spatial.pdf.

[43] Manheim & Atik—Research Paper, *supra* note 34, at 9.

[44] *Id.* at 2, 8.

professor's question is the speech of the student or the professor.[45] Obviously, the answer is that the student's answer is the student's speech, because the student autonomously generates an answer to the professor's question through their own cognitive process. By extension, while a human's prompt into an LLM is the speech of the prompter, the output of the LLM is not the prompter's speech, as it is generated by a process that is autonomous of the human.[46] Yet since the LLM is not human—and lacks even the ability of a dog or cat or fruit fly to think, sense, and feel, its output cannot be speech in the First Amendment sense of the term—for speech requires communicative intent.

## II. First Amendment Jurisprudence Recognizes the Right of Vulnerable Listeners to be Protected from Harmful Speech.

The First Amendment protects the rights of speakers *and* listeners.[47] Courts have long recognized that the right to free speech includes the right to receive information and ideas, including controversial and unpopular ideas.[48] Yet listeners rights are a two-way street, as the First Amendment recognizes the right of listeners to be protected from communications whose manner causes harm in a particular time and place

---

[45] *Id.* at 8

[46] *Id.*

[47] See, e.g. RonNell Andersen Jones, *Press Speakers and the First Amendment Rights of Listeners,* 90 U. COLO. L. REV. 499 (2019) (exploring the development of listeners' rights conceptions of the First Amendment in scholarship and jurisprudence).

[48] See, e.g. *Stanley v. Georgia,* 394 U.S. 557, 565 (1969) , 565 ("If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch.").

(subject to intermediate scrutiny), and even in view of their content (subject to strict scrutiny).

Time and again, courts have upheld restrictions on speech to prevent deception[49] and fraud.[50] False or misleading commercial speech is wholly unprotected by the First Amendment because it frustrates listeners' interests in receiving accurate information,[51] while similar rationales underpin the availability of civil remedies for reputational harms.[52]

Regardless of what First Amendment interests listeners may have in receiving the output of an LLM, this does not mean that the First Amendment confers blanket immunity from tort liability for harms stemming from such outputs. As three leading First Amendment scholars have noted:

> "[C]overing AI speech under the First Amendment will not insulate all of its outputs as speech, any more than treating humans as rights-bearing speakers converts all human behavior to speech, or insulates all of their speech outputs from government regulation."[53]

---

[49] *See, e.g.*, *Friedman v. Rogers,* 440 U.S. 1 (1979); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557 (1980).

[50] *See, e*.g., *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 (1976) (recognizing that untruthful speech has never been protected for its own sake).

[51] Toni M. Massaro, Helen Norton, & Margot Kaminski, *SIRI-OUSLY 2.0: What Artificial Intelligence Reveals about the First Amendment,* 101 MINN. L. REV. 2481, at 2519 (2017) [hereinafter Massaro et al.].

[52] *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974) (recognizing erroneous statement of fact are not worthy of constitutional protection).

[53] Massaro et al., *supra* note 51, at 2516.

Correspondingly, even if this Court determines that LLM outputs merit some level of First Amendment protection—either as "speech" or based on listeners' interests in receiving information—such protections would be subject to longstanding First Amendment jurisprudence concerning when speech-related harms are addressable by statute or by tort.

### A.  Encouraging Suicide Falls Outside First Amendment Protection.

The law has long recognized that certain kinds of harmful speech and expressive conduct are not protected by the First Amendment, as they frustrate the First Amendment's underlying purposes rather than advancing them.[54] Consistent with this logic, the Massachusetts Supreme Judicial Court recognized in *Commonwealth v. Carter* that utterances encouraging someone to take their own life can serve as the basis for criminal liability.[55]

The Court in *Carter* upheld an involuntary manslaughter conviction against a girlfriend who encouraged her boyfriend to commit suicide, finding that "verbal conduct in the appropriate circumstances could overcome a person's willpower to live and therefore … be the cause of suicide…."[56] This is especially so where the words are directed at a vulnerable individual. The intimate relationship between Carter and the

---

[54] *See, e.g., United States v. Stevens,* 559 U.S. 460 (2010); *Virginia v. Black,* 538 U.S. 343 (2003); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992); *New York v. Ferber,* 458 U.S. 747 (1982); *Miller v. California,* 413 U.S. 15 (1973); *Brandenburg v. Ohio,* 395 U.S. 444 (1969); *Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942).

[55] *Commonwealth v. Carter,* 115 N.E.3d 559 (Mass. 2019)

[56] *Id.* at 565-66.

decedent was of particular significance to the Court, for as his "girlfriend and closest, if not only confidant, in the suicidal planning," Carter was in a unique position to overcome any willpower the victim had as a mentally ill individual.[57]

The decision in *Carter* is distinguishable from *McCollum v. CBS*,[58] in which a court in California declined to hold a music label liable for a song allegedly encouraging suicide, reasoning that passive media consumption could not create the requisite causal link for liability. As we explain in Part III, *infra,* interactions with LLMs can be of a sufficiently intimate and interactive nature to establish the causal nexus between words and actions found in *Carter.*

## B. Children Merit Special Protections Under the First Amendment.

Likewise, the Supreme Court has long recognized the state's compelling interest in protecting minors, which justifies shielding them from harmful materials. In *Ginsberg v. New York,* the Court upheld a statute prohibiting the sale of sexually explicit magazines to minors, reasoning that while the material was not obscene for adults, the state's compelling interest in protecting minors justified stricter regulation.[59] Similarly, in *F.C.C. v. Pacifica,* the Court justified restrictions on the broadcast of seven particularly profane words because the nature of radio and television broadcasting

---

[57] *Id.* at 568.

[58] *McCollum v. CBS, Inc.,* 202 Cal. App. 3d 989 (Cal. Ct. App. 1988).

[59] *Ginsberg v. New York,* 390 U.S. 629, 636 (1968).

created a significant risk of exposing children to indecent material in the safety of their homes.[60]

The logic of *Pacifica* is especially important to consider in the context of LLMs. Just as broadcast signals enter the home and are extraordinarily difficult for parents to control, so too are the outputs of LLMs as products incorporating their capabilities proliferate in a manner that is readily accessible to children. Features powered by LLMs are now incorporated into the operating system of every new phone, tablet, and computer sold by Apple[61] and most smartphones running Google's Android mobile operating system.[62] Likewise, Amazon Alexa smart speakers, which respond to the voice commands of adults and children alike, will soon incorporate generative AI technologies in responding to the queries of their users.[63]

Over a decade ago, Chief Justice Roberts observed in *Riley v. California* that "modern cell phones […] are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."[64] If every modern cell phone comes pre-installed with features

---

[60] *F.C.C. v. Pacifica Found.,* 438 U.S. 726, 748 (1978).

[61] *Apple Intelligence,* APPLE, https://www.apple.com/apple-intelligence/ (last visited Mar. 20, 2025) (noting that ChatGPT is "seamlessly integrated" into Apple's products).

[62] Ryan Whitham, *End of Life: Gemini will completely replace Google Assistant later this year,* ARS TECHNICA (Mar. 14, 2025, 3:00 pm), https://arstechnica.com/google/2025/03/end-of-life-gemini-will-completely-replace-google-assistant-later-this-year/.

[63] Panos Panay, *Introducing Alexa+, the Next Generation of Alexa*, AMAZON (Feb. 26, 2025), https://www.aboutamazon.com/news/devices/new-alexa-generative-artificial-intelligence (noting that Alexa+ is "infused [with] cutting-edge LLMs").

[64] 573 U.S. 373 at 385 (2014).

powered by LLMs, then it is well-nigh impossible for adults and children alike to simply "avert their eyes"[65] and ears from the outputs of this technology without unplugging themselves from modern life. These new realities have significant implications for how and when the developers and deployers of such technologies should be held liable for defects in their design, as discussed below.

## III. The Unique Characteristics of LLMs Justify Different Regulatory Approaches than for Human-Generated Speech.

The interactive nature of LLMs, combined with their lack of consciousness and their consequential inability to engage in moral decision-making, presents dangers that are different in kind—not in degree—from those posed by human beings engaged in speech or other expressive activities. These differences justify regulatory and liability approaches for LLM outputs that are different from how the law has historically treated human expression.

Leading First Amendment scholars have highlighted how government regulation of human expression is justified when speakers have greater access to information and when listeners are relatively dependent or vulnerable.[66] Setting aside the question of whether LLM outputs are speech, the foregoing logic applies with particular force to LLM outputs. Users—including young people—engage with LLMs in interactive conversations in real-time. They may share information with an LLM that places them

---

[65] Character AI Motion to Dismiss, ECF No. 59, at p. 12, n. 13 (quoting *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 212 (1975)).

[66] *See, e.g.,* Helen Norton, *Truth and Lies in the Workplace: Employer Speech and the First Amendment,* 101 MINN. L. REV. 31, 58-9 (2016).

in a position of great vulnerability, such as regarding their most intimate thoughts or a current, distressed emotional state.

Yet unlike human beings in similar settings, LLMs are incapable of feeling or of moral reasoning. All they can do in response to a prompt—including one that suggests that someone is about to harm themselves—is to generate an output based on statistical inference. Such outputs may or may not prove as dangerous to someone interacting with an LLM as were Michelle Carter's text messages in encouraging her boyfriend to take his own life. Yet the legal and public policy problem is that an LLM is not deterrable in the moment from generating an output that contributes to harm, as it lacks consciousness, emotions, and moral scruples. Correspondingly, the only way to guard against LLMs generating vile, obscene, defamatory, or other harmful outputs— even in response to the most anodyne of human prompts—is to build guardrails into such systems by design.[67]

## IV. Non-Expressive Design Elements Lack First Amendment Protection.

In cases involving social media platforms that host and curate human speech, courts have drawn a clear line between regulating speech and regulating design. They have held that only "inherently expressive" design choices are protected by the First

---

[67] *See* Yi Dong et al., *Building Guardrails for Large Language Models* (Feb. 2, 2024) (unpublished manuscript), https://arxiv.org/html/2402.01822v1 (explaining how "guardrails" need to be engineered into LLMs to prevent them from generating unwanted or harmful outputs, and surveying the landscape of socio-technical approaches to building such guardrails).

Amendment.[68] Correspondingly, non-expressive choices related to the design of platforms that curate human speech fall outside the ambit of the First Amendment.

In one such case, a California state court denying in part a motion by numerous social media companies to dismiss a defective design claim on First Amendment grounds analogized the platforms' design features to "the physical material of a book containing Shakespeare's sonnets, rather than to the sonnets themselves."[69] Likewise, the Northern District of California recently ruled that defective design claims against social media platforms operated by tech giants such as Meta and Alphabet relating to features such as parental controls, age verification mechanisms, account deletion workflows, and reporting mechanisms for child sexual abuse material ("CSAM") did not and could not implicate the platforms' First Amendment rights, since such design features have no bearing on what speech such platforms can disseminate, or how they do so.[70]

Correspondingly, regardless of whether LLM outputs warrant some degree of First Amendment protection, claims concerning the non-expressive design features of such systems—such as the absence of parental controls or inadequate warnings and reporting mechanisms—do not implicate the First Amendment at all. However, given

---

[68] *See, e.g., Moody v. NetChoice, LLC*, 603 U.S. 707, 745 (2024) (Barrett, J., concurring) (citing *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 568 (1995)).

[69] *In re Coordinated Proceeding Special Title Rule 3.550 Soc. Media Cases,* 2023 Cal. Super. LEXIS 76992 at *113.

[70] *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.,* 702 F. Supp. 3d 809, 835-38, 849-854 (N.D. Cal. 2023) (motion to certify appeal denied, No. 4:22-MD-03047-YGR, 2024 WL 1205486 (N.D. Cal. Feb. 2, 2024)).

the fundamental differences between how humans think, feel, and speak, and how LLMs generate textual outputs in response to prompts, *Amici* urge this Court not to preemptively foreclose novel legal questions regarding the design of products incorporating LLMs merely because Defendants invoke the First Amendment, without even the benefit of a factual record.

## V.  Further Factual Discovery is Warranted in This Case of First Impression.

Given the fundamental differences between how LLMs generate outputs and how humans generate speech, and the fact that many of the Plaintiff's claims relate to non-expressive design elements, granting the Defendants' Motions to Dismiss is inappropriate at this stage. As in many other seminal First Amendment cases,[71] this case of first impression should proceed to discovery to develop an evidentiary record to permit the Court to make determinations about the relevance and application of the First Amendment to the facts giving rise to the Plaintiff's claim.

Character AI appears to conflate the existence of potential First Amendment defenses with the immunity that Section 230 of the Communications Decency Act (47 U.S.C. § 230) confers on online content hosts against claims premised on traditional notions of publisher liability. Yet even in the context of recent litigation involving social media platforms, courts have rejected defendants' attempts to invoke the First

---

[71] *See, e.g., Morse v. Frederick,* 551 U.S. 393 (2007); *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986); *F.C.C v. Pacifica Found.,* 438 U.S. 726 (1978); *Ginsberg v. New York,* 390 U.S. 629 (1968).

Amendment as a blanket shield from suit.[72] Instead, courts conduct a claim-by-claim analysis to determine whether each allegation seeks to impose liability for protected speech as opposed to conduct not shielded by the First Amendment.[73]

Indeed, as Justice Barrett recently recognized in her concurrence in *Moody v. NetChoice,* First Amendment claims involving novel technology require "fact-intensive" analysis that "will surely vary from function to function and platform to platform."[74] In this case of first impression concerning the relationship between LLM outputs, the First Amendment, tort law, and products liability law, the arguments for denying motions to dismiss and proceeding to discovery to inform the Court's decision could not be stronger.

## CONCLUSION

For the foregoing reasons, *Amici* Encode, Design It For Us, and Young People's Alliance respectfully urge this Court to deny the Defendants' Motions to Dismiss (ECF Nos. 59, 61, 63, 65), and allow these proceedings to move forward.[75]

---

[72] *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.,* 702 F. Supp. 3d 809, 835 (N.D. Cal. 2023).

[73] *Id.* at 836.

[74] *Moody v. NetChoice, LLC,* 603 U.S. 707, 747 (2024) (Barrett, J., concurring).

[75] *Amici* wish to acknowledge the research assistance of Santana Andazola, Jordan Chen, Fynn Fehrenbach, Zoe Leonore Glepa, Neven Grigic, Natalie Phillips, and Telly Scott—student attorneys in the University of Colorado Law School Clinical Programs—in preparing this brief.

Respectfully submitted this 31st day of March, 2025,

/s/ Heidi Mehaffey

Heidi Mehaffey
(Fla. Bar No. 118806)
Mehaffey, P.A.
813 Orchid Drive
Plantation, FL 33317

heidi@mehaffeypa.law

Vivek Krishnamurthy
(*pro hac vice* pending)
University of Colorado Law School
Wolf Law Building
2450 Kittredge Loop Dr | 404 UCB
Boulder, CO 80309

vivek.krishnamurthy@colorado.edu

*Counsel to Amici Curiae*

March 31, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Heidi Mehaffey

Heidi Mehaffey
(Fla. Bar No. 118806)
Mehaffey, P.A.
813 Orchid Drive
Plantation, FL 33317
heidi@mehaffeypa.law

*Counsel to Amici Curiae*