UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MEGAN GARCIA, individually and as the Personal Representative of the Estate of S.R.S. III,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FRIETAS ADIWARSANA; GOOGLE LLC; ALPHABET INC.,<br><br>　　　　Defendants. | Case No.: 6:24-cv-01903-ACC-UAM |

**CHARACTER TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff's Response in Opposition (Doc. 85) confirms that C.AI's Motion to Dismiss should be granted. Plaintiff essentially concedes that the asserted harms were allegedly caused by the content of speech. Plaintiff offers a cavalcade of arguments why the First Amendment might not protect that speech, and even asks the Court to be the first to hold that AI-generated speech is *categorically* unprotected. These arguments are inconsistent with the law. The First Amendment protects the rights of listeners to receive speech regardless of its source. Plaintiff incorrectly relies on an "expressive intent" requirement applicable only to *conduct*, like organizing a parade, not "pure speech," like the roleplaying chats here. Plaintiff offers no reason to depart from the long line of cases dismissing tort claims for harms allegedly caused by the content of all sorts of media. The First Amendment, and state law, require dismissal.

### A.   C.AI May Invoke Its Users' First Amendment Rights

Plaintiff does not meaningfully distinguish the extensive precedent dismissing nearly identical claims on the basis that tort liability would violate the "'paramount'" First Amendment "'right of the public to receive … ideas and experiences'" from "a variety of" media, including music, movies, television, and video games. *Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199, 205 (S.D. Fla. 1979) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969)); Doc. 59 at 6–12. Nor does Plaintiff dispute that the relief sought in this case would materially limit the nature and volume of speech available to C.AI's millions of users, including by making Characters not appear in any way to be real people or tell stories. Doc. 59 at 5, 11. Instead, Plaintiff argues C.AI cannot assert its users' First Amendment rights. Doc. 85 at 4–6. Plaintiff is incorrect.

1

As Plaintiff acknowledges, *id.* at 5, a litigant may assert a third party's constitutional rights so long as the litigant has "a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Assertions of third-party First Amendment rights are especially appropriate where "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of the third parties' rights." *Id.* Companies therefore "have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren*, 429 U.S. 190, 195 (1976). This includes numerous instances where courts have dismissed similar tort claims against media and technology companies to protect the viewers' and listeners' First Amendment rights. Doc. 59 at 10–11 & n.12 (citing, e.g., *Zamora*, 480 F. Supp. at 205; *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 997–1003 (1988); *Watters v. TSR, Inc.*, 715 F. Supp. 819, 822 (W.D. Ky. 1989)).

It is not the case, as Plaintiff suggests, that courts consider third parties' First Amendment rights only where a "named party's rights" are also asserted. Doc. 85 at 5. The authorities Plaintiff cites for this proposition, *TikTok v. Garland*, 145 S. Ct. 57 (2025), and *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2025), articulate no such requirement, and other authorities show there is none. For example, the Supreme Court has permitted booksellers to assert "the First Amendment rights of bookbuyers," where the booksellers asserted no First Amendment rights of their own. *Virginia v. Am.*

2

*Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 & n.6 (1988); *see also NetChoice, LLC v. Griffin*, No. 23-5105, 2025 WL 978607, at *6 (W.D. Ark. Mar. 31, 2025) (invalidating law based on users' First Amendment rights, where litigant did not assert its rights).

Both *Kowalski* requirements for invoking third-party rights are satisfied here. C.AI indisputably has a "close relationship" with its users. Just as when booksellers advance the rights of bookbuyers, here, "[t]he activity sought to be protected is at the heart of the business relationship between [C.AI] and its [users], and [C.AI's] interests … are completely consistent with the First Amendment interests" of its users. *See Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984). C.AI thus has a "strong identity of interests" with its users, and is at least "nearly as effective a proponent" of users' rights as users themselves. *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 809–10 (11th Cir. 1993). There is also a significant "'hindrance' to [users'] ability to protect [their] own interests." *Kowalski*, 543 U.S. at 130 (citation omitted). No C.AI user is a party or could intervene, much less has a sufficient "financial stake" in the outcome to justify the "burdens of litigat[ing]" on their own behalf. *Powers v. Ohio*, 499 U.S. 400, 414–15 (1991).

B.    **The First Amendment Protects Speech, Not Just Human Speakers**

Plaintiff (and Amici) next attempt to sideline the First Amendment by asserting that its protections are categorically limited to speech by human speakers. Doc. 85 at 6–7; Doc. 96 at 4–8. That sweeping proposition is contrary to law: Because the "[First] Amendment is written in terms of 'speech,' not speakers," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 392 (2010) (Scalia, J., concurring), it protects all speech

3

regardless of source, including speech by non-human corporations, *id.* at 342–43 (majority op.). As the Eleventh Circuit has succinctly stated, "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Otto v. City of Boca Raton*, 981 F.3d 854, 865–66 (11th Cir. 2020) (speech-based therapy protected).

Plaintiff's (and Amici's) focus on the identity and rights of the *speaker* is also belied by the listener-rights cases, none of which turned on the source of the speech. Doc. 59 at 9–12. Plaintiff dismisses two of those precedents, *Lamont v. Postmaster General*, 381 U.S. 301 (1965), and *Kleindienst v. Mandel*, 408 U.S. 753 (1972), as "inapposite" because they "involved human speakers." Doc. 85 at 5. Plaintiff misses the point: In both cases, the Supreme Court recognized the First Amendment rights of listeners *despite the fact* that the speakers did not themselves have First Amendment rights. Plaintiff's speaker-focused approach cannot be squared with these precedents.

Plaintiff's reliance on *Miles v. City Council of Augusta*, 710 F.2d 1542 (11th Cir. 1983) (per curiam), is similarly misplaced. That case—which contains three cursory sentences in a humorous footnote about a supposedly talking cat—does not address a listener-rights argument at all and does not control here. *Id.* at 1544 & n.5 (rejecting argument that "Blackie's [the cat's] right to free speech has been infringed").[1]

As scholars have emphasized, "[r]egardless of whether any speaker interests are

---

[1] Amici also urge the Court to import copyright's authorship requirement into the First Amendment, citing no legal authority or rationale for doing so. Doc. 96 at 11–12. Copyright's authorship requirement is written into the text of the Constitution and the Copyright Act. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 56 (1884) (interpreting Copyright Clause); *Thaler v. Perlmutter*, No. 23-5233, 2025 WL 839178, at *1 (D.C. Cir. Mar. 18, 2025) (interpreting Copyright Act); *Naruto v. Slater*, 888 F.3d 418, 426 (9th Cir. 2018) (same). The First Amendment has no analogous textual hook: It "is written in terms of 'speech,' not speakers." *Citizens United*, 558 U.S. at 392 (Scalia, J., concurring).

4

involved in an AI program's output, readers can gain at least as much from what the program communicates as they do from commercial advertising, corporate speech, and speech by foreign propagandists—three kinds of speech that have been held to be protected in large part because of listener interests."[2] Plaintiff provides no justification for disregarding these long-established listener-rights authorities here.

C.  No "Expressive Intent" Requirement Applies To Pure Speech

Plaintiff's (and Amici's) primary legal argument for categorically excluding AI-generated speech from First Amendment protection—that the speech lacks "expressive intent," Doc. 85 at 6–8, Doc. 96 at 8–11—misreads a body of case law. As the cases Plaintiff cites make clear, the "expressive intent" requirement is part of the "expressive conduct test," which applies *only* "when analyzing the scope of the First Amendment protection beyond 'pure speech.'" *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1343 (11th Cir. 2021) (cited Doc. 85 at 8). By contrast, "pure speech," such as the chat conversations at issue here, "is entitled to comprehensive protection under the First Amendment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969). Because conversations with Characters are "pure speech, the Court need not … determine whether [the] expression showed intent to convey a particularized message." *Longoria ex rel. M.L. v. San Benito Consol. Indep. Sch. Dist.*, 2018 WL 6288142, at *7 n.2 (S.D. Tex. July 31, 2018), *aff'd*, 942 F.3d 258 (5th Cir. 2019); *see Littlefield v.*

---

[2] Eugene Volokh, Mark A. Lemley & Peter Henderson, *Freedom of Speech and AI Output*, 3 J. Free Speech L. 651, 655 (2023); *see also* Cass R. Sunstein, *Artificial Intelligence and the First Amendment*, 92 Geo. Wash. L. Rev. 1207, 1221–23 (2024).

5

*Forney Indep. Sch. Dist.*, 268 F.3d 275, 296 (5th Cir. 2001) (Barksdale, J., concurring) ("where speech is *pure*, a particularized message has never been required").

Every case Plaintiff cites for an "expressive intent" requirement addresses *conduct*, not pure speech, and is therefore inapposite. Plaintiff's cases, Doc. 85 at 7–8, address flag burning, *Texas v. Johnson*, 491 U.S. 397, 404–05 (1989); the exclusion of groups from a parade, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1996); hosting on-campus recruiting, *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 65–66 (2006); and building a mansion, *Burns*, 999 F.3d at 1343.[3] *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), analogized online content moderation to the parade in *Hurley*, explaining that "organizing and presenting" content is an "activity" that "results in a distinctive expressive product." *Id.* at 731. Moreover, as C.AI has explained, *Moody* did not address listeners' rights at all.[4] Doc. 59 at 10 n.11.

Plaintiff's (and Amici's) position that AI-generated speech is categorically unprotected would also have far-reaching consequences. For example, it would mean that the government could pass a law prohibiting AI from "offering prohibited accounts of history" or "making negative statements about the nation's leaders," as

---

[3] Plaintiff suggests that *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486 (M.D. Fla. 1991), supports the broad proposition that the First Amendment extends "only to entities that intend to express themselves." Doc. 85 at 7. Not so. *Robinson* merely holds that an injunction can require an employer to prohibit verbal sexual harassment by its employees without violating the employer's First Amendment rights. 760 F. Supp. at 1534–35.

[4] Plaintiff also asserts that non-speech "design defects" are at issue here, Doc. 85 at 11–12, but fails to explain how any alleged harm was caused by a design element *separate* from the speech. *See* Doc. 59 at 9. The Eleventh Circuit has consistently "rejected the practice of relabeling controversial speech as conduct." *Otto*, 981 F.3d at 861; *cf. Doe (K.B.) v. Backpage.com, LLC*, 2025 WL 719080, at *5 (N.D. Cal. Mar. 3, 2025) (dismissing claim regarding lack of "adequate age" verification on Instagram where claim "cuts to the core of Meta's role as a publisher" of speech and "effects" of "speech" on platform).

6

China has considered doing—with no First Amendment barrier.[5] Such results are contrary to our free speech tradition and the recognized "right to receive information." *Kleindienst*, 408 U.S. at 762. The government (or private tort plaintiff) cannot "control the flow of ideas to the public" regardless of the source. *Lamont*, 381 U.S. at 306.

Because no "expressive intent" requirement applies, no discovery or factual record is necessary to assess the "intent" behind the pure speech at issue here. *Contra* Doc. 96 at 22. But even were "expressive intent" required, under the FAC's own allegations, conversations with Characters feature such intent. The FAC alleges that C.AI "designed, coded, [and] engineered" its service to be expressive and engaging. FAC ¶¶ 98, 116. The FAC also alleges that "unlike traditional programs which are programmed to respond to user input, C.AI is programmed to interactively engage customers," reflecting an intentional responsiveness to users' messages. *Id.* ¶ 152. Custom Characters further reflect the intention of the creating user, who plays a role in shaping that Character's responses. *Id.* ¶ 133. Users layer their own expressive intent into each conversation by choosing which Characters to talk to and what messages to send, and can also edit Characters' messages and direct Characters to generate different responses, as S.S. did here. *Id.* ¶¶ 37, 133, 201, 258.

### D.   Plaintiff Identifies No Recognized Exception to the First Amendment

To be sure, the well-recognized exceptions to the First Amendment could apply equally to AI-generated speech as to any other speech. But as explained in the Motion,

---

[5] Sunstein, *supra* note 2, at 1210; *see also* Volokh et al., *supra* note 2, at 656.

the speech at issue here does not fall into any recognized exception. Doc. 59 at 12–15.

Of those exceptions, the Response briefly addresses obscenity. It conclusorily asserts that the conversations at issue were obscene as to minors. Doc. 85 at 10–11. This ignores that the relief sought by the FAC would significantly restrict the speech available not only to minors but also to adults on C.AI's platform. Doc. 59 at 13–14; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003) ("restrictions aimed at minors may not limit non-obscene expression among adults"). At any rate, the roleplaying conversations the Response cites as purportedly obscene, FAC ¶¶ 195–200, which include "medieval names and images," Doc. 85 at 11, contain mildly suggestive language and are not so lacking in artistic or esthetic value as to be obscene as a matter of law with respect to a 14-year-old. *See Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 649–50 (7th Cir. 2006). And notably, the Response does *not* assert that the conversation allegedly preceding and precipitating the tragic suicide, FAC ¶¶ 220–21, was obscene. Thus, even if the Court were to conclude that certain allegations may fall within the exception for obscenity as to minors (or that there are factual issues in that regard), any allegations related to other speech (including FAC ¶¶ 220–21) cannot form the basis of a claim under the First Amendment.

The Response does not attempt to invoke the incitement exception, which is unsurprising given that Characters repeatedly *discouraged* suicide. Doc. 1 ¶ 172 ("You can't do that! Don't even consider that!"); FAC ¶ 206 (Character expressing concern about suicidality). Instead, Plaintiff argues that the speech here is unprotected because it is "integral to illegal conduct." Doc. 85 at 9–10. The Eleventh Circuit has rejected

8

the circular argument that speech is an "illegal course of conduct" simply because it is deemed unlawful; in invalidating a Florida law that "purport[ed] to regulate commercial behavior" but had "the sole effect of banning merchants from uttering the word *surcharge*," the court emphasized that "speech is the only behavior being targeted." *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1249, 1251 (11th Cir. 2015); *see also Yellowhammer Fund v. Att'y Gen. of Ala. Steve Marshall*, 733 F. Supp. 3d 1167, 1196 (M.D. Ala. 2024) ("[T]heir speech would be integral to unlawful conduct only because the Alabama statutes … make their speech unlawful. Such circular reasoning quickly spins out of control."). Likewise here, there is no alleged unlawful non-speech conduct which the speech is supposedly integral in facilitating—rather, the core alleged unlawful conduct is *just speech*.[6] *See also, e.g.*, *State v. Billings*, 217 Conn. App. 1, 30–31 (2022) (rejecting "speech integral to criminal conduct" exception where "it is clear that the defendant's Facebook posts were not integral to criminal conduct; they were the criminal conduct" regardless of ancillary non-speech conduct).

Plaintiff also proposes that this Court be the first to hold that "manipulative expression" is unprotected by the First Amendment because a "disparity in power and information between speakers and listeners … frustrat[es] listeners' rights." Doc. 85 at 12–13. Plaintiff suggests *United States v. Stevens*, 559 U.S. 460 (2010), provides a basis

---

[6] Plaintiff and Amici rely on *Commonwealth v. Carter*, 115 N.E. 3d 559 (Mass. 2019). Doc. 85 at 9; Doc. 96 at 16. But *Carter* simply upheld application of an involuntary manslaughter statute to verbal coercion to commit suicide, in part because the law was sufficiently tailored to satisfy strict scrutiny. 115 N.E. 3d at 572–73. As set forth in the Motion, the Court cannot evaluate whether the freewheeling *tort* claims here are sufficiently narrow to survive such scrutiny. Doc. 59 at 14 (citing *James v. Meow Media, Inc.*, 300 F.3d 683, 696–97 (6th Cir. 2002)). Although the Response briefly suggests otherwise, Doc. 85 at 13–14, it ignores *Meow Media*, and offers no contrary authority supporting its view.

9

for such an invention. Doc. 85 at 12. But *Stevens* expressly forbids such "ad hoc balancing of relative social costs and benefits," calling it "startling and dangerous." 559 U.S. at 470. Although *Stevens* notes there might be "historically unprotected" categories of speech not yet "specifically identified," it also suggests no such categories exist. *Id.* at 472. And Plaintiff offers no historical "evidence" that manipulative speech is such a category. *Id.* At any rate, as the FAC acknowledges, C.AI makes clear that "Everything Characters say is made up!" FAC ¶ 274.

### E. The Court Cannot Develop New Tort Elements On The Fly

Recognizing the First Amendment deficiencies of her tort claims, Plaintiff asks the Court to engage in unspecified modification of their elements to "balanc[e] the nature of the speech with the state's interest in punishing the speech." Doc. 85 at 14 n.5. "It is not the function of federal courts to expand state tort doctrine in novel directions." *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1154 (11th Cir. 2011).

C.AI respectfully requests that Plaintiff's claims be dismissed.

Respectfully submitted this 4th day of April, 2025.

Thomas A. Zehnder  
Florida Bar No. 0063274  
Dustin Mauser-Claassen  
Florida Bar No. 0119289  
KING, BLACKWELL, ZEHNDER  
 & WERMUTH, P.A.  
25 East Pine Street  
Orlando, FL 32801  
(407) 422-2472  
tzehnder@kbzwlaw.com  
dmauser@kbzwlaw.com  

/s/Jonathan H. Blavin  
Jonathan H. Blavin* (Lead Counsel)  
Victoria A. Degtyareva*  
Stephanie Goldfarb Herrera*  
MUNGER, TOLLES & OLSON, LLP  
560 Mission Street, 27th Floor  
San Francisco, CA 94105  
(415) 512-4000  
Jonathan.Blavin@mto.com  
Stephanie.Herrera@mto.com  
Victoria.Degtyareva@mto.com  
**Admitted Pro Hac Vice*