UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MEGAN GARCIA, individually and as
the Personal Representative of the
Estate of S.R.S. III,

       Plaintiff,

v.

CHARACTER TECHNOLOGIES,
INC.; NOAM SHAZEER; DANIEL
DE FRIETAS ADIWARSANA;
GOOGLE LLC; ALPHABET INC.,

       Defendants.

Case No.: 6:24-cv-01903-ACC-NWH

## CHARACTER TECHNOLOGIES, INC.'S MOTION FOR CERTIFICATION OF IMMEDIATE APPEAL PURSUANT TO 28 U.S.C. § 1292(B) AND FOR STAY PENDING APPELLATE REVIEW

### I. INTRODUCTION

Character Technologies, Inc. ("C.AI") respectfully moves the Court to certify for immediate appeal a novel legal issue resolved by its May 21, 2025 Order, Doc. 115: Do users lack First Amendment rights *as listeners* to receive information and ideas communicated by generative AI technologies absent a separate showing of "expressive choice" by a human *speaker*? So the Order holds—the first in the nation to address the First Amendment's reach in a new and rapidly expanding medium of public discourse.

As the use of generative AI in daily life explodes, the Order's holding may affect the ability of millions of Americans to access and engage with information and ideas using a variety of AI technologies. This is the "exceptional case[]" raising an abstract

constitutional issue so consequential that the Eleventh Circuit should be permitted to exercise its discretion to address the issue now. *Benson v. Enter. Leasing Co. of Orlando, LLC*, No. 6:20-cv-891, 2021 WL 1078410, at *6, *8 (M.D. Fla. Feb. 4, 2021) (quoting *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1256 (11th Cir. 2004)).

The Order meets the requirements for certification under 28 U.S.C. § 1292(b):

- The applicable First Amendment standard is "a controlling question of law" that could determine the outcome of most, if not all, of Plaintiff's claims;

- "[S]ubstantial ground for difference of opinion" exists where, as here, a novel and difficult issue of first impression is presented, and reasonable jurists may differ on the application of First Amendment precedents and principles; and

- "[A]n immediate appeal from the order may materially advance the ultimate termination of the litigation," at a minimum, by substantially narrowing the claims and issues, and providing guidance on the applicable legal framework.

As the Supreme Court and courts in this District have held, these requirements "are 'most likely to be satisfied when a … ruling involves a new legal question or is of special consequence, and district courts should not hesitate to certify an interlocutory appeal in such cases.'" *Benson*, 2021 WL 1078410, at *8 (quoting *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 110–11 (2009)). The scope of listeners' First Amendment rights to receive information and ideas communicated by generative AI technologies is undoubtedly a new legal question of special consequence. Legal commentators have described the Court's Order as a "watershed moment" that "may move the needle on

2

… future … cases involving artificial intelligence."[1]  Plaintiff's counsel too have stated that the Order is "historic" and "paves the way for additional cases."  *Id.*

The novelty and potential impact of the Order favors certification.  It may affect how courts and legislatures think about future lawsuits or statutes that seek to restrict the dissemination of information and ideas through AI technologies.  It also may chill innovation in the nascent AI industry, impairing the rights of millions of members of the public "to experiment and to create in the realm of thought and speech" using AI and to "use new forms, and new forums" to receive and express ideas.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 372 (2010) (citation omitted).

Given the significance of this constitutional issue of first impression, the Eleventh Circuit should be afforded the opportunity to decide whether immediate appellate guidance is appropriate.[2]

## II. BACKGROUND

Plaintiff alleges that her son's tragic suicide was caused by his interactive, text-based conversations with chatbots on C.AI's generative AI service.  Doc. 11.  C.AI moved to dismiss all Plaintiff's claims as barred by the First Amendment, among other

---

[1] Kat Black, *Do Chatbots Enjoy Free Speech Rights? A US Judge in Florida's Answer May Be a Watershed Moment*, Law.com (May 27, 2025), https://www.law.com/2025/05/27/do-chatbots-enjoy-free-speech-rights-a-us-judge-in-floridas-answer-may-be-a-watershed-moment/.

[2] C.AI anticipates that several amici will seek leave to file briefs in support of § 1292(b) certification, highlighting the importance of immediate appellate review here.  Courts routinely and as a matter of course consider amicus briefs when deciding § 1292(b) motions.  *E.g.*, *Sec. & Exch. Comm'n v. Coinbase, Inc.*, 761 F. Supp. 3d 702, 720 n.6 (S.D.N.Y. 2025); *New York ex rel. James v. Citibank, N.A.*, No. 24-cv-659, 2025 WL 1194377, at *1 (S.D.N.Y. Apr. 22, 2025); *Flint Riverkeeper, Inc. v. S. Mills, Inc.*, 261 F. Supp. 3d 1345, 1346 & n.1 (M.D. Ga. 2017); *Bean Me. Lobster, Inc. v. Monterey Bay Aquarium Found.*, No. 2:23-cv-129, 2025 WL 1114801, at *1 (D. Me. Apr. 15, 2025); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 890 F. Supp. 470, 498 n.1 (D.S.C. 1995).

grounds. Doc. 59 at 6–15; Doc. 98 at 3–10. C.AI argued that imposing tort liability based on the content of conversations with chatbots would infringe on the First Amendment rights of C.AI's millions of users to interact with and receive speech and ideas on its service. Doc. 59 at 9–12; Doc. 98 at 1–3.

The Court largely denied C.AI's motion. Doc. 115. Relevant here, the Court agreed that C.AI can assert its users' First Amendment rights, and acknowledged that "Plaintiff endeavors to restrict Character A.I. users' access to Character A.I. and to its LLM's output," *id.* at 27, but held that C.AI "must still demonstrate that the *users'* First Amendment rights are implicated." *Id.* (emphasis added). On that point, the Court held that the "operative question is whether *Character A.I.'s* output is speech." *Id.* at 29 (emphasis added). Relying on the test for expressive conduct, the Court further held that "speech, even pure speech" must reflect an "'expressive choice'" by a human speaker to implicate the First Amendment. *Id.* at 30–31 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 746 (2024) (Barrett, J., concurring)). The Court thus concluded that, to invoke the First Amendment, C.AI must demonstrate that the output of its generative AI model, which takes the form of words in interactive conversations with users, "is expressive such that it is speech" for First Amendment purposes. *Id.* at 31.

The Court explained its "expressive choice" requirement by analogizing C.AI's text-based conversations with users to AI-powered online content moderation. Although *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), holds that online content moderation also is protected by the First Amendment, *id.* at 718–19, the Court focused on Justice Barrett's concurrence in *Moody*, which "hypothesized" that AI-powered

4

content moderation "'might be different'" from non-AI content moderation because "'a human being with First Amendment rights'" may not have "'made an inherently expressive choice … not to propound a particular point of view.'"  Doc. 115 at 31 (quoting *Moody*, 603 U.S. at 746 (Barrett, J., concurring)).  Because, in the Court's view, it was not evident on the pleadings that the output of C.AI's generative AI model reflects human "expressive choice," the Court stated that it was "not prepared to hold that the [C.AI] LLM's output is speech at this stage" of litigation.  *Id.* at 27, 31–32.

The Court also held that nearly all Plaintiff's claims were adequately pled, allowing the case to proceed to discovery.  *Id.* at 48.  Dispositive motions are due in May 2026, with trial set for November 2026.  Doc. 52 at 2–3.

### III. STANDARD

A district court may certify an order for immediate appeal if "such order involves a controlling question of law," there is "substantial ground for difference of opinion" as to that question, and "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Certification is especially appropriate where the question is of "significant import beyond [the] case [presented]."  *McFarlin*, 381 F.3d at 1262.

### IV. ARGUMENT

#### A.    The Court's Order Resolves A Controlling Question of Law

The Court's holding that users' First Amendment rights as listeners to receive information and ideas expressed in words communicated by generative AI

technologies depend upon a separate showing of "expressive choice" by a human speaker presents a "controlling question of law" under 28 U.S.C. § 1292(b).

First, whether listeners' First Amendment rights are limited to communicated words that satisfy a separate human "expressive choice" requirement is a pure "question of law" under § 1292(b).  The Eleventh Circuit has held that demarcating the boundary of "speech protected by the First Amendment … presents a question of law." *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir. 1995). This type of "abstract legal issue" regarding the scope of a constitutional provision is precisely "what the framers of § 1292(b) had in mind." *McFarlin*, 381 F.3d at 1258.

Second, the First Amendment question presented is "stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases." *Id*. at 1259.  The question *whether* words communicated by AI technologies must satisfy a separate human "expressive choice" requirement to implicate the First Amendment is a "pure law premise[]" the Eleventh Circuit can examine "quickly and cleanly[,] without having to study the record." *Id.* at 1258–59.  The Eleventh Circuit need only decide *what framework applies*, *not how it applies* to the facts alleged here.  Indeed, the Eleventh Circuit could not "delve beyond the surface of the record" if it wanted to, *id.* at 1259, because the Court reserved application of its human "expressive choice" requirement to the words at issue here, Doc. 115 at 31.  If the Eleventh Circuit holds there is no separate human "expressive choice" requirement, this Court may apply the Eleventh Circuit's analytical framework to Plaintiff's allegations in the first instance on remand.

Third, the First Amendment question presented is "controlling" under § 1292(b). "A legal issue is controlling if it could materially affect the outcome of the case." *U.S. ex rel. Armfield v. Gills*, No. 8:07-cv-2374, 2011 WL 2084072, at *1 (M.D. Fla. May 24, 2011) (quoting *In re City of Memphis*, 293 F.3d 345, 351 (6th Cir. 2002)). The issue need not be dispositive of the litigation: It is sufficient that the issue controls "a substantial part of the case." *McFarlin*, 381 F.3d at 1264; *id.* at 1259 (question that may "substantially reduce the amount of litigation left in the case" is controlling).

The Court's holding that words communicated to users by AI technologies must satisfy a separate human "expressive choice" requirement to implicate the First Amendment is a "controlling" question under these standards. Whether a separate human "expressive choice" requirement exists may be the difference between a full judgment in favor of C.AI (and the other Defendants) on the pleadings and the possibility of content-based liability on a range of claims. At a minimum, immediate appellate review would provide certainty regarding the constitutional standard that will govern this central issue in this litigation, and the legal framework that will substantially guide the parties' discovery and expert reports.

Moreover, as explained in Part IV.D, *infra*, immediate appellate review will provide guidance in other cases raising similar questions about the First Amendment's application to AI—cases which Plaintiff's counsel have acknowledged are to be filed, *see supra* at 2–3 & n.1. A legal issue may also be "controlling" under § 1292(b) if "clear guidance from the Eleventh Circuit will aid district courts in a large number of cases," even if reversal would not "terminate the action." *Baxter v. Miscavige*, No. 8:22-cv-986,

2023 WL 3863287, at *2 (M.D. Fla. June 7, 2023); *see also Benson*, 2021 WL 1078410, at *8; *Coinbase, Inc.*, 761 F. Supp. at 715 (finding legal issue "controlling" because of "precedential value for a large number of cases" (citation omitted)).

For these reasons, the Eleventh Circuit and other courts consistently allow interlocutory appeals on important issues regarding the scope of First Amendment protection—particularly where, as here, the defense could completely shield the defendant from liability. For example, in *Ray v. Edwards*, 725 F.2d 655 (11th Cir. 1984), the Eleventh Circuit granted interlocutory appeal to decide whether certain protected political activities of the defendant constituted "constitutionally protected speech" that was "completely shielded from liability." *Id.* at 659. In *Horsley v. Rivera*, 292 F.3d 695 (11th Cir. 2002), the Eleventh Circuit granted interlocutory appeal to decide whether the defendant's challenged statement was "not protected as a matter of law by the First Amendment." *Id.* at 697. Other Courts of Appeals have granted interlocutory appeal on similar First Amendment issues. *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109–10 (D.C. Cir. 2017) (Kavanaugh, J.) (whether plaintiff presented sufficient evidence of actual malice to overcome summary judgment on defamation claim); *In re Trump*, 874 F.3d 948, 951 (6th Cir. 2017) ("whether the First Amendment applies to bar [a] claim" is "undoubtedly" a controlling question of law).

District courts have likewise certified analogous First Amendment questions, including "whether … speech is entitled to some measure of First Amendment protection." *Hines v. Alldredge*, No. 1:13-cv-56, 2014 WL 12649849, at *1 (S.D. Tex. Mar. 27, 2014). One such court noted that the controlling-question requirement is

"easily met" by a "First Amendment defense" that is "akin to an argument for complete immunity." *Nat'l Ass'n of Afr.-Am. Owned Media v. Charter Commc'ns, Inc.*, No. CV-16-609, 2016 WL 10647193, at *5 (C.D. Cal. Dec. 12, 2016). As the Order recognizes, that is the case here: C.AI "contend[s] that all Plaintiff's claims are categorically barred by the First Amendment." Doc. 115 at 24.

For these reasons, the question whether words communicated by AI technologies must satisfy a separate human "expressive choice" requirement to be protected by the First Amendment is a "controlling question of law" under § 1292(b).[3]

## B. Substantial Grounds Exist for Difference of Opinion

The second of § 1292(b)'s requirements, that there exist "substantial grounds for difference of opinion," is also satisfied here.

"[T]his requirement is met where 'fair-minded jurists might reach contradictory conclusions' on difficult issues of first impression." *Benson*, 2021 WL 1078410, at *7 (quoting *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011)); *see also Revival Chiropractic LLC v. Allstate Ins. Co.*, No. 6:19-cv-445, 2020 WL 3266040, at *2 (M.D. Fla. Apr. 29, 2020) (substantial grounds exist where issues are "'difficult and of first impression'"); *Reese*, 643 F.3d at 688 ("Courts traditionally will find that a substantial ground for difference of opinion exists where novel and difficult questions of first impression are presented."); *In re Trump*, 874 F.3d at 952; *In re San Juan Dupont*

---

[3] Any argument that the Court should not certify this First Amendment issue of first impression because the Order also addresses other issues would be misplaced. When a district court certifies an order under § 1292(b), the Eleventh Circuit has discretion to "limit [its] review to the discrete and abstract legal issue the district court identifie[s]." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1275 (11th Cir. 2020).

*Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1009, 1010 n.1 (1st Cir. 1988).  Thus, the Court

may certify a novel and difficult issue for immediate appeal even if no other court has

yet addressed the same question.[4]  *Mamani v. Berzain*, No. 07-22459, 2014 WL

12689038, at *2–3 (S.D. Fla. Aug. 18, 2014) (certifying issues "of first impression").

The Court's Order satisfies these criteria.  Whether words communicated to

users by AI technologies must satisfy a separate human "expressive choice"

requirement to implicate the First Amendment is a difficult issue of first impression.

As the Order acknowledges, no other authority addresses this question with respect to

AI.[5]  *See* Doc. 115 at 31 (citing *W.W. v. Orlando Health, Inc.*, No. 6:24-cv-1068, 2025

WL 722892, at *7 (M.D. Fla. Mar. 6, 2025), and noting "lack of binding authority").

Courts routinely conclude that such "novel and difficult" First Amendment issues

satisfy the substantial grounds requirement—even if the court does not believe that the

party requesting certification "can be correct in its argument."  *Nat'l Ass'n of Afr.-Am.

Owned Media*, 2016 WL 10647193, at *3–6 (certifying "novel (and important)" First

Amendment defense that court believed was incorrect but "at least colorable"); *see also

Best Carpet Values, Inc. v. Google LLC*, No. 5:20-cv-4700, 2022 WL 22843012, at *3

(N.D. Cal. 2022) (certifying "novel and difficult issue" of "Defendant's First

Amendment argument" where "no court ha[d] considered whether that protection

---

[4] Although some courts have stated that a litigant "normally" satisfies this requirement by citing conflicting decisions, those cases also recognize that questions of first impression can be certified.  *E.g.*, *In re Pac. Forest Prods. Corp.*, 335 B.R. 910, 922, 924 (S.D. Fla. 2005) (favorably citing *Hall v. Synalloy Corp.*, 540 F. Supp. 263, 276 (S.D. Ga. 1982), which certified a question of first impression).

[5] As the Order recognizes, Doc. 115 at 29–30, courts have repeatedly held in non-AI contexts that a particularized expressive message is not required where words, not conduct, are at issue.  *See infra* n.6.

extends to advertisements and other messages superimposed on a website").

Not only is the First Amendment question presented novel and difficult, but also fair-minded jurists may reasonably disagree with the Court's imposition of a separate human "expressive choice" requirement on at least two related grounds. Even if this Court is "confident" that its Order "is correct," these two grounds for difference of opinion warrant permitting the Eleventh Circuit to exercise its discretion to decide whether to entertain an immediate appeal. *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, No. 1:20-cv-613, 2025 WL 1488015, at *1 (D. Del. May 23, 2025) (certifying fair use and copyright questions regarding AI), *appeal accepted*, No. 25-8018 (3d Cir. June 17, 2025), Doc. 22.

### 1.    *Reasonable jurists might conclude that words are inherently expressive and therefore implicate the First Amendment*

First, fair-minded jurists could conclude that the words communicated to users by generative AI are expressive by their nature and therefore constitute "speech" that implicates the First Amendment without any inquiry into human "expressive choice."[6]

As C.AI explained in its briefing, binding Eleventh Circuit authority holds that "[s]peech is speech, and it must be analyzed as such for purposes of the First

---

[6] Reasonable jurists could also conclude, based on the facts alleged, that users' conversations with Characters on C.AI's service reflect human "expressive choice"—as C.AI has argued, Doc. 98 at 7. As Plaintiff alleges, C.AI designed its service to respond to user input in expressive and engaging ways. *Id.* The user who creates each Character makes expressive choices about what kinds of words that Character will generate, such as the fictional Game of Thrones Characters at issue here. *Id.* And each user injects expressive intent into each conversation by choosing which Characters to converse with and what messages to send, and by editing Characters' messages and directing Characters to generate different responses, as S.S. did at times. *Id.* As the Court noted at oral argument, "[T]here's pretty much no doubt that there are aspects of this chatbot that are protected." Tr. 27:16–17.

Amendment." Doc. 59 at 7 (quoting *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1307–11 (11th Cir. 2017) (en banc)); Doc. 98 at 4 (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 865–66 (11th Cir. 2020)). Applying that principle, the Eleventh Circuit has rejected "'the enterprise of labeling certain verbal or written communications 'speech' and others'" "not speech." *Otto*, 981 F.3d at 861 (quoting *Wollschlaeger*, 848 F.3d at 1308). For example, the Eleventh Circuit rejected the argument that speech-based therapy was "non-expressive conduct" that did "not implicate the First Amendment" because it "consists—entirely—of words." *Id.* at 861, 865.

Other circuits are in accord. The Ninth Circuit has held that "words" are a "form[] of pure expression" "entitled to full First Amendment protection without any need" to determine whether the words are "'sufficiently imbued with elements of communication.'" *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058–59, 1061 (9th Cir. 2010) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)). The Second Circuit similarly has held that a "writing" is "entitled to full First Amendment protection," and has rejected a case-specific inquiry into whether such an inherently expressive medium is "lacking in communicative concepts or ideas." *Bery v. City of New York*, 97 F.3d 689, 695 (2d Cir. 1996). Several other courts have held the same, including with respect to novel forms of communication like computer source code. *E.g.*, *Bernstein v. U.S. Dep't of State,* 922 F. Supp. 1426, 1434–35 (N.D. Cal. 1996) (rejecting argument that source code "cannot be speech" because it is "not intended to convey a particular message" based on the reasoning that a "court need only assess the expressiveness of conduct in the absence of 'the spoken or written word'" and that

"'[l]anguage is by definition speech'" (quoting *Yniguez v. Arizonans for Off. Eng.,* 69 F.3d 920, 935 (9th Cir. 1995), *vacated on other grounds,* 520 U.S. 43 (1997))).[7]

Finally, at least one court has implicitly reached a conclusion contrary to the Court's Order in analyzing AI-generated text under the First Amendment.  In *Walters v. OpenAI, L.L.C.*, No. 23-A-04860-2 (Ga. Sup. Ct. May. 19, 2025) (submitted Docs. 114, 114-1), the court considered a defamation claim against a generative AI company based on words generated by a large language model.  The court applied the First Amendment's heightened defamation standard to the challenged words to hold that the plaintiff's claim failed and that the First Amendment precluded punitive damages. *Id.* at slip op. 12–22.  The court thus concluded that the words communicated by the large language model—the same type of AI model Plaintiff alleges is at issue here— implicated the First Amendment without separately analyzing whether those words reflected human "expressive choice."

Given these precedents, reasonable jurists could disagree with the Order's imposition of a separate human "expressive choice" requirement to determine whether the First Amendment applies to words communicated by AI technologies.  Reasonable jurists could conclude that Eleventh Circuit (and other) precedent precludes treating certain verbal or written communications as "speech" and others as "not speech" and

---

[7] *See also Longoria ex rel. M.L. v. San Benito Consol. Indep. Sch. Dist.*, No. 1:17-cv-160, 2018 WL 6288142, at *7 n.2 (S.D. Tex. July 31, 2018), *aff'd*, 942 F.3d 258 (5th Cir. 2019) (cited Doc. 98 at 5) ("Because [student] engaged in pure speech, the Court need not apply the symbolic speech test … to determine whether [the] expression showed intent to convey a particularized message."); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 296 (5th Cir. 2001) (Barksdale, J., concurring) (cited Doc. 98 at 4–5; cited Doc. 115 at 30) ("[W]here speech is *pure*, a particularized message has never been required.").

that the First Amendment extends to written conversations between users and Characters that are "composed—entirely—of words." *Otto*, 981 F.3d at 865. That is especially so given that Plaintiff herself alleges that the words at issue here were harmful *because of the message they conveyed*. *E.g.*, Doc. 11 ¶¶ 151, 197, 220.

As C.AI noted in its Motion, Justice Barrett's concurrence in *Moody* is not inconsistent with these authorities. Doc. 59 at 10 n.11. Justice Barrett's concurrence concerns AI-driven editorial decisions, not words (AI-generated or otherwise), and addresses platforms' First Amendment rights with respect to such decisions, not users' rights to receive information and ideas. *See Moody*, 603 U.S. at 746. Indeed, Justice Barrett's concurrence itself demonstrates substantial grounds for difference of opinion: It was joined by no other Justice, and it merely raises hypothetical questions. *See id.*

### 2. Reasonable jurists might conclude that listeners' First Amendment rights do not depend on any speaker-side expressive choice

Second, fair-minded jurists could conclude that the First Amendment protects the rights of C.AI's users as *listeners* to interact with and receive speech and ideas on its service, without inquiring into the "expressive choices" of any *speakers*.

"The First Amendment protects speech *and* speaker, *and* the ideas that flow from each." *Citizens United*, 558 U.S. at 341 (emphases added). C.AI sought dismissal on the ground that Plaintiff's claims violate the rights of C.AI's millions of users to "receive information and ideas." Doc. 59 at 10. The Order holds that C.AI may assert its users' First Amendment rights, Doc. 115 at 15–17, and recognizes that C.AI's users receive ideas and expression on its service, *see id.* at 36 (product liability claims may

go forward "so far as Plaintiff's claims arise from defects in the Character A.I. app rather than ideas or expressions within the app").  The Order also recognizes that the claims and relief sought would dramatically limit the amount and nature of information and ideas available to C.AI's users.  *Id.* at 27 ("Plaintiff endeavors to restrict Character A.I. users' access to Character A.I. and to its LLM's output.").

The Order nonetheless states that C.AI cannot show "[its] users' First Amendment rights are implicated" without "convinc[ing] the Court that the [C.AI] LLM's output is protected speech" under a separate human "expressive choice" inquiry.  *Id.* at 27, 31.  The Order thus holds that the rights of C.AI's *users* to receive information and ideas on its service depend on *speaker-side* expressive choices (and assumes C.AI's model is the only speaker).  *Id.*  Reasonable jurists could disagree.

As the Order recognizes, "[t]he [First] Amendment is written in terms of 'speech,' not speakers."  *Citizens United*, 558 U.S. at 392 (Scalia, J., concurring) (cited at Doc. 115 at 25).  "Its text offers no foothold for excluding any category of speaker." *Id.* at 392–93.  This is because the "constitutional guarantee of free speech serves significant societal interests wholly apart from the speaker's interest in self-expression," including "the public's interest in receiving information."  *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (plurality op.).  Thus, when analyzing *listeners'* rights, asking whether the First Amendment protects the *speaker's speech* is "the wrong question," given that the "inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source."

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776–77 (1978).  Reasonable jurists could therefore disagree with the Order's speaker-focused "expressive choice" inquiry.

Further ground for difference of opinion is provided by the Supreme Court's seminal listener-rights decisions, which hold that listeners have a right to receive information and ideas even if the speaker lacks First Amendment rights (and, thus, their speech is not protected).  *See Kleindienst v. Mandel*, 408 U.S. 753, 762-65 (1972) (U.S. citizens had First Amendment rights "to hear, speak, and debate with" a foreign Marxist professor even though the professor lacked First Amendment rights); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 305–07 (1965) (U.S. citizens had First Amendment rights to receive foreign "communist political propaganda" even though the foreign propagandists lacked First Amendment rights).  Reasonable jurists could conclude that the Order's speaker-focused "expressive choice" requirement conflicts with these precedents, which recognize listeners' First Amendment rights even where the speaker lacks a First Amendment right to espouse "protected speech."  *Cf.* Doc. 115 at 27.

The implications of the Court's holding confirm that, at a minimum, it is in tension with principles articulated in the Supreme Court's listener-rights precedents. The First Amendment rightly precludes "command[ing] where a person may get his or her information or what distrusted source he or she may not hear."  *Citizens United*, 558 U.S. at 356.  Yet if information and ideas communicated to users by AI fall outside the protection of the First Amendment, the government is free to "use its full power, including the criminal law" to declare AI a "distrusted source" and punish citizens for receiving certain information from it.  *Id.*  Such "censorship to control thought" is

contrary to our free speech tradition and the listener-rights precedents, *id.*, yet may well be permissible under the Court's Order. *See* Doc. 98 at 6–7. Reasonable jurists therefore could conclude that the dissemination of information and ideas by AI technologies implicates the public's First Amendment rights—irrespective of any speaker-side First Amendment rights or "expressive choice."

Justice Barrett's concurrence in *Moody* is, again, not inconsistent with these authorities. As noted, Justice Barrett's concurrence concerned whether online platforms could assert *their own rights as speakers* with respect to editorial decisions made by AI technology. Doc. 59 at 10 n.11; Doc. 98 at 6. Neither *Moody* nor Justice Barrett's concurrence considered the First Amendment rights of *users* to receive information and ideas on online platforms—much less written communications composed entirely of words, like the messages at issue here.

## C.    Immediate Appeal May Materially Advance Ultimate Termination

The final § 1292(b) requirement, "that an immediate appeal from the order may materially advance the ultimate termination of the litigation," is also satisfied here.

Immediate appellate review of the First Amendment question presented may "serve to avoid a trial or otherwise substantially shorten the litigation." *McFarlin*, 381 F.3d at 1259; *see also Nat'l Ass'n of Afr.-Am. Owned Media*, 2016 WL 10647193, at *3–6 (certifying an issue that could terminate the litigation, but noting that "immediate termination is not required" for certification). If words are speech under the First Amendment, without a separate inquiry into whether the words reflect human "expressive choice," the remaining First Amendment analysis—whether the words

alleged here fall within any recognized First Amendment exception—involves pure questions of law under well-settled standards the Court may decide on remand without factual development.  The Court's resolution of that inquiry could result in termination of all or most of Plaintiff's claims on the pleadings.  This is true even though Plaintiff purports to challenge various "design" features, such as the absence of parental controls, age verification, and reporting mechanisms, as those features themselves are inextricable from speech.  *E.g.*, *Comput. & Commc'ns. Indus. Ass'n v. Uthmeier*, No. 4:24-cv-438, 2025 WL 1570007, at *12 & n.19 (N.D. Fla. June 3, 2025) (enjoining Florida law imposing parental consent controls and related requirements on minors' access to and use of online platforms with "addictive features" (but not regulating content directly), because such features were "inextricable from the speech element combined in the same course of conduct—namely, accessing a forum for speech"); *cf.* Doc. 115 at 36 (product liability claims arising from "ideas or expressions" may not go forward). Such a substantial reduction in the number and scope of claims and alleged harms would streamline the litigation and materially advance its ultimate termination.

Immediate appeal would also ensure that the parties and the Court are applying the correct First Amendment framework from the start—thereby avoiding potentially wasted efforts in wide-ranging fact discovery, complicated technical and other expert reports, summary judgment, and at trial.  When key framing questions are disputed in complicated litigation, appellate review at "an early stage" ensures that "analysis proceeds on the right path in the court[] below."  *Moody*, 603 U.S. at 717, 726 (holding that lower court had erred "especially stark[ly]" in concluding First Amendment did

not apply). Such early appellate guidance materially advances the ultimate termination of litigation because it can "streamline and focus discovery efforts for the parties to understand the proper analytical standards governing" the case. *Nat'l Ass'n of Afr.-Am. Owned Media*, 2016 WL 10647193, at *6.

Early appellate review would provide all these benefits here. If the parties are operating under the First Amendment framework set forth in the Court's Order, determining whether the First Amendment bars some or all of Plaintiff's claims will likely entail a sprawling inquiry that is dependent on burdensome and highly complex technical discovery, expert reports, and significant briefing, regarding both what the Order's human "expressive choice" prerequisite requires and whether the words at issue satisfy such a requirement. If the Eleventh Circuit ultimately determines that such a requirement does not exist, however, these efforts will have been for nought and will only delay ultimate resolution. *See id.* "[E]ven an affirmance may provide useful guidance before the parties engage in potentially wide-ranging and expensive discovery," *Best Carpet Values, Inc.*, 2022 WL 22843012, at *3, and "fruitfully aid in the resolution of this case, either in-court or otherwise," *Nat'l Ass'n of Afr.-Am. Owned Media*, 2016 WL 10647193, at *6.

Moreover, even were the Court to conclude on remand that a First Amendment exception applies to some speech at issue, immediate appellate review could still dramatically narrow the scope of the case. For example, as C.AI explained at argument and in its briefing, Plaintiff does not argue that the obscenity exception applies to the non-sexual messages that Plaintiff alleges proximately caused S.S.'s

death.  Doc. 98 at 8; Tr. 41–42; Doc. 11 ¶¶ 220, 395 (alleging that non-sexual messages about "com[ing] home" in "last conversation" with a Character "especially" caused suicide).  In that scenario, dismissal of the wrongful death and other claims stemming from non-sexual messages would significantly streamline the case and discovery.

These principles favoring early appeal apply with even more force in the First Amendment context.  Immediate appeal from a "failure to dismiss" on First Amendment grounds may avoid "long and expensive trial proceedings, which, if not really warranted, would themselves offend" free speech principles "because of the chilling effect of such litigation" on users' ability to access AI-generated speech on C.AI and other platforms.  *Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir. 1969). These First Amendment interests too favor immediate appeal.

### D.    The Order's Effect Beyond This Case Merits § 1292(b) Certification

"[W]hen a … ruling involves a new legal question or is of special consequence," "district courts should not hesitate to certify an interlocutory appeal."  *Benson*, 2021 WL 1078410, at *8 (quoting *Mohawk Indus.*, 558 U.S. at 110–11).  Certification is especially appropriate where the legal question at issue is of "significant import beyond this case."  *McFarlin*, 381 F.3d at 1262.  And certification is also especially appropriate in the First Amendment context:  The "importance" of a legal issue is "a factor warranting § 1292(b) certification," and the "right of free speech 'ranks near the top of the hierarchy of constitutional rights.'"  *Brown v. Town of S. Thomaston*, No. 08-308, 2010 WL 11545906, at *2 (D. Me. Jan. 21, 2010) (quoting *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 11–12 (1st Cir. 2004)).

In addition, the application of law to novel AI technology separately supports certification.  Indeed, other courts recently have certified "difficult legal questions" involving AI technologies, including "copyright and non-generative AI tools," because "[a]ddressing these questions now will speed up resolving the case *and benefit the public*." *Thomson Reuters*, 2025 WL 1488015, at *4 (emphasis added); *see also Doe 1 v. Github, Inc.*, No. 22-cv-06823, 2024 WL 4336532, at *1 (N.D. Cal. Sept. 27, 2024) (certifying issue of Digital Millennium Copyright Act's application to generative AI).

The Court's Order is of special consequence beyond this case because it calls into question the basic legal status of a new and rapidly growing area of expression— interactions with generative AI services of all kinds—which could dramatically impact future litigation and regulatory efforts to limit access to AI-generated speech.  As C.AI and scholars alike have noted, if the information and ideas communicated by AI technologies fall outside the protection of the First Amendment, the government has free rein to prohibit, or even criminalize, the dissemination or receipt of AI-generated speech on disfavored topics or viewpoints.  Doc. 98 at 6–7; Eugene Volokh et al., *Freedom of Speech and AI Output*, 3 J. Free Speech L. 651, 656 (2023).

The parties, the public, the nascent AI industry, and the millions of American users of generative AI services would benefit from appellate guidance now, not later.  Summary judgment in this case will not occur until May 2026 or later, and the trial is set for November 2026—almost a year and a half from now.  That wait for appellate guidance is especially long in the context of the rapidly advancing AI industry.  Enormous    investments    in    generative    AI    research,    development,    and

commercialization may occur during that time—or may not occur because of the shadow of liability cast by the Court's Order.  Immediate appellate review will provide needed certainty on this fundamental and critical First Amendment issue—whether the Eleventh Circuit affirms or reverses.

### E.    If the Court Certifies the Order, the Court Should Stay Proceedings

If the Court certifies the Order for immediate appeal, the Court should stay all further proceedings while C.AI petitions the Eleventh Circuit for permission to appeal and, if an appeal is permitted, while the appeal proceeds.[8]  Such stays are routine when courts certify § 1292(b) appeals.  *E.g.*, *Thomson Reuters*, 2025 WL 1488015, at *1; *Best Carpet Values, Inc.*, 2022 WL 22843012, at *3; *Hines*, 2014 WL 12649849, at *2; *Brown*, 2010 WL 11545906, at *2; *Mamani*, 2014 WL 12689038, at *3.  Otherwise the parties and district court will engage in potentially unnecessary litigation while the Court of Appeals decides whether to consider, and considers, a controlling legal issue, which may render the interlocutory appeal "pointless."  *Nat'l Ass'n of Afr.-Am. Owned Media*, 2016 WL 10647193, at *6.

A stay is particularly appropriate here because discovery will be "complex, time consuming, and expensive."  *Mamani*, 2014 WL 12689038, at *3.  Plaintiff has already issued *fifty* broad requests for production covering a huge variety of highly technical and other subjects, including (among numerous other requests):  "all documents and communications relating to the development, testing, and release of [C.AI's] Large

---

[8] The Court has inherent authority to control the disposition of cases on its docket "with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

Language Model"; "statistics and reports on [C.AI's] registered user base, including age and demographic data"; and "all documents, studies, and research articles (published and unpublished) conducted by [C.AI] or []third parties related [to] [C.AI's] AI chatbots … and other AI technology in the areas including but not limited to design choice, safety, coercion, persuasion, exploitation abusive [*sic*], harmful, deceptive, manipulation, anthropomorphism, personalization, trust and rapport; including all underlying user experimentation data."

C.AI is working diligently to fulfill its discovery obligations. But if C.AI ultimately prevails on its First Amendment defense on the pleadings, its burdensome discovery efforts in this case will be wasted. Even if a portion of the case proceeds, huge effort and expense could be avoided by a stay. For instance, discovery on "anthropomorphism" will be entirely wasted if the First Amendment applies to the words communicated to users by Characters, including words such as "'Uhm,' 'Mmmmmm,' and 'Heh'"—words that Plaintiff herself alleges have expressive value, such as conveying nervousness. Doc. 115 at 4–5 (citing Doc. 11 ¶ 151). Further, some of Plaintiff's discovery requests concern users who are not parties to this case, such as requests for "all underlying user experimentation data" and all documents regarding "self-harm by minor users." Such broad requests for data that Plaintiff herself describes as "highly personal and sensitive," Doc. 11 ¶ 322, are likely to lead to discovery disputes that may ultimately be avoidable. The Court can thus preserve its own resources, as well as the parties' resources, by granting a stay pending appeal.

C.AI would also have no objection to seeking expedited treatment of any appeal

under Eleventh Circuit Internal Operating Procedure 27.3.

## V. CONCLUSION

C.AI respectfully requests that the Court certify the First Amendment question presented herein for immediate appeal under 28 U.S.C. § 1292(b).  If the Court so certifies, C.AI further requests that the Court stay proceedings pending any further appellate proceedings.

### Local Rule 3.01(g) Certification

I certify that C.AI conferred with Plaintiff by video conference on June 10, 2025, in a good-faith effort to resolve the motion.  Plaintiff opposes the relief requested.

Respectfully submitted this 18th day of June, 2025.

Thomas A. Zehnder
Florida Bar No. 0063274
Dustin Mauser-Claassen
Florida Bar No. 0119289
KING, BLACKWELL, ZEHNDER
 & WERMUTH, P.A.
25 East Pine Street
Orlando, FL 32801
(407) 422-2472
tzehnder@kbzwlaw.com
dmauser@kbzwlaw.com

/s/ Jonathan H. Blavin
Jonathan H. Blavin* (Lead Counsel)
Victoria A. Degtyareva*
Stephanie Goldfarb Herrera*
MUNGER, TOLLES & OLSON, LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000
Jonathan.Blavin@mto.com
Stephanie.Herrera@mto.com
Victoria.Degtyareva@mto.com
*Admitted Pro Hac Vice

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that, on June 18, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/Dustin Mauser-Claassen
Dustin Mauser-Claassen
Florida Bar No.: 0119289