UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MEGAN GARCIA, individually and as the Personal Representative of the Estate of S.R.S. III,<br><br>    Plaintiff,<br><br>v.<br><br>CHARACTER TECHNOLOGIES, INC., NOAM SHAZEER, DANIEL DE FRIETAS, GOOGLE LLC, and ALPHABET INC.,<br><br>    Defendants, | Case No.: 6:24-cv-1903-ACC-NWH |

**Brief of Proposed *Amici Curiae* in Support of Defendants' Motion Requesting That This Court Certify the Case for Interlocutory Appeal**

## Summary of Argument

An order should be certified for interlocutory appeal when it "involves a controlling question of law as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b). Interlocutory appeals under § 1292(b) are "intended, and should be reserved, for situations in which the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record." *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004). "The district court should measure the weight of opposing arguments to the disputed ruling in deciding whether there is a substantial

Exhibit A

ground for dispute." *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.,* No. 19-CV-23591, 2020 WL 3433147, at *2 (S.D. Fla. June 23, 2020).

This *amicus* brief opines on a single issue: whether Large Language Model (LLM) and chatbot output received and understood by an AI service's users is protected by the First Amendment. Court rulings that recognize a First Amendment right to listen, and to receive and gather information, create a "substantial ground for difference of opinion" on whether a non-human source of textual information affects its status as First Amendment-protected "speech."

First, the First Amendment protects the rights of listeners. "It is now well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia,* 394 U.S. 557, 564 (1969). The Supreme Court has protected the right of listeners to receive speech even when it was not clear that any First Amendment-protected speaker was engaged in the speech. This logic justifies recognizing that the First Amendment protects AI chatbot output. *See* Part I, *infra*.

Second, courts have recognized that the First Amendment protects the use of technology such as video or audio recording to "gather information," *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000), and to create materials that the gatherer can then further communicate. People likewise often use LLMs to generate writing that they use to express themselves in the

2

Exhibit A

form of social media posts and comments. This too justifies providing First Amendment protection to AI output, as a means of protecting the users' future speech. See Part II, *infra*.

Third, the developers and users of LLMs jointly create an "expressive choice[]," *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024), about how to program, and then how to use, these chatbots as a tool to create speech for their own reading consumption. This likewise justifies providing First Amendment protection to AI output. See Part III, *infra*.

Because First Amendment coverage would affect the legal and factual issues in this case and would help stabilize the law in this rapidly evolving industry, the court should certify this issue for interlocutory appeal.

## Interest of *Amici Curiae*

Professor Jane Bambauer is a Professor of Law and Brechner Eminent Scholar Chair at the University of Florida Levin College of Law and at the College of Journalism and Communications. She teaches First Amendment, AI and the Law, Tort Law, and Privacy Law, and currently serves on the National AI Advisory Committee Subcommittee on Law Enforcement.[1] Professor Bambauer's work analyzes how the regulation of these new information technolo-

---

[1] *See* National Artificial Intelligence Advisory Committee, Law Enforcement Subcommittee, *Year 1 Report & Roadmap* (Feb. 2024), https://ai.gov/wp-content/images/NAIAC-LE-Subcommittee-Year1-Report-Roadmap.pdf.

3

gies will affect free speech, privacy, law enforcement, health and safety, competitive markets, and government accountability. *See, e.g.*, Jane R. Bambauer, *Negligent AI Speech: Some Thoughts About Duty*, 3 J. FREE SPEECH L. 343 (2023).

Professor Eugene Volokh is the Gary T. Schwartz Distinguished Professor of Law Emeritus at UCLA School of Law, and the Thomas M. Siebel Senior Fellow at the Hoover Institution at Stanford University. He often writes about legal issues central to this case, including First Amendment protection for AI output. *See, e.g.*, Eugene Volokh, Mark A. Lemley & Peter Henderson, *Freedom of Speech and AI Output*, 3 J. FREE SPEECH L. 651 (2023); Eugene Volokh, *Large Libel Models? Liability for AI Output*, 3 J. FREE SPEECH L. 489 (2023).

## Argument

### I. There is substantial ground to believe that the First Amendment protects AI output, because the First Amendment protects listeners' rights to access information

The First Amendment protects the rights of listeners as well as of speakers. Indeed, it protects listeners' rights even when it is unclear whether the speakers have such rights. Thus, for instance, even though the First Amendment may not protect foreign speakers who produce "political propaganda prepared and printed abroad by or on behalf of a foreign government," *Lamont v. Postmaster Gen.*, 381 U.S. 301, 305, 307-08 (1965) (Brennan, J., concurring), the Court struck down a restriction on the mailing of such material into the

U.S. in order to protect "the addressee's First Amendment rights." *Id.* at 307 (majority opin.).

Likewise, before the constitutional protection for corporations' rights to speak about elections was settled in *Citizens United v. Federal Election Commission,* 558 U.S. 310 (2010), the Court struck down restrictions on such speech because of the interests of "the public" as listeners: "[T]he inherent worth of the speech in terms of its capacity for informing the public," the Court held, "does not depend upon the identity of its source, whether corporation, association, union, or individual." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978). And a major reason that the Court recognized the protection of commercial speech in *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976), was readers' "right to receive" the message. *Id.* at 757. *See also id.* at 757 n.15 (recognizing "the independent right of the listener to receive the information sought to be communicated").

Similarly, the First Amendment surely protects citizens' interest in reading works of long-dead authors, like Aristotle or Machiavelli, even though those authors lack their own constitutional rights, since "[a] person's constitutional rights terminate at death," *State v. Powell*, 497 So. 2d 1188, 1190 (Fla. 1986). And that is true independently of the right of publishers to reprint those authors: Restricting access to such authors would violate our rights as readers at least as much as it would violate publishing companies' rights as publishers.

5

And the First Amendment applies even when the specific and often-unique expression that is received by viewers was not created under the full control of a human speaker. The "painting of Jackson Pollock," after all, is "unquestionably shielded by the First Amendment," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995), even though the point of his paint splatter technique is precisely that the output was not entirely within his control. *See* Teresa L. Ebert, *The Aesthetics of Indeterminacy: The Postmodern Drip Paintings of Jackson Pollock,* 22 CENTENNIAL REV. 139, 139 (1978). The same would presumably be true of the automation and use of randomization among the Surrealists. *See* Santiago Arango-Muñoz & José P. Bermúdez, *Intentional Mind-Wandering as Intentional Omission: The Surrealist Method*, 199 SYNTHESE 7727 (2021), https://doi.org/10.1007/s11229-021-03135-2. More importantly, the First Amendment protects a right to receive information in order to facilitate the listener's freedom of mind, not to serve the speaker's agenda. "'The makers of our Constitution'" "'sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations.'" *Stanley,* 394 U.S. at 564 (quoting *Olmstead v. United States,* 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).

We are therefore entitled to read AI-generated output, even if no living human generated that output. And, as in *Virginia Pharmacy*, the distributors

of that speech are entitled to First Amendment protection as a means of vindicating reader rights. One way of seeing this is to imagine *viewpoint-based* speech restrictions on AI output, such as a state law restricting AI output that is critical of the government, or that advocates for (or against) abortion rights. Surely those restrictions would be unconstitutional, because the government may not thus try to interfere with readers' rights to acquire information and argument—including AI-generated information and argument. The First Amendment of course generally protects against content-based speech restrictions and not just against viewpoint-based ones. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

II.  **There is substantial ground to believe that the First Amendment protects AI output, because the First Amendment protects users' rights to use AI programs to generate speech that they would then publish**

Millions of Americans who use LLM AIs use them to generate speech that they can further distribute (perhaps after some editing), including "social media posts," "presentations," and "emails." *See* Lee Rainie, *Close Encounters of the AI Kind* 8 (Elon Univ. Imagining the Digital Future 2025), https://perma.cc/X4CU-EN3Y. The First Amendment protects AI output in part to protect users' ability to use that output to themselves speak.

7

The right to record in public places offers a helpful analogy. "[B]anning photography or note-taking at a public event would raise serious First Amendment concerns; a law of that sort would obviously affect the right to publish the resulting photograph or disseminate a report derived from the notes. The same is true of a ban on audio and audiovisual recording." *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595-596 (7th Cir. 2012). This is especially well-established when a person records public officials. *See Smith v. City of Cumming*, 212 F.3d at 1333 ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."). Videorecording is not itself speech—but it produces material "in a form that can readily be disseminated to others," *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011). Likewise, restricting AI output would raise serious First Amendment concerns, because it would affect people's right to revise and then publish that output, as the user's own speech.

Justice Barrett's concurrence in *Moody* raised questions about whether AI-based *content moderation decisions* (not AI-generated text) would be protected by the First Amendment. *See Moody,* 603 U.S. at 744 (Barrett, J., concurring). Yet even if this one-Justice analysis were treated as definitive and applicable beyond content moderation, Justice Barrett acknowledged that AI-based decisions would indeed often be protected when they "simply implement

8

human beings' inherently expressive choice 'to exclude a message,'" *id.* at 746 (citation omitted), for instance when the platform operators "decide to remove posts promoting a particular political candidate or advocating some position on a public-health issue." *Id.* Thus, she acknowledged that many AI-based decisions *are* protected by the First Amendment, if they merely implement "human beings' inherently expressive choice[s]." Most LLM output likewise implements human beings' expressive choices—both the choices of users and of the AI programs' designers. *See, e.g.*, Am. Compl., Doc. 11 ¶ 37 (describing defendant's system as "capable of generating unique, original content . . . based on user input"); *id.* ¶ 133 (describing how defendant's system "provides customers with limited fields in which they can customize their 'Character'"—such as providing a name for the character—which "may impact how the Character responds when interacting with customers").

Justice Barrett suggested (without definitively deciding) that an AI program tasked with the vague prompt to "remove 'hateful' content," *id.*, might possibly not be afforded free speech protections because the program itself determines what is "hateful" with no input from the user. In such a situation, she reasoned, the program's effect—removing certain posts—is too far disconnected from the user's expression. *Id.* at 746 (Barrett, J., concurring). This tentatively suggested analysis may be incorrect; after all, an AI program that is

9

deciding "for itself" what is hateful is still trained on past input that was created by, reinforced by, or in some way a reflection of human judgment about "hate." But in any case, the LLM output of chatbots is very closely linked to the user's input: not completely controlled by it, of course, but heavily influenced by it, especially in the course of an extended conversation.

### III. There is substantial ground to believe that the First Amendment protects AI output, because the First Amendment protects users' rights to use AI programs to generate speech that they want to read

Most users of programs such as Character.AI likely use those programs just to generate speech that they would want to read—such as a conversation with a fictional character—rather than speech that they would want to publish to the world. But such personal speech itself merits First Amendment protection. The First Amendment protects a person's "the right to read or observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his own home." *Stanley v. Georgia,* 394 U.S. 557, 565 (1969).

To be sure, the Court in *Stanley* held this as to obscenity, and the law can indeed forbid the distribution to minors of material that is obscene as to minors. *See Ginsberg v. New York*, 390 U.S. 629 (1968). But, contrary to plaintiff's insinuations, none of the material described in the Complaint was outright pornographic, even when read by a 14-year-old. None, for instance, depicted "nudity," "sexual conduct," "sexual excitement" ("human male or female

10

genitals when in a state of sexual stimulation or arousal"), or "sadomasochistic abuse," which would be required for it to qualify as "harmful to minors" under FLA. STAT. §§ 847.001(7), (11), (16), (19), (20). And in any event, the conclusion that "the Court is not prepared to hold that Character A.I.'s output is speech," May 21, 2025 Order (Doc. 115) at 31, would apply to all AI output rather than just for sexually themed output.

## Conclusion

The Court should certify this case for interlocutory appeal because there is a substantial ground for difference of opinion as to whether "Character A.I.'s output is speech," *id.* at 31, that is presumptively protected by the First Amendment. Precedents protecting Americans' First Amendment rights to receive speech—even when the speakers may not themselves be protected by the First Amendment—suggest that AI output should indeed be viewed as protected. So do cases protecting Americans' First Amendment rights to use technological tools (such as cameras) to create material that the users can then communicate to the public. And users' interest in using technological tools in creating expression that they themselves want to read, for the sake of "satisfy[ing their own] intellectual and emotional needs," also suggests that AI output is protected by the First Amendment. This purely legal finding would alter the trajectory of this case and provide clarity for courts and litigants operating in the Circuit.

Exhibit A

       Respectfully submitted,

       SHULLMAN FUGATE PLLC

       */s/ Rachel E. Fugate*
       Rachel E. Fugate
       Florida Bar No. 144029
       rfugate@shullmanfugate.com
       Minch Minchin
       Florida Bar No. 1015950
       mminchin@shullmanfugate.com
       100 N. Ashley Drive, Suite 600
       Tampa, FL 33602
       Tel: (813) 935-5098

       *Counsel for the Amici*

Exhibit A