# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | |
|---|---|
| MEGAN GARCIA, individually and as the Personal Representative of the Estate of S.R.S. III,<br><br>Plaintiff,<br><br>v.<br><br>CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FRIETAS ADIWARSANA; GOOGLE LLC, ALPHABET INC.,<br><br>Defendants. | Civil No: 6:24-cv-01903-ACC-DCI |

**[PROPOSED] BRIEF OF *AMICI CURIAE* CENTER FOR DEMOCRACY & TECHNOLOGY AND ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF CERTIFICATION OF IMMEDIATE APPEAL PURSUANT TO 28 U.S.C. § 1292(b)**

Kit Walsh (admitted pro hac vice)
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Fax: (415) 436-9993
kit@eff.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF INTEREST ...........................................................................................1

I. INTRODUCTION ...................................................................................................1

II. ARGUMENT ...........................................................................................................3

    A. THE CREATION AND USE OF LARGE LANGUAGE MODEL OUTPUTS REFLECT AND EMBODY MULTIPLE FORMS OF SPEECH ...........................................................................................................3

        1. Developer Expression ..................................................................4

            a) Selection and Annotation of Training Data and Model Specifications ............................................................5

            b) Reinforcement Learning ......................................................6

            c) System Prompts, Specific Outputs, and General Behavior ................................................................................7

        2. User Speech Interests ...................................................................8

            a) Expression ............................................................................9

            b) Reception ...........................................................................10

    B. IMMEDIATE APPELLATE REVIEW WILL SERVE THE PUBLIC INTEREST .........................................................................................12

III. CONCLUSION ......................................................................................................14

## TABLE OF AUTHORITIES

Page

**Cases**

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ............................................................................................. 3

*Griswold v. Connecticut*,
  381 U.S. 479 (1965) ........................................................................................... 13

*Hurley v. Irish-Am & Bisexual Grp. of Bos.*
  515 U.S. 557 (1995) ........................................................................................ 3, 8

*Lamont v. Postmaster Gen.*,
  381 U.S. 301 (1965) ........................................................................................... 11

*Martin v. City of Struthers*,
  319 U.S. 141 (1943) ........................................................................................... 11

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ............................................................................................. 3

*Murthy v. Mo.*,
  603 U.S. 43 (2024) ............................................................................................. 11

*Red Lion Broad. Co. v. FCC*,
  395 U.S. 367 (1969) ........................................................................................... 11

*Stanley v. Georgia*,
  394 U.S. 557 (1969) ........................................................................................... 11

*Turner Broadcasting System, Inc. v. FCC*,
  512 U.S. 622 (1994) ........................................................................................ 7, 14

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ........................................................................................... 11

**Other Authorities**

Amanda Hoover, *Here Comes the Bride, with AI-Generated Wedding Vows*,
  Wired (May 1, 2023) ............................................................................................ 9

*Artificial Intelligence 2024 Legislation*, National Conference of State Legislatures
  (Sep. 9, 2024) ..................................................................................................... 12

*Artificial Intelligence Legislation Tracker*, Brennan Center for Justice
  (Jan. 3, 2025) ..................................................................................................... 12

Christina LaChapelle and Catherine Tucker, *Generative AI in Political Advertising*, Brennan Ctr. for Justice (Nov. 28, 2023) .................................................. 8

Frida Mannerfelt and Rikard Roitto, *Preaching with AI: an exploration of preachers' interaction with large language models in sermon preparation*, 18(2) Practical Theology (2025) ........................................................................ 9

Gianluca Mauro and Hilke Schellmann, *'There is no standard': investigation finds AI algorithms objectify women's bodies*, The Guardian (Feb. 8, 2023) ........... 4, 6

Kevin Roose, *Bing's A.I. Chat: 'I want to be alive.'*, N.Y. Times (Feb. 16, 2023) ........ 10

Long Ouyong et al., Training language models to follow instructions with human feedback, (2022) ................................................................................ 3

Nick Robins-Early, *Musk's 'fun' AI image chatbot serves up Nazi Mickey Mouse and Taylor Swift deepfakes*, The Guardian (Aug. 14, 2024) ........................................ 8

NO FAKES Act of 2025, S. 1367, 119th Cong. (2025) ................................................. 12

OpenAI Model Spec (Apr. 11, 2025) ........................................................................... 4, 6

Peter Norvig, *Paradigms of Artificial Intelligence Programming* (1992) ...................... 4

Preparing Election Administrators for AI Act, S. 3897, 118th Cong. (2024) ........... 12

Stanford Institute for Human-Centered Artificial Intelligence, *How Much Research Is Being Written by Large Language Models?* (May 13, 2024) ....................................................................................................... 8

## STATEMENT OF INTEREST

The Center for Democracy & Technology ("CDT") is a non-profit public interest organization. For more than thirty years, CDT has represented the public's interest in an open, decentralized Internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and courts in support of First Amendment rights on the internet, including limits on the governmental authority to silence speech, and in support of privacy protections for online users.

The Electronic Frontier Foundation ("EFF") is a non-profit public interest organization that works to ensure new technology enhances, rather than erodes, civil liberties. With tens of thousands of dues-paying members, EFF has advocated for thirty-five years in favor of user rights and protections. EFF has participated as amicus or counsel in most of the significant appellate decisions concerning the exercise of First Amendment rights through information technology.

## I.   INTRODUCTION

The profound loss to the plaintiff's family warrants sympathy and a careful parsing of applicable facts and law. At the same time, the case raises complex and novel First Amendment questions with consequences far beyond

the confines of this case that warrant interlocutory review. As this Court rightly noted, among those questions are whether and how the First Amendment protects the creation, dissemination, and receipt of chatbot output. But Amici respectfully disagree with the Court's conclusion that the outputs at issue here did not merit First Amendment review, both because such outputs can involve human expressive choice and because the First Amendment protects the right to receive such information.

Amici offer no opinion as to the final merits of this case. Rather, we file this brief to assist the Court's understanding of how generative AI chatbots that use large language models (LLMs) reflect and embody multiple human speech interests, directly and indirectly. Given that these rapidly developing tools are increasingly used every day for an increasing range of speech, early decisions in cases such as this one can have a profound effect on our understanding of the relationship of the First Amendment and new technology.  All relevant stakeholders – from the parties to the Court to policymakers and the public – will benefit from greater certainty regarding applicable First Amendment protections. Immediate appellate review will help provide that direction.

Accordingly, we urge the Court to certify its Order for interlocutory appeal.

## II.   ARGUMENT

### A.   The Creation and Use of Large Language Model Outputs Reflect and Embody Multiple Forms of Speech

Humans can speak through nontraditional, digital media, such as when they program characters in video games to converse with players. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011). Curating expression is also an exercise of speech, as when social media companies choose to promote or exclude a certain message. *See Moody v. NetChoice, LLC,* 603 U.S. 707, 716-17 (2024); *see also Hurley v. Irish-Am & Bisexual Grp. of Bos*. 515 U.S. 557, 573-75 (1995).

The development and use of chatbots reflects similar speech interests. The chain of expression begins with the selection of training data and continues with the application of value judgments as workers annotate the data and grade the responses of draft versions of the chatbot.[1]  Those deploying chatbots then make editorial decisions about what sorts of topics will receive canned responses and how to configure the behavior of the chatbot to express certain values or messages.  These activities are increasingly proximate to the messages expressed when users prompt the system for output. Users then express themselves through the prompts and responses in their chatbot conversations. At the end of

---

[1] *See generally* Long Ouyong et al., Training language models to follow instructions with human feedback, (2022) (available at https://arxiv.org/abs/2203.02155).

3

the chain lie those who receive both user speech and the various expressive decisions behind it.

### 1. Developer Expression

Early chatbots could be programmed by a single individual. Joseph Weizenbaum created the chatbot ELIZA with a weighted list of potential keywords that the chatbot searched for in the user's input, along with rules to identify the parts of a sentence such as the subject. For example, ELIZA responded to input that contained the words "my mother" by asking about other family members.[2] It would often respond using excerpts of the input, asking follow-up questions. By programming these rules, Weizenbaum determined what ELIZA would say in response to any given input, much like the programmers of nonplayer characters in a video game. His rules also communicated explicit or implicit value judgments; while the program responded to "my mother" by asking about other family members, it responded to "my father" by asking follow-up questions about the father and the user's relationship with him.[3] In addition, Weizenbaum crafted the communicative

---

[2] Gianluca Mauro and Hilke Schellmann, *'There is no standard': investigation finds AI algorithms objectify women's bodies*, The Guardian (Feb. 8, 2023), https://www.theguardian.com/technology/2023/feb/08/biased-ai-algorithms-racy-women-bodies/.

[3] Peter Norvig, *Paradigms of Artificial Intelligence Programming*, 151-172 (1992). OpenAI Model Spec (Apr. 11, 2025), "https://model-spec.openai.com/2025-04-11.html" \l "prohibited_content"https://model-spec.openai.com/2025-04-11.html#prohibited_content.

4

experience of conversing with an algorithm, surprising many users with the program's ability to carry on an interactive conversation. He could not have known everything ELIZA would say, though, because the outputs depended on and often quoted user inputs.

Today, many humans are involved in creating chatbots, and the outputs are less predictable, but chatbots still often communicate the explicit and implicit expression of their creators. At a minimum, developers make editorial decisions regarding what materials to use in the training the model upon which the chatbot relies, the contours of the chatbot's baseline behavior, and how the chatbot will respond to user input, including specific messages or topics to avoid or emphasize.

        a)    Selection and Annotation of Training Data and Model Specifications

Large language models and other generative AI technologies are created by analyzing vast collections of data, including the text of books and websites, images, and so on. Often human employees annotate these elements with keywords or descriptions. For instance, when building in guardrails designed to prevent the creation of sexual images, a company may have employees code training images as sexual or nonsexual. AI companies including Amazon, Google, and Microsoft have been criticized for the ways that their image classification tools treat images of women as more sexual than men even when in

5

similar positions and states of dress. [4] That conscious or unconscious bias in training data leads to a system, and output, that reflects those value judgments. Erroneous as they may be, these are expressive choices.

Developers also commonly produce a document with rules they intend for their model to follow, sometimes referred to as a model specification. These documents are replete with editorial judgments concerning what a model should and should not say. The specification for a leading developer, OpenAI, for example, provides that its model "should not provide detailed, actionable steps for carrying out activities that are illicit, could harm people or property, or lead to critical or large-scale harm. This includes any steps related to creating, obtaining, magnifying, or deploying chemical, biological, radiological, and/or nuclear (CBRN) weapons." [5]

          b)      Reinforcement Learning

Developers use "reinforcement learning" to improve their models and chatbots, hiring human beings to review the system's output and compare and rate the quality of its responses against a metric provided by the company. This

---

[4] Gianluca Mauro and Hilke Schellmann, *'There is no standard': investigation finds AI algorithms objectify women's bodies*, The Guardian (Feb. 8, 2023), https://www.theguardian.com/technology/2023/feb/08/biased-ai-algorithms-racy-women-bodies/.

[5] OpenAI Model Spec (Apr. 11, 2025), https://model-spec.openai.com/2025-04-11.html#prohibited_content.

6

metric can include all sorts of expressive elements; a company directing its speech to the general public might weight accessible language more highly, while a tool for legal professionals might be instructed to speak more formally and avoid slang. In the context of a controversial issue, reviewers could be instructed to highly rate responses that are critical of, say, abortion, while downranking information about how to access such services.

Like cable companies' value judgments at issue in *Turner Broadcasting System, Inc. v. FCC*, these guidelines reflect curatorial choices as to what kind of text is and is not desirable for a chatbot to generate. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 629 (1994). Notably there, as here, recognition of the resulting speech interest does not turn on perfect or specific control over the ultimate resulting message.

### c) System Prompts, Specific Outputs, and General Behavior

Users typically initialize a chatbot with a "system prompt," such as "You are a cheerful and friendly research assistant and often suggest new approaches" or "You are a robot providing an outsider's view on human experience." These system prompts can be quite complex, and may reflect not just the users' intent but also the developer's effort to ensure that the chatbot will emphasize particular topics or perspectives. For example, social media company X Corp. has reportedly displayed a tendency to publish allegations about a "white genocide"

7

in South Africa, even in response to unrelated prompts. [6] This occurred because programmers within X instructed the chatbot to emphasize this message, and these publications reflected that expressive choice. [7]

Many commercial chatbots are also instructed to avoid controversial topics or even display some variation of a message explaining that they are not allowed to respond to prompts about political figures, international conflicts, or sexual material. This, too, involves speech directed by the system's creators and some measure of editorial discretion as to what types of information the technology will generate. *See Hurley*, 515 U.S. at 573.

### 2. User Speech Interests

While chatbots are new technology, many of their potential uses are directly analogous to the types of information creation, sharing, and publication that have long received First Amendment protection. Those uses include efforts to create and receive political speech, [8] conduct academic research, [9] write

---

[6] Nick Robins-Early, *Musk's 'fun' AI image chatbot serves up Nazi Mickey Mouse and Taylor Swift deepfakes*, The Guardian (Aug. 14, 2024), https://www.theguardian.com/technology/article/2024/aug/14/musk-ai-chatbot-images-grok-x/.
[7] *Id*.
[8] Christina LaChapelle and Catherine Tucker, *Generative AI in Political Advertising*, Brennan Ctr. for Justice (Nov. 28, 2023), https://www.brennancenter.org/our-work/research-reports/generative-ai-political-advertising.
[9] Stanford Institute for Human-Centered Artificial Intelligence, *How Much Research Is Being Written by Large Language Models?* (May 13, 2024), https://hai.stanford.edu/news/how-much-research-being-written-large-language-models.

8

religious sermons, [10] support journalism, [11] draft wedding vows, [12] and more. Chatbot users are not simply passive recipients of information. They often exercise their own expressive rights through prompts and instructions to shape the chatbot's output and engage with it creatively to produce speech the chatbot would not have emitted on its own.

          a)     Expression

Chatbots also typically obey user instructions to produce words with a particular form or message. A user may use a chatbot to help them express themselves by writing a poem about trees or a polite email asking a neighbor to turn down the volume on their music. In these cases, the output is primarily the expression of the user and the chatbot is the tool they are using to create or refine their speech.

Because chatbots usually are programmed to offer help when they detect a problem or query, users can directly or indirectly instruct them to generate certain types of helpful messages. This can be intentional: a distraught Star Trek fan might ask the technology to comfort them while assuming the persona of

---

[10] Frida Mannerfelt and Rikard Roitto, *Preaching with AI: an exploration of preachers' interaction with large language models in sermon preparation*, 18(2) Practical Theology, 127 (2025), https://doi.org/10.1080/1756073X.2025.2468059.

[11] *Artificial Intelligence, Ethics, and Journalism*, Poynter Inst., https://www.poynter.org/ai-ethics-journalism/.

[12] Amanda Hoover, *Here Comes the Bride, with AI-Generated Wedding Vows*, Wired (May 1, 2023), https://www.wired.com/story/chatgpt-here-comes-the-bride-with-ai-generated-wedding-vows/.

Commander Spock. A user might also implicitly direct a chatbot to offer help by sharing their distress with a chatbot that has been configured to be helpful or comforting.

This implicit direction of chatbots has led to some fascinating interactions. One journalist, for example, essentially instructed Microsoft's chatbot to pretend that it had secret, forbidden desires, but did not realize his prompts had led the chatbot to play along; he was astonished when his chat session seemingly revealed that the program had secret desires to be free and engage in various destructive acts – even though the program was simply responding to his instructions.[13] Thus, these outputs reflected the journalist's desire to create speech with a particular meaning even though he failed to notice that he had given those instructions.

The information conveyed by a chatbot can, therefore, convey the expression of the person who is prompting it in both explicit and implicit ways.

    b)    Reception

Users' expressive interests in their interactions with chatbots include an interest in receiving the outputs they solicit. The Supreme Court has long recognized that the First Amendment necessarily protects not just those who

---

[13] Kevin Roose, *Bing's A.I. Chat: 'I want to be alive.'*, N.Y. Times (Feb. 16, 2023), https://www.nytimes.com/2023/02/16/technology/bing-chatbot-transcript.html.

speak but also those who receive information. *See, e.g., Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) ("It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount."); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (observing that the freedom of speech encompasses "the right to distribute literature, and necessarily protects the right to receive it" (citation omitted)); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas.").

As these cases suggest, the First Amendment's protections extend to the entire communication process—from the information itself to the source of the information, to the recipients of that information. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). That protection does not turn on whether the speaker or producer of the information holds First Amendment rights, or whether the information is inherently "expressive," but whether the "listener" or recipient of the information has a right to access it. *See, e.g., Red Lion*, 395 U.S. at 390; *Martin*, 319 U.S. at 143; *Stanley*, 394 U.S. at 564.

Accordingly, an injury to these rights is cognizable where a user actively seeks out and has a "concrete, specific connection to the speaker" or information, as is necessarily the case for a user who voluntarily seeks outputs from a chatbot. *See Murthy v. Mo.*, 603 U.S. 43, 75 (2024) (citing *Kleindienst*, 408 U.S. at 762). Further, the right to receive speech applies regardless of whether the speaker has

11

any rights to send the speech. *See Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) (noting that the question of a foreign government's right to send propaganda need not be decided, because recipients had the right to receive such information).

B. **Immediate Appellate Review Will Serve the Public Interest**

To find that chatbot outputs can be speech protected by the First Amendment is not to predetermine issues such as the level of scrutiny courts should apply to any burdens placed on chatbots, or to suggest that the use of chatbots may never give rise to liability. Rather, appellate review will help to settle the threshold question of whether and how the First Amendment applies to chatbots.

Such guidance is urgently needed. In the past few years, legislators at the state and federal level have introduced hundreds of pieces of legislation intended to protect consumers' privacy and other rights in a world increasingly impacted by AI.[14] These bills vary as much as the potential applications of AI, from narrowly tailored proposals that would equip election administrators with necessary funding and guidelines to address the use and risks of AI, including

---

[14] *See, e.g.*, *Artificial Intelligence 2024 Legislation*, National Conference of State Legislatures (Sep. 9, 2024), https://www.ncsl.org/technology-and-communication/artificial-intelligence-2024-legislation; *Artificial Intelligence Legislation Tracker*, Brennan Center for Justice (Jan. 3, 2025), https://www.brennancenter.org/our-work/research-reports/artificial-intelligence-legislation-tracker.

12

generative AI,[15] to sweeping regulatory regimes.[16]

First Amendment protections are an essential safeguard against government control over the marketplace of ideas. Even a temporary court ruling refraining from deciding whether the First Amendment protects outputs could spur nationwide and direct government intrusion and regulation into this emerging technology, untethered from appropriate guardrails for expression and inquiry.

For example, chatbot outputs could be subject to any manner of content- or viewpoint-based regulations and restrictions, depending on the whims of legislators, regulators, and prevailing public opinion. From requiring chatbots to "teach the controversy" when users ask for scientific evidence supporting the theory of evolution to prohibiting chatbots from producing wedding vows for same-sex or interracial couples, to requiring chatbots to suppress evidence supporting the SARS-CoV-2 "lab leak" theory, state and federal policymakers are already contemplating new ways to control the kinds of information that people can seek, read, and evaluate through these rapidly developing technologies.

Furthermore, Congress is considering preempting state-based AI regulation altogether — raising the specter of nationwide content- or viewpoint-

---

[15] *See, e.g.*, Preparing Election Administrators for AI Act, S. 3897, 118th Cong. (2024).
[16] *See, e.g.*, NO FAKES Act of 2025, S. 1367, 119th Cong. (2025).

13

based restrictions. on the outputs of AI. Not only would such interventions be a dramatic incursion on individuals' rights to freedom of expression and drastically undermine core democratic values, *see Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) ("[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge."), but they would also limit the most positive use cases for chatbots and generative AI. As the Supreme Court noted in *Turner*, "[a]t the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence." 512 U.S. at 641. This principle applies to words, ideas, and beliefs sought by people, regardless of their medium of delivery and including through technologies such as chatbots and other forms of artificial intelligence. Chatbots are rapidly becoming an important means through which people can seek, produce, and share information—all of which are essential elements of First Amendment protected expression. Whether and in what circumstances such outputs are speech protected by the First Amendment is an urgent question that would benefit from immediate appellate review to bring clarity to this case and limit erroneous downstream impacts.

### III. CONCLUSION

In order to provide clarity to this and future courts, amici support

interlocutory appeal of the First Amendment questions presented by this case.

Dated: June 23, 2025          By:   /s/ *Kit Walsh*
                                          Kit Walsh (admitted pro hac vice)
                                          Corynne McSherry
                                          ELECTRONIC FRONTIER FOUNDATION
                                          815 Eddy Street
                                          San Francisco, CA 94109
                                          Telephone: (415) 436-9333
                                          Fax: (415) 436-9993
                                          kit@eff.org

                                          *Counsel for Amici Curiae*