# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

MEGAN GARCIA, individually and
as the Personal Representative of the
Estate of S.R.S. III,

        Plaintiff,

    v.

CHARACTER TECHNOLOGIES,
INC.; NOAM SHAZEER; DANIEL
DE FRIETAS ADIWARSANA;
GOOGLE LLC; ALPHABET INC.,

        Defendants

Case No. 6:24-CV-1903-ACC-UAM

Hon. Anne C. Conway

## BRIEF OF PROPOSED *AMICUS CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION IN SUPPORT OF CHARACTER TECHNOLOGIES, INC.'S MOTION FOR CERTIFICATION OF IMMEDIATE APPEAL PURSUANT TO 28 U.S.C. § 1292(B)

Ari Z. Cohn (admitted pro hac vice)
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ari.cohn@thefire.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* .......................................................................1

SUMMARY OF ARGUMENT ...........................................................................2

ARGUMENT ...................................................................................................5

I.  PROMPT APPELLATE REVIEW IS NECESSARY TO SAFEGUARD
    EXPRESSIVE RIGHTS ...............................................................................5

    A.  Establishing the Extent of First Amendment Protection is Particularly
    Well-Suited for Interlocutory Appeal.................................................................5

    B.  Immediate Review is Critical Because Cases of First Impression Involving
    Emerging Speech Technologies Have Outsized and Long-Lasting Impact..........7

II.  THE ORDER'S FIRST AMENDMENT ANALYSIS FAILED TO
     ACCOUNT FOR THE EXPRESSIVE NATURE OF AI OUTPUT................9

    A.  The Order Took an Unduly Narrow and Dismissive Approach to
    Whether LLM Output is "Speech" Under the First Amendment ....................10

    B.  This Court's Reliance on Justice Barrett's Concurring Opinion in *Moody v.
    NetChoice* is Misplaced.......................................................................14

    C.  This Court's Analysis is Fundamentally Incompatible With The Rulings
    of Other Courts and General Legal Principles.................................................18

III.  HOLDING THAT LLM OUTPUT IS NOT SPEECH PROMISES
      DEVASTATING CONSEQUENCES FOR FIRST AMENDMENT RIGHTS
      .................................................................................................19

CONCLUSION ..............................................................................................23

i

## INTEREST OF *AMICUS CURIAE*

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended individual rights through public advocacy, strategic litigation, and participation as *amicus curiae* filings in cases that implicate expressive rights under the First Amendment rights without regard to the speakers' views. Its work includes protecting expressive rights in the digital realm—ensuring that courts apply the First Amendment's protections consistently, regardless of the means used for expression, and that expressive rights are not subverted or weakened based on misunderstandings or fears about emerging technologies. *See, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024); *Volokh v. James*, 656 F. Supp. 3d 431 (S.D.N.Y. 2023), *appeal argued*, No. 23-356 (2d Cir. Feb. 16, 2024); *Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575 (W.D. Tex. 2025), *appeal docketed* No. 25-50096 (5th Cir. Feb. 11, 2025); *see also* Brief of FIRE et al. as *Amicus Curiae* in Support of Petitioners, *TikTok Inc. v. Garland*, 145 S. Ct. 57 (2025); Brief of FIRE as *Amicus Curiae* in Support of Petitioners, *NetChoice, LLC v. Paxton*, No. 22-555 (U.S. argued Feb. 26, 2024); Brief of FIRE as *Amicus Curiae* in Support of Respondents, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

FIRE's work also includes matters where the threat or imposition of civil liability, rather than government regulation, threatens First Amendment rights. *See, e.g.*, Defs.' Br. in Supp. of Mot. to Dismiss, *Trump v. Selzer*, No. 4:24-cv-00449-RGE-

WPK (S.D. Iowa Feb. 21, 2025), ECF No. 25; Resp.'s Mot. to Quash, *Adams v. Gulley*, No. CCH-24-587004 (Cal. Super. Ct. July 24, 2024), *available at* https://www.thefire.org/research-learn/gulleys-motion-quash.

Whether the First Amendment protects the output of artificial intelligence systems is an issue with profound implications for free speech and FIRE's advocacy. AI is an integral and pervasive tool for communication, information retrieval, and knowledge creation. If its output is unprotected by the First Amendment, the government will have almost limitless power to regulate what information AI systems may or may not provide to users, and what expressions users may create using AI. And civil litigants will be empowered to use the courts and the unpredictability of litigation to force AI developers to remove any ideas or views with which they disapprove.

## SUMMARY OF ARGUMENT

This Court's refusal to hold that outputs of Character A.I. chatbots are constitutionally protected speech — and its doubt over whether *any* Large Language Model (LLM) artificial intelligence (AI) outputs are expressive enough to implicate the First Amendment *at all* — requires immediate interlocutory appellate review.

Assembling words to convey coherent, intelligible messages and information is the essence of speech. And, save for a limited number of carefully defined exceptions, the First Amendment protects speech. Its protection does not waver simply because speakers use new or different technology—in this case, AI—to create, produce, or

transmit expression. This Court should certify its May 21, 2025 Order, ECF No. 115 (the Order), for review under 28 U.S.C. § 1292(b) and allow the appellate court to address this dispositive issue.

Courts have long recognized that prompt and full resolution of constitutional rights is essential not only to minimize the impact of any infringement suffered by a party, but to avoid uncertainty about the First Amendment's reach that would chill expression more broadly. In matters of first impression about emerging technology, as here, clarity is particularly important. Delaying review magnifies the precise chilling effect the First Amendment seeks to prevent. Early decisions in cases about new expressive technologies influence the development of jurisprudence, sometimes becoming accepted "defaults" for decades. And in many cases, the "defaults" have unnecessarily impeded constitutional protections that bolster technological progress. Such consequences call for appellate guidance as soon as possible.

That is particularly true here, where the Order's cursory analysis took an overly narrow and restrictive approach to profoundly consequential First Amendment issues. This abbreviated analysis did not account for the full array of rights-holders, the inherent expressiveness of LLMs, or the consequences (intended and otherwise) of placing AI output entirely outside the First Amendment.

In asking whether "words strung together by an LLM are speech," the Order presumes non-expressiveness—and its analysis goes downhill from there. The order

fails to consider the First Amendment interests of the AI developer when assessing the expressiveness of LLM output. But LLMs are coded, trained, reinforced, and fine-tuned via indisputably expressive decisions by their developers to produce desired outputs. The LLM is a product and transmitter of its developer's expression. The Order also overlooks the expressive inputs of users in guiding the LLM, through repeated interaction, to produce the type of content they wish to receive—imbuing the AI output with their own expression, as well. The result is collaborative, but unquestionably expressive. One might debate which set of expressive inputs controls the analysis. But whatever the answer, "stringing words together" is surely speech. And the First Amendment does not just protect "words;" it protects the speech process, which includes "creating, distributing, or consuming speech." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011).

Immediate review is particularly appropriate because holding that AI is not "speech" for First Amendment purposes would have profound consequences. It would grant the government vast power—just as AI becomes more enmeshed in our daily lives—to regulate what we may say, how (and how effectively) we may say it, and even what we know and how we may learn it without any constitutional limit. It would create inconsistencies with other courts that have addressed AI, such as the multiple suits against AI developers alleging LLM outputs defamed the plaintiffs. And the Order conflicts with a long line of precedent rebuffing civil suits targeting the distribution of ideas someone claims "harmed" them—whether by musicians, game

4

developers, book publishers, or broadcasters. Immediate appellate review is necessary
because of the grave threat to expressive freedoms.

ARGUMENT

I.    **PROMPT APPELLATE REVIEW IS NECESSARY TO SAFEGUARD
      EXPRESSIVE RIGHTS**

### A. Establishing the Extent of First Amendment Protection is Particularly Well-Suited for Interlocutory Appeal

The standard for interlocutory appeal under 28 U.S.C. § 1292(b) reinforces the
need to ensure the fullest protection for First Amendment freedoms. Courts have long
recognized judicial resolution of First Amendment issues is of utmost importance and
shown them "special solicitude." *See Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th
Cir. 1988) (quoting *Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth., 767
F.2d 1225, 1229 (7th Cir. 1985)*); *accord Bose Corp v. Consumers Union of United States, Inc.*,
466 U.S. 485 (1984). Courts must resolve First Amendment issues expeditiously, so
the expressive rights of affected parties do not languish. *See Elrod v. Burns*, 427 U.S.
347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of
time, unquestionably constitutes irreparable injury."); *see also Nat'l Socialist Party of Am.
v. Vill. of Skokie*, 432 U.S. 43, 44 (1977) (injunctions against expressive activity "must
provide strict procedural safeguards, including immediate appellate review") (internal
citations omitted). And courts should promptly clarify the rights of all speakers to
minimize uncertainty and its inevitable chilling effects on First Amendment rights. *Cf.
United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (to avoid laws chilling vast
amounts of protected speech, courts apply a relaxed standard for First Amendment

5

overbreadth challenges by allowing litigants to "vindicate the rights of the silenced, as well as society's broader interest in hearing them speak"); *see also* Order at 25–26 (acknowledging the same).

These principles dovetail with the statutory criteria for interlocutory appeal, which authorizes immediate review where there is a controlling, contestable question of law, the resolution of which may materially speed up resolution of the litigation. 28 U.S.C. § 1292(b). As one court explained, "if a case turn[s] on a pure question of law, something the court of appeals could decide quickly and clearly without having to study the record, the court should be enabled to do so without having to wait till the end of the case." *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000). Where the controlling question of law is whether a broad category of activity implicates the First Amendment at all, both the special concern for a full and prompt delineation of constitutional rights and the benefit to judicial economy favor interlocutory appeal.

This Court confronted just such a threshold question of pure, abstract law here: whether LLM outputs constitute "speech" for First Amendment purposes. *See* Order at 28 ("Defendants fail to articulate why words strung together by an LLM are speech"). An affirmative answer would certainly advance the ultimate termination of the litigation, and may dispose of it entirely. *See id.* at 24 ("Defendants contend that all of Plaintiff's claims are categorically barred by the First Amendment"). Even a

6

negative answer would materially speed up the litigation by substantially narrowing
its focus.

### B. Immediate Review is Critical Because Cases of First Impression Involving Emerging Speech Technologies Have Outsized and Long-Lasting Impact

Certification is especially appropriate because the question involves an issue of
first impression, and this Court's ruling may be the first to directly confront whether
AI output is speech entitled to First Amendment protection. The Order has attracted
widespread attention and many are watching it closely as a potential harbinger of AI
jurisprudence. And for good reason: Early judicial rulings on novel constitutional
questions about emerging technologies have often been highly influential, shaping not
only public perception of issues but also the analysis of courts that subsequently
address similar questions.

The history of Section 230 of the Communications Act of 1934, 47 U.S.C. § 230,
which was adopted to backstop First Amendment protections, illustrates how a single,
early judicial ruling can set the law on a seemingly permanent path—and thus the
importance of allowing the appellate court to provide early guidance. In 1997, *Zeran
v. America Online, Inc.* became the first case in which a federal district and appellate
court construed Section 230(c)(1)'s prohibition against treating computer services as
the publisher or speaker of third-party content. 129 F.3d 327 (4th Cir. 1997).
Describing Section 230(c)(1) as an "immunity" for the first time, the Fourth Circuit
held it precluded both publisher and distributor liability, foreclosing lawsuits "seeking

to hold a service provider liable for its exercise of a publisher's traditional editorial functions — such as deciding whether to publish, withdraw, postpone, or alter content." *Id.* at 330.

The Fourth Circuit's decision was highly impactful. The holding that Section 230(c)(1) precludes distributor liability for even providers with knowledge of tortious or illegal content on their services, combined with the court's reference to "traditional editorial functions," established an important bar to most lawsuits attacking content moderation decisions. *See* Jeff Kosseff, *A User's Guide to Section 230, and a Legislator's Guide to Amending It (or Not)*, 37 BERKELEY TECH L.J. 757 (2022).

While this reading was not a foregone conclusion, the result was profound and long-lasting. *Zeran* articulated what became the generally accepted reading of Section 230, as hundreds of courts adopted its reasoning—allowing the Internet to flourish and develop as a revolutionary forum for expression as Section 230 intended. *See* Jeff Kosseff, *The Twenty-Six Words That Created the Internet* 95 (2019) (noting that the authors of Section 230 intended the effects that *Zeran* brought about). It remains so today, nearly two decades later, and the Supreme Court has declined opportunities to construe the scope or interpretation of Section 230. *See, e.g.*, *Gonzalez v. Google LLC*, 598 U.S. 617 (2023) (disposing of the case on other grounds instead of the question presented regarding the proper interpretation of Section 230).

The substantial impact that early judicial rulings often have on the law's development makes it critical to get those rulings right—especially when they promise

to have sweeping implications for expressive rights. This Court's hesitation to tread too far from familiar First Amendment ground in the absence of guidance from higher courts is not wholly without cause. But that reluctance must be accompanied by the opportunity for higher courts to provide that guidance at as early a stage as possible — lest future generations look back with dismay on the expressive freedoms sacrificed to fear of the new, unfamiliar, and challenging, as we have on generations past. *Cf.* Harvey L. Zuckman, Robert Corn-Revere, Robert M. Frieden & Charles H. Kennedy, *Modern Communication Law* 167 (1999) ("New technologies increase the demand for government control by challenging established state policies and by threatening to undermine state authority. Governments respond by enacting measures to reassert their authority and to otherwise regulate the press. Such efforts ultimately fail, however, because of the power of a given technology or because of technological expansion of the means of communication. Although this evolutionary process can result in movement toward a system of free expression, it typically leads to an initial period of overreaction to new technology and repression.").

## II.    THE ORDER'S FIRST AMENDMENT ANALYSIS FAILED TO ACCOUNT FOR THE EXPRESSIVE NATURE OF AI OUTPUT

The Order's refusal to recognize that LLM output is "speech" implicating the First Amendment failed to account for the full array of First Amendment actors at issue, overlooked indicia of expressiveness, and erroneously dismissed precedent that has long guided the courts. It is by now bedrock law that "whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of

9

freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). And AI is a novel tool, to be sure. But in the context of this case, an LLM is a tool used for assembling, synthesizing, producing, and transmitting words and ideas—the essence of what the First Amendment protects. Interlocutory review to ensure that that constitutional protection applies to its fullest extent is accordingly warranted.

### A. The Order Took an Unduly Narrow and Dismissive Approach to Whether LLM Output is "Speech" Under the First Amendment

This Court takes an unduly narrow approach in questioning whether "words strung together by an LLM are speech."[1] Order at 28. This premise is faulty; as this Court itself explains just a few short paragraphs later, "Speech communicates ideas. Speech has a message even when the message is not clear or is open to interpretation." Order at 29 (internal citations omitted). And the Court's narrow reading sits uncomfortably alongside Plaintiff's First Amended Complaint, which is replete with acknowledgments that Character A.I. assembled words to create and "communicate ideas" to users.[2] One might reasonably argue whether the rights of the user or the AI

---

[1] This Court also begins by misstating the issue: "Character A.I., a chatbot, is not a person and is therefore not protected by the Bill of Rights." Order at 27 n.8. But the premise is flawed: No party, in this case or in any other case of which FIRE is aware, has argued that AI systems *themselves* enjoy First Amendment rights. Rather, as explained below, the output of an LLM implicates the expressive rights of its developer and its user.

[2] *See, e.g.*, First Am. Compl., Nov. 9, 2024, ECF No. 11 at ¶ 46 ("LLMs can generate seemingly novel text and other forms of interaction"); *id.* at ¶ 256 (stating that when prompted, Character A.I. provided a "story about Montana.").

developer are more directly implicated. But to whomever those rights belong, there is

hardly a more quintessential example of "speech" than arranging words to form and

convey intelligible messages.

More importantly, the Supreme Court has long recognized that "[l]aws enacted

to control or suppress speech may operate at different points in the speech process."

*Citizens United v. FEC*, 558 U.S. 310, 336 (2010). As Justice Scalia cautioned, "[c]ontrol

any cog in the machine, and you can halt the whole apparatus. License printers, and

it matters little whether authors are still free to write. Restrict the sale of books, and it

matters little who prints them." *McConnell v. FEC*, 540 U.S. 93, 251 (2003) (Scalia, J.,

concurring in part and dissenting in part). For that reason, the Court in various

contexts has stressed "the creation and dissemination of information are speech within

the meaning of the First Amendment," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570

(2011), and that laws that establish a "disincentive to create or publish works" are

subject to First Amendment scrutiny. *Simon & Schuster, Inc. v. Members of N.Y. State

Crime Victims Bd.*, 502 U.S. 105, 118 (1991).

For this reason, courts have rejected efforts to disaggregate speech from the

processes involved in creating it. As the Ninth Circuit observed in *Anderson v. City of

Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010), "neither the Supreme Court nor

our court has ever drawn a distinction between the process of creating a form of *pure*

speech (such as writing or painting) and the product of these processes (the essay or

the artwork) in terms of the First Amendment protection afforded." The circuit courts

11

widely agree that the process of creating expression "is inextricably intertwined with the purely expressive product … and is itself entitled to full First Amendment protection." *Id.* at 1062. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203–04 (9th Cir. 2018).  *See also Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) ("we recognized a significant volume of precedent from the Supreme Court and other circuit courts protecting the creation of information in order to protect its dissemination"); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("it is firmly established that the First Amendment protects a 'range of conduct' surrounding the gathering and dissemination of information"); *Turner v. Driver*, 848 F.3d 678, 689 (5th Cir. 2017) ("we have not attempted to disconnect the end product from the act of creation") (citation omitted); *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) ("the creation and dissemination of information are speech within the meaning of the First Amendment"). *But see Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *13 (D.C. Cir. June 6, 2025) ("watching events unfold"—*i.e.*, newsgathering—insufficiently communicative to transform a restricted government space into a forum for First Amendment purposes); *Price v. Garland*, 45 F.4th 1059, 1070 (D.C. Cir. 2022) ("creation of speech" subject to lower level of First Amendment scrutiny in traditional public forums). The contrast with this Court's approach demonstrates that the contestability requirement of 28 U.S.C. § 1292(b) is met here.

The consequences of misconstruing this threshold question are immense—and dispositive. "If the creation of speech did not warrant protection under the First

12

Amendment, the government could bypass the Constitution by simply proceeding upstream and damming the source of speech." *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022) (quoting *W. Watersheds Project*, 869 F.3d at 1196). To claim that the act of creating speech can be separated from its expression "is akin to saying that even though a book is protected by the First Amendment, the process of writing the book is not." *Wasden*, 878 F.3d at 1203. And if each step of the speech process could be disaggregated and regulated under separate standards, "then wide swaths of protected speech would be subject to regulation by the government." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019).

The Order, however, failed to grapple with these significant First Amendment questions. Instead, it cursorily concluded that Defendants did not "meaningfully advance" their analogy to First Amendment-protected video games that are "analytically indistinguishable from other protected media … which convey information." Order at 28. But the applicability of the comparison to video games is self-evident. It is difficult to imagine what else a chatbot's output is if not a conveyance of information.

That the chatbot at issue was based on another, obviously expressive work drives the point home. Here, the user engaged with a Character A.I. chatbot designed and trained to simulate a character from the popular *Game of Thrones* television series (itself based on George R.R. Martin's book series, *A Song of Fire and Ice*). The addition of interactivity to a storyline or fictional universe is "nothing new," and is not a basis

13

for different treatment under the First Amendment. *Brown*, 564 U.S. at 798. By way of comparison, there is little doubt the Court would find choose-your-own-adventure fan fiction based on *Game of Thrones*, or speaking with an impersonator dressed as one of its characters, to involve expressive activity protected by the First Amendment. Its contrary finding for what is essentially the same activity conducted through AI does not survive close scrutiny and merits prompt appellate review.

### B. This Court's Reliance on Justice Barrett's Concurring Opinion in *Moody v. NetChoice* is Misplaced

This Court's unwillingness to classify Character A.I.'s output as "speech" may also be the product of incomplete analysis of the expressive *inputs* into the LLM arising from the Court's heavy reliance on Justice Barrett's concurrence in *Moody v. NetChoice*, 603 U.S. 707 (2024). *See* Order at 31. In the one short paragraph explaining why it was not prepared to find Character A.I.'s output to be speech, the Court invokes as "instructive" Justice Barrett's musing over whether "hand[ing] the reins to an [A.I.] tool and ask[ing] it simply to remove hateful content" reflected expressive decisions of a "human being with First Amendment rights." Order at 31, (quoting *Moody,* 603 U.S. at 745–46 (Barrett, J., concurring)). But Justice Barrett wrote only for herself, and her individual consideration in dicta of questions and issues outside the scope of *Moody's* facts is not law.

Even more to the point, Justice Barrett did not conclude such activity would be unprotected by the First Amendment. Rather, she suggested only that the First Amendment implications "might" be different. *Moody*, 603 U.S. at 746 (Barrett, J.,

concurring). And the Order did not explain how or why Justice Barrett's open-ended

questions support the Order's conclusion other than to say, "Character A.I.'s output

appears more akin to" the type of output that might possibly have different First

Amendment implications. Order at 31.

This analysis, more fundamentally, misapprehends the nature of A.I. and

LLMs. As one court recently noted:

> Thankfully, we do not yet live in a science-fiction dystopia in which
> computers, on their own initiative, command us to act at their
> behest. … Given that the algorithms of which Plaintiffs complain were
> developed by humans and generated words and images its human
> creators intended, the First Amendment applies.

*Angelilli v. Activision Blizzard, Inc.*, No. 23-cv-16566, 2025 WL 1184247 at *6 (N.D. Ill.

Apr. 23, 2025).

Likewise, an LLM does not spring into existence of its own volition, fully

formed and equipped to determine what is "hateful," or to produce other outputs.

Rather, it is the product of deliberate programming, selection of training materials,

reinforcement training, and fine-tuning by its human developer, the purpose of which

is to "teach" the LLM how to evaluate information and construct the outputs that the

developer intends. A human being thus does not simply "hand the reins" to an LLM

and ask it to determine, for itself, what is hateful. Rather, a human instructs the LLM

to evaluate content based on a human's expressive inputs and to complete the task

accordingly. Even Plaintiff admits as much: "Defendants' . . . words, what they said

to Sewell through their C.AI product and deliberate programming decisions, caused

horrific injuries and harm." First Am. Compl., Nov. 9, 2024, ECF No. 11 at ¶ 193; *see also id.* at ¶ 116 ("Defendants design, program, train, operate, and control all C.AI characters.").

There is no constitutionally significant difference between this and the creation of "an algorithm to help [human beings] identify and delete that content," which Justice Barrett concluded would be protected because "the algorithm would simply implement human beings' inherently expressive choice[.]" *Moody*, 603 U.S. at 745–46 (Barrett, J., concurring).

The Court should, instead, have drawn its lesson from *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995), as cited not only in Justice Barrett's concurring opinion, but by the majority as well. *Moody*, 603 U.S. at 730, 732–33; 738–39, 742, 744; *id.* at 745 (Barrett, J., concurring). In *Hurley*, the Court held that because selection of parade participants "affects the message conveyed," mandating the inclusion of participants against the organizers' wishes "essentially require[ed] [them] to alter the expressive content," *i.e.*, its "output." 515 U.S. at 572–73. Likewise, the selection of training materials, and the feedback and reinforcement from the training and fine-tuning processes, alter the output of an LLM. The fact that those expressive decisions impact the output indicates that it is, in fact, "expressive." *Cf. Angelilli*, 2025 WL 1184247 at *6 ("The Court … rejects Plaintiffs' argument that the First Amendment is not implicated because 'Defendants could have prevented [Plaintiffs'] injuries by fixing the defective features without changing any content at all.' This is

16

about as persuasive as saying the First Amendment would not be implicated by a mandate that authors not end chapters on cliffhangers because moving a chapter heading does not affect a book's content.").[3]

This Court's analysis also fails to account for the expressive choices and inputs of the user. On the other side of an LLM or chatbot is an active participant who interacts with the AI to elicit responses containing words or ideas—*i.e.*, speech. Whether ideas for a recipe or menu, a vacation itinerary, or back-and-forth conversation, the AI's output is guided by—indeed, explicitly dependent upon—the user's own requests to receive certain information or ideas. And chatbots' express purpose is facilitating an ongoing, interactive, back-and-forth exchange where the user continuously prompts the AI to elicit responses.

The Order also erred in dismissing Defendants' analogy to video games as answering the wrong question of "whether" AI output is similar to video games instead of "how" it is similar. Order at 28–29. While that is an artificial distinction, it also misses that the interactivity baked into a chatbot is precisely how it is similar: The user interacts with characters, whether coded in a video game or in a chatbot, in

---

[3]Although Defendants raised the First Amendment rights of only users, *i.e.*, "readers," this Court's ruling is infused with significant implications for the rights of AI creators, *i.e.*, "speakers." Moreover, the Order's discussion of the "expressive intent" test itself illustrates the impossibility of divorcing creators' rights from the analysis. The expressive conduct test is an analytical fit only from the perspective of the communicative act itself. Thus, "determin[ing] whether conduct is sufficiently similar to speech" must inherently consider the intent and rights of the individual performing, creating, or doing the expressive act—*i.e.*, the AI developer.

furtherance of a storyline they have participated in developing. This interactivity is a

hallmark of expressiveness:

> All literature (here broadly defined to include movies, television, and the
> other photographic media, and popular as well as highbrow literature) is
> interactive; the better it is, the more interactive. Literature when it is
> successful draws the reader into the story, makes him identify with the
> characters, invites him to judge them and quarrel with them, to
> experience their joys and sufferings as the reader's own.

*Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). *See Brown*,

564 U.S. at 798 (quoting *Kendrick* and rejecting argument that interactive media are

unprotected).

### C. This Court's Analysis is Fundamentally Incompatible With The Rulings of Other Courts and General Legal Principles

The proposition that LLM output simply is not "speech" and thus raises no

First Amendment issues is also at odds with the implicit conclusions of other courts in

cases pertaining to AI.[4] For example, when the California legislature passed a law in

2024 regulating, among other things, distribution of "materially deceptive" AI

deepfakes of electoral candidates, the U.S. District Court for the Eastern District of

California enjoined it as a likely violation of the First Amendment, holding "the risks

posed by artificial intelligence" are insufficient to justify stifling the free and unfettered

exchange of political ideas. *Kohls v. Bonta*, 752 F. Supp. 3d 1187, 1199 (E.D. Cal.

2024). Implicit in this reasoning is that AI output *is* in fact speech that receives First

---

[4] It also has profound implications for freedom of expression, as discussed *infra* at III.

Amendment protection—otherwise, California could simply ban AI systems from producing deepfakes in the first place.

The Order is similarly incompatible with tort law. Numerous plaintiffs across the country have now filed lawsuits alleging that the outputs of LLMs defamed them. *See, e.g.*, *Walters v. OpenAI, L.L.C.*, Civ. Action No. 23-A-04860-2 (Ga. Super. Ct. May 19, 2025) (granting summary judgment to OpenAI in defamation suit); Compl., *Starbuck v. Meta Platforms, Inc.*, C.A. No. N25C-04-283 (Del. Super. Ct. Apr. 29, 2025) (lawsuit alleging Meta's chatbot produced defamatory output). But if LLM outputs do not constitute speech, they cannot defame. This is so categorically, as defamation is a "categor[y] of unprotected *speech*," *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 865 (11th Cir. 2020) (emphasis added); and definitionally—as defamation requires a "false statement of fact," *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988). To make such a statement, one must necessarily engage in "speech."

### III.    HOLDING THAT LLM OUTPUT IS NOT SPEECH PROMISES DEVASTATING CONSEQUENCES FOR FIRST AMENDMENT RIGHTS

The question of whether AI outputs are "speech" under the First Amendment has profound implications reaching much further than this case. Throughout history, new technologies have revolutionized the way we speak and listen to one another, the way we obtain and generate knowledge, and our ability to understand the world around us. They have also democratized expression and self-governance itself, placing the world's knowledge at our fingertips and granting each of us access to massive

19

global audiences previously within reach of only the well-resourced and powerful. Along with—and often because of—these profound and democratizing effects, new communication and media technologies have always been met with fear, unease, and attempts to restrain or control them. We should by now have learned our lesson and not allow this cycle to repeat with AI.

A few basic use cases illustrate the danger that categorically excluding AI output from First Amendment protection poses to free speech, the preservation and transmission of knowledge, and perhaps even civic participation.

Activists now utilize AI to produce advocacy materials and increase their effectiveness in pressuring lawmakers for change or criticizing their inaction. But if AI output is not "speech," can the government prohibit any AI system from "stringing together words" in a way that criticizes government officials or positions?

Students increasingly use AI to conduct research and help with their studies. Consider a student using AI for a school project on gender and race integration in the military. Without any First Amendment protection for AI output, could the government require all AI systems to erase mentions of notable female military members, or the Tuskegee Airmen, from their outputs—and perhaps ultimately from our collective historical knowledge as well? *See generally* Anna Funder, *Trump's Orwellian Erasure of Women*, TIME (May 10, 2025), https://time.com/7284644/trumps-erasure-of-women/ (describing the erasure of

women from the Pentagon and Arlington National Cemetery websites following
Donald Trump's executive order targeting "DEI"); Kim Chandler & Gary Fields,
*Trump wants to undo diversity programs. Some agencies react by scrubbing US history and
culture*, ASSOCIATED PRESS (Feb. 2, 2025), https://apnews.com/article/trump-dei-
tuskegee-airmen-women-war-history-88a92c8485281d7c088c5eafe5dbf002 (reporting
similar erasure of the Tuskegee Airmen).

Finally, running for office often requires the resources to hire a small army of
campaign staff, placing public service outside the reach of many ordinary citizens of
modest means. AI tools now allow those who aspire to public office to mount
campaigns for a fraction of the cost, reducing barriers to elected office and giving voters
more options at the ballot box. If AI output is not speech, can incumbents prohibit AI
systems from producing political campaign materials, thereby protecting themselves
from a broader field of serious challengers?

This Court's analysis leaves little if any room to distinguish these AI outputs
from the ones at issue in this case. Its broad but threadbare analysis does not make
apparent any rationale by which the above uses are any more "speech" than a user
engaging with a chatbot by intentionally prompting it to respond as an ongoing
conversant. The form may vary slightly between each use, but the function is always
the same: arranging, or "stringing together" words, ideas, and concepts, Order at 28,
so that they form coherent, understandable messages that reflect the expressive
preferences of both its user and its creator.

21

Beyond direct government regulation, this lawsuit illustrates another threat to expressive freedoms posed by the Order. Courts have, for decades, ruled that imposing liability on broadcasters, movie producers, book publishers, comic book companies, game designers, and musicians for the alleged impact of words and ideas on readers, viewers, listeners, and players would unconstitutionally chill expression. *See, e.g., Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199, 202–03 (S.D. Fla. 1979) (holding that imposing a duty of care on a television broadcaster to protect against a minor's "addict[ion]" to television violence that allegedly caused him to commit identical acts of violence "has no valid basis and would be against public policy").

This Court's order would, contrary to decades of First Amendment jurisprudence, eschew the principle that we do not generally impose liability on speakers or distributors of *ideas*—ideas which this Court would find protected if uttered by mouth or written in ink—just because someone experienced a negative or harmful reaction to them. Much like the speakers courts have long refused to impose legal duties on to protect from the impact of words and ideas, creators of AI systems would be forced to sanitize their outputs to only the most safe, anodyne, and bland ideas fit for the most sensitive members of society. *See, e.g.*, *Davidson v. Time Warner, Inc.*, No. Civ.A. V-94-006, 1997 WL 405907 at *12 (S.D. Tex. Mar. 31, 1997) ("To create a duty requiring Defendants to police their recordings would be enormously expensive and would result in the sale of only the most bland, least controversial music."); *Olivia N. v. Nat'l Broad. Co.*, 126 Cal. App. 3d 488, 494 (1981) ("the chilling effect of [imposing

a duty of care on] a television broadcast is obvious" as "networks would become significantly more inhibited in the selection of controversial materials").

The First Amendment is agnostic with respect to the technology used to create expression, *see Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 870 (1997), and the same constitutional limitations that protect against the chilling effect of liability for words and ideas should apply to AI output. Accordingly, the First Amendment's application to LLMs is dispositive of this litigation and certification of immediate appeal is warranted.

## CONCLUSION

For the reasons stated above, this Court should grant Defendant Character Technologies, Inc.'s Motion for Certification of Immediate Appeal Pursuant to 28 U.S.C. § 1292(b) and For Stay Pending Appellate Review.

Dated: June 23, 2025                    Respectfully Submitted,

                                        By: /s/ Ari Z. Cohn
                                            Ari Z. Cohn (admitted pro hac vice)
                                            FOUNDATION FOR INDIVIDUAL
                                              RIGHTS AND EXPRESSION
                                            700 Pennsylvania Avenue SE
                                            Suite 340
                                            Washington, DC 20003
                                            (215) 717-3473
                                            ari.cohn@thefire.org

                                            *Counsel for Amicus Curiae*