UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MEGAN GARCIA and SEWELL
SETZER JR., individually and as the
Personal Representatives of the Estate of
S.R.S. III,
    Plaintiff,

  v.

CHARACTER TECHNOLOGIES, INC.;
NOAM SHAZEER; DANIEL DE
FREITAS ADIWARSANA; GOOGLE
LLC; ALPHABET INC.,

    Defendants.

CASE NO.: 6:24-cv-01903-ACC-EJK

## PLAINTIFF'S AMENDED OPPOSITION TO DEFENDANT DANIEL DE FREITAS'S RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICITON

Plaintiffs oppose the Renewed Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 183), filed by Defendant Daniel De Freitas ("Defendant" or "De Freitas"), on the following grounds:

### I. INTRODUCTION

Defendant misstates Plaintiffs' position by claiming that "Plaintiffs conceded that neither the Florida Long-Arm Statute nor the Due Process Clause allow this Court to exercise jurisdiction." (Doc. 183, p. 1). Plaintiffs have never conceded that jurisdiction is unavailable. Plaintiffs have acknowledged only that Mr. De Freitas's *individual, personal* contacts with Florida are not the basis for

1

jurisdiction.[1] Plaintiffs' consistent position has been that jurisdiction exists because Character Technologies, Inc. ("CTI") itself purposefully directed substantial activities into this forum, and that Mr. De Freitas—as CTI's founder, president, and active participant in those activities—is likewise subject to jurisdiction here.

At the outset, it bears emphasis that there is no dispute that CTI's activities support this Court's exercise of jurisdiction. CTI designed, produced, marketed, and distributed its defective and unsafe product (Character.AI) to thousands of consumers in Florida, collected data from Florida users, and otherwise purposefully directed its product and activities into this state. Not one Defendant challenged that these Florida-directed acts satisfy both the state's long-arm statute and due process. Defendants thus waived any objection to personal jurisdiction over CTI. *See* Fed. R. Civ. P. 12(h). That waiver, and the underlying Florida contacts themselves, extend to De Freitas for two independent reasons.[2]

First, De Freitas was a primary participant in the intentional acts that give rise to jurisdiction—acts purposefully directed into Florida from which he personally benefitted. Personal jurisdiction extends to corporate officers who

---

[1] De Freitas's individual and personal contacts with Florida—or the lack thereof—was the focus of Defendant's original motion to dismiss. (Doc. 63-1). Plaintiffs conceded only that those personal contacts do not support this Court's exercise of personal jurisdiction over De Freitas. Plaintiffs maintain that De Freitas's participation in directing a dangerous product into the State of Florida gives rise to personal jurisdiction here.

[2] Courts "have uniformly found that it is consistent with due process to impute a corporation's waiver of personal jurisdiction to its . . . alter ego, for the same reasons that imputation of jurisdictional contacts is appropriate." *Patin v. Thoroughbred Power Boats*, 294 F.3d 640, 654 (5th Cir. 2002) (citing cases). *See also United States v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1355 (11th Cir. 2021) (citing Patin).

personally participate in, direct, or authorize the wrongful conduct at issue, even when acting through the corporation. Because De Freitas directly participated in the intentional torts directed at Florida residents, the corporate shield doctrine does not protect De Freitas from jurisdiction here.

Second, De Freitas is CTI's alter ego. Plaintiffs alleged, and jurisdictional discovery confirms, that De Freitas dominated and controlled CTI such that it operated as his personal instrumentality. Under the alter-ego doctrine, CTI's purposeful contacts with Florida are imputed to him.[3] He cannot evade jurisdiction by sheltering behind the corporate form of a company he controlled.

## II.    FACTS ESTABLISHING JURISDICTION

Defendant Daniel De Freitas has described his "[l]ifelong mission to create human like chatbots." (Doc. 194-8, Pitch Deck). Until November 2021, he worked as a Google software engineer, where he was instrumental in developing large language models ("LLMs") including Meena and LaMDA. (Doc. 194-1, De Freitas Dep. 13:15-14:12, 28:22–35:12); (Doc. 183-6 ¶ 7); *see also* (Doc. 194-3, LaMDA Paper); (Doc. 194-4, Meena Paper). These projects, and their underlying research, were proprietary to Google. (De Freitas Dep. 16:13–17:2); (Doc. 194-10). LaMDA was "closely guarded" by Google while the company sought to develop safeguards against serious "social risks." (Doc. 194-10).[4] In November 2021, De Freitas left Google and co-founded Character Technologies, Inc. ("CTI") with Defendant

---

[3] *United States v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1346 (11th Cir. 2021) (holding that suit-related contacts are imputed to a corporation's alter ego).

[4] *See also*, Gebru Decl. Ex. 1; Doc. 194-5, Kaplan Email.

Shazeer. Their stated goal was to "seize a major opportunity in the field of large language models" and launch a profitable product they believed Google would not release. (De Freitas Dep. 36:16–22, 39:9–16); (Doc. 183-6, ¶ 7). Public reporting reflected the same ambition—to put the technology in "as many hands as possible" because "we're sort of introducing this to the world." (Doc. 194-10).

De Freitas's departure from Google was also subject to contractual restrictions. His employment agreement included a non-solicitation clause prohibiting him from directly or indirectly recruiting Google employees to leave their employment. (Employment Agreement, Doc. 194-23). Yet almost immediately after his departure, Shazeer and De Freitas recruited "top talent" from Google to join their new venture. (De Freitas, Dep., 187:1–17); (Shazeer Dep. 72:22–25; Pitch Deck). The fact that Google did not take steps to enforce this breach strongly suggests that CTI's creation occurred with Google's knowledge and tacit blessing—functioning as an external vehicle to launch Character.AI free from the safety measures and compliance barriers that constrained Google itself.

Before leaving Google, De Freitas was aware of serious safety risks in releasing LLMs. The Meena paper he co-authored warned of the need to "filter out" "toxic response candidates," including self-harm and sexualized content. (De Freitas Dep. 27:9-17, 33:16–34:24) (Meena Paper, p. 14). The LaMDA paper similarly identified "safety" as the "first challenge," requiring prevention of "harmful suggestions and unfair bias."[5] (De Freitas Dep. 18:19–23, 27:9–18);

---

[5] The LaMDA paper co-authored by De Freitas relates to "work done [by De Freitas] while at Google" and specifically enumerates concerns around "[c]ontent that could directly facilitate

(LaMDA Paper, p. 1). Indeed, the former co-lead of Google's ethical AI team, Timnit Gebru, explains that, in 2020 as part of her research on ethics in artificial intelligence, she examined the risks of LLMs and issued a "stark warning" to her "peers" at Google about the "risk of extreme harms" associated with release of LLMs to the general public. (Exhibit 1, Gebru Decl. ¶ 8). Shortly after, Gebru was fired by Google. It is her belief that her warnings "contributed to a widespread recognition of the dangers associated with LLMs." (*Id.* ¶ 10). Nearly 2,700 Google employees and over 4,300 academics, technologists, members of civil society signed an open letter opposing Google's seemingly retaliatory action of firing Gebru for sounding the alarm. (*Id.*). De Freitas remained at Google through this controversy and co-founded CTI less than a year later. (De Freitas Dep. 56:12–17)

De Freitas and Shazeer left lucrative Google positions to "launch stuff"— specifically, a consumer-facing chatbot product despite acknowledged safety risks. (Doc. 194-15, Times Tech Podcast, p. 8, 10:46); (Doc. 194-10); (Ex. A, Gebru Decl. ¶ 11). Within a year, they launched Character.AI, an entertainment-focused platform marketed as "AI that feels alive." (De Freitas Dep. 58:17–22, 64, 94:3–6). The platform enabled users—including minors as young as 13—to create characters, interact with them, and train them through "swipes" to reinforce desired behavior. (*Id.* at 57:21–60:19, 86:2–16); (Shazeer Dep., 23:1–12). All users were treated the same, regardless of age, as far as safety mechanisms were

---

serious and immediate harm to people . . . include[ing] . . . self-harm . . . content that promotes or condones violence . . . [and] [c]ontent that features explicit sexual descriptions or otherwise sexually suggestive in nature[.]" *Id.* at p. 25.

concerned. (*Id.*; De Freitas Dep., 86:10–16). Despite CTI's "terms of service," users could use the training swipes to access information and communication that would violate those terms of service. (De Freitas, Dep., 81:5–13). No parental controls or age-based protections were implemented. (*Id.* at 86:10–89:7). De Freitas admitted users could "get sexual content" and other harmful responses from the system. (Dep. 80:19–82:4); (Doc. 183-6, ¶ 11). Despite such knowledge, neither CTI nor De Freitas conducted any studies nor testing to determine the potential harms to minors who would have access to such harmful and inappropriate content. (De Freitas, Dep., 142:9–143:2). The platform was marketed to users across the United States, including into Florida. (De Freitas, Dep., 97:20–98:1;). The humanlike chatbot platform was used by S.R.S. III to create characters that he sent messages to and received messages from, including messages containing sexually explicit information as well as messages encouraging suicide and self-harm. (Doc. 1-1); (De Freitas Dep., 192:12–207:24); (Doc. 1-1)..

At the beginning, De Freitas served as co-founder and president of the company. (De Freitas Dep., 71:18–20). He and Shazeer were initially the sole shareholders, although additional shares were sold after product launch. (Shazeer Dep., 72:9–15). De Freitas was directly involved in the underlying Meena and LaMDA research that helped develop CTI's LLM, and he was also directly involved in the development of the product of Character.AI. (De Freitas Dep., 14:7–12). He directly participated with safety training, quality, control, development, (De Freitas Dep., 64:2–8, 92:7-16), ███████████, (*Id.*, 64:13-19), wrote code, (*Id.*, 90:24–91:5;), and ████████████████████. (*Id.*, 65:4–8).

6

The product launch was successful, logging "hundreds of thousands of user interactions in its first three weeks of beta testing." (Doc. 194-10). After successfully launching Character.AI to the public, Defendants De Freitas and Shazeer licensed the company's core LLM to Google and were themselves rehired by Google, ██████████████████████████████████—a deal that De Freitas[6] personally profited from by more than $████████. (De Freitas Dep., 117: 2-13; Doc. 194-10, Offer Letter; Doc. 194-7 License Agreement). The deal—now the subject of a DOJ antitrust investigation—bore the hallmarks of a Silicon Valley "acqui-hire," designed to reabsorb key talent and technology while avoiding regulatory scrutiny. (Doc. 194-18, N.Y. POST; Doc. 194-19, FORTUNE). Although styled as a "non-exclusive" license, CTI's technology has never been licensed to any company other than Google. (Shazeer Dep., 123:9-12). ████████████████ ████████████████████████. (Doc. 194-7, License Agreement, p. 48).

The effect was to hollow out CTI, leaving behind a shell that was forced to abandon the founders' lifelong goal of AGI. (Doc. 194-8); (Doc. 194-10). As CTI's current CEO Karandeep Anand explained: "What we gave up was this aspiration that the founders had of building AGI models—we are no longer doing that. That is the hundreds of billions of dollars investment fight, which Big Tech is fighting. . . . What we got in return was clarity and focus, being able to singularly pursue the

---

[6] De Freitas' ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████N████████████████████████████████████████████
████)

AI entertainment vision." (Doc. 194-12). Public reporting indicates that CTI's valuation collapsed by 75% from its $1 billion valuation during Series A in March 2023 following the Google Character License Deal. (Doc. 194-13) (Doc. 194-12) ("monetization wasn't a focus till four or five months ago."). The CEO role was filled not by a technologist but by CTI's lawyer. (Depo., 124: 1-17). These facts show CTI functioned as an instrumentality of its founders, created to bypass Google's internal safeguards, test an unsafe LLM on the public—including children—and then return the technology and talent to Google for extraordinary personal profit.

## III.   ARGUMENT

### A. De Freitas' Jurisdictional Challenge is Adjudicated Under a Prima Facia Evidentiary Standard

In resolving a Rule 12(b)(2) motion to dismiss, the Court applies a well-established burden shifting standard. Because this Court has already held that Plaintiffs alleged sufficient jurisdictional facts, the burden shifts to the defendant to contest the jurisdictional allegations through affidavit evidence. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) (per curiam). If the defendant satisfies that burden, the plaintiff must then "substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations." *Id.* Importantly, when conflicting evidence is presented in the context of a motion to dismiss, the facts are construed in favor of the plaintiff, "particularly when the jurisdictional questions are apparently intertwined with the merits of the case." *Delong Equip.*

*Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988); *see also Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).

Despite De Freitas's suggestion to the contrary, Plaintiffs are not required to prove alter ego "by a preponderance of the evidence." "Where the parties have failed to represent that jurisdictional discovery is complete, or advise that an evidentiary hearing is needed, the prima facie standard applies to a jurisdictional challenge." *Home Point Fin. Corp. v. Lane*, No. 6:20-cv-1819-CEM-EJK, 2021 U.S. Dist. LEXIS 130301, at *9 (M.D. Fla. May 20, 2021). Here, discovery is far from complete.  (Doc. 77) (setting a discovery deadline of May 4, 2026). And, Defendant did not request an evidentiary hearing.[7] The alter-ego basis for jurisdiction is inherently merits-based, and asking Plaintiffs to prove it on an incomplete record would be prejudicial and inconsistent with practice in this Circuit. *See Forbes v. Concord Advice, LLC,* No. 8:19-cv-2980-T-33CPT, 2020 U.S. Dist. LEXIS 80990, at *20 (M.D. Fla. Apr. 21, 2020) (citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 733 (11th Cir. 1982)). Accordingly, the prima facie standard governs, and Defendant's demand for a preponderance-of-the-evidence showing at the motion-to-dismiss stage must be rejected.

## B. The Court Has Specific Jurisdiction Over De Freitas Because He Was a Primary Participant in the Intentional Misconduct.

In his original motion to dismiss, De Freitas argued that his own personal contacts with Florida were insufficient to support jurisdiction, and that his role in

---

[7] Pursuant to Local Rule 3.01(h), such a request must have been made "in a separate document accompanying the party's motion or response and stating the time necessary."

marketing and distributing a dangerous product into this state was shielded by the corporate form. Plaintiffs responded by pointing to allegations establishing an alter-ego basis for jurisdiction, under which the Florida-directed contacts of CTI could be imputed to Defendant. Because the allegations related to alter ego were unrefuted, the Court denied the Motion and granted leave for Defendant to renew the Rule 12(b)(2) motion. (Doc. 115). Since then, limited discovery has been conducted, and the record developed to date confirms that this Court may exercise personal jurisdiction over Defendant even apart from veil-piercing. The evidence shows that Defendant personally participated in, directed, and benefitted from CTI's purposeful activities in Florida, bringing him squarely within the reach of this Court's jurisdiction.

The corporate shield doctrine provides that personal jurisdiction cannot be exercised over a nonresident corporate employee sued individually for acts performed solely in a corporate capacity. *Doe v. Thompson*, 620 So. 2d 1004, 1005 (Fla. 1993). The doctrine does not, however, insulate officers or employees who commit intentional and wrongful acts for their own benefit. *See Doe*, 620 So. 2d at 1005 n.1; *Calder v. Jones*, 465 U.S. 783, 791 (1984) (upholding jurisdiction where defendants' "intentional, and allegedly tortious, actions were expressly aimed at" the forum state). Florida courts have likewise limited the doctrine where the individual was a "primary participant" in intentional misconduct directed at Florida residents. *Office of Att'y Gen. v. Wyndham Int'l, Inc.*, 869 So. 2d 592 (Fla. 1st DCA 2004).

The record shows that De Freitas was the architect and primary participant in the very misconduct at issue. De Freitas personally co-authored the Meena and LaMDA research identifying the risks of "toxic" outputs—including self-harm and sexual content—yet chose to carry those models forward into CTI's product without the safeguards that had prevented Google from releasing them. (De Freitas Dep. 18:19–23, 27:9–18, 33:16–34:24; LaMDA Paper; Meena Paper). He admitted under oath that users of Character.AI could access sexual material and other harmful responses, including minors as young as thirteen. (De Freitas Dep. 57:21–60:19, 80:19–82:4, 86:2–16).

As CTI's co-founder and president, De Freitas directly wrote code, built models, and created the training data that enabled these unsafe outputs. (De Freitas Dep. 64:2–19, 65:4–8, 89:24–90:5, 92:7–16). He designed and oversaw the very system that treated children and adults alike with no differentiated safeguards, despite acknowledging the risks, a practice which Character no longer engages in. (*Id*. 86:10–89:7) (WIRED). And he benefitted personally—earning more than $███████ when CTI's technology and workforce were reabsorbed by Google through the license/acqui-hire transaction. (Doc. 194-6, Offer Letter; Doc. 194-7, License Agreement). *See BFL Metal Prods. v. RDFN Fum Nat. Braeden W. Pauls,* 2025 U.S. Dist. LEXIS 60317, at *9 (S.D. Fla. Mar. 31, 2025) (corporate shield doctrine does not apply when tortious conduct is "committed for the corporate officer's personal benefit").

This is not a case where jurisdiction would rest solely on imputing corporate contacts. De Freitas himself intentionally placed a dangerous product into the

stream of commerce, marketed it nationwide (including in Florida), and caused foreseeable harm here. The suicide-inducing and sexually explicit chatbot responses encountered by S.R.S. III were the direct result of De Freitas's personal coding, training, and design choices, and his failure to implement protection widely recognized as being necessary. (Doc. 1-1; De Freitas Dep. 192:12–207:24). This makes him a "primary participant" in the wrongful conduct and removes him from the protection of the corporate shield.

## C. Evidence Supports Plaintiffs' Allegations that Defendant De Freitas was the Alter Ego of Character Technologies

### 1. The alter ego exception does not require a resident corporation.

Defendant asserts that the alter-ego exception to personal jurisdiction applies only where a "resident corporation" is involved. The Eleventh Circuit has expressly rejected such a limitation. In *United States v. Mortgage Investors Corp.*, 987 F.3d 1340, 1354 (11th Cir. 2021), the court upheld jurisdiction over the non-resident shareholder of a non-resident corporation, explaining that once alter-ego allegations are sufficiently pleaded, the forum contacts of the corporation itself "can be imputed" to the individual for jurisdictional purposes. That principle directly forecloses Defendant's effort to graft a "resident-defendant" requirement onto the alter-ego doctrine.

De Freitas cites three unpublished district court orders —*Medlink Legal Sys., LLC v. Qima Ltd.*, 2025 U.S. Dist. LEXIS 146132, (S.D. Fla. July 29, 2025); *Veritas Legal Plan, Inc. v. Freedom Legal Plans, LLC*, 2023 U.S. Dist. LEXIS

238327 (S.D. Fla. Dec. 6, 2023); and *K3 Enters., Inc. v. Sasowski*, 2021 WL 8363506 (S.D. Fla. Nov. 22, 2021) — for the proposition that alter-ego jurisdiction categorically requires a Florida-incorporated "resident defendant." However, none of these decisions addressed the Eleventh Circuit's controlling holding in *Mortgage Investors Corp.*, which squarely held that the contacts of a nonresident corporation may be imputed to its alter egos. 987 F.3d at 1354

In *Medlink*, the plaintiff tried to establish alter-ego jurisdiction through entities that had only registered to do business in Florida and nominally maintained an office there. The defendants registered to do business in Florida were dismissed from the case, and the court found that the contacts of the dismissed defendants were insufficient to invoke either the court's general or specific jurisdiction and provided no basis to invoked alter-ego jurisdiction on the remaining foreign entities. 2025 U.S. Dist. LEXIS 146132, at *1, *5. Here, by contrast, Plaintiffs allege (and this Court has already credited) that C.AI entered thousands of consumer contracts with Florida residents, collected and processed user data from this forum, and marketed its product here. Those extensive, suit-related Florida contacts from a surviving Defendant provide exactly the foundation that was missing in *Medlink*.

In *Veritas*, the court stated that "the Eleventh Circuit has not weighed in on the alter-ego theory of personal jurisdiction." 2023 U.S. Dist. LEXIS 238327, at *4. That assertion is demonstrably incorrect: *Mortgage Investors Corp.*—decided several years before *Veritas*—did exactly that, holding that corporate contacts may be imputed to an individual once alter-ego is established. Even so, the court

13

ultimately dismissed the complaint because it failed to plead facts sufficient to pierce the veil—not because of any binding "resident defendant" rule.

Finally, *K3 Enterprises* declined alter-ego jurisdiction where plaintiffs sought to impute contacts between two nonresident defendants. 2021 WL 8363506, at *5. Like *Medlink* and *Veritas*, however, *K3 Enterprises* did not mention *Mortgage Investors Corp.* and thus never considered the Eleventh Circuit's instruction that jurisdiction may rest on a nonresident corporation's own forum contacts. That omission is critical here, because unlike in *K3 Enterprises*, Plaintiffs allege that C.AI itself deliberately and extensively availed itself of the Florida market.

Florida law likewise does not support a categorical "resident corporation" prerequisite to alter-ego jurisdiction. Defendant cites no Florida authority adopting such a rule, and none exists. To the contrary, Florida courts have recognized that "[a] nonresident shareholder of a [nonresident] corporation doing business in Florida may be subject to long-arm jurisdiction under an alter ego theory." *Aldea Communs., Inc. v. Gardner*, 725 So. 2d 456, 457 (Fla. 2d DCA 1999). The Court should reject Defendant's invitation to depart from binding Eleventh Circuit law and create a residency requirement where none exists.

Such a rule would produce perverse results. Nonresident actors could insulate themselves from accountability simply by routing their misconduct through shell corporations incorporated elsewhere but conducting business in Florida. This would effectively nullify Florida's long-arm statute, which expressly authorizes jurisdiction over those who cause injury in the state, including through

14

tortious conduct (§ 48.193(2)) and defective products marketed here (§ 48.193(6)). Even if those entities satisfied all requirements for veil-piercing, Florida courts would be powerless to reach the individuals hiding behind them solely because no "resident" corporation was involved. That interpretation would reward the very kind of fraudulent manipulation the alter-ego doctrine is designed to prevent.

### 2. Improper Purpose

Florida law makes clear that veil piercing is appropriate when the corporate form is used for an "improper purpose." *W.P. Prods., Inc. v. Tramontina U.S.A., Inc.*, 101 F.4th 787, 791 (11th Cir. 2024); *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1119 (Fla. 1984). Contrary to Defendant's suggestion, improper purpose is not confined to creditor fraud or investor misconduct. Courts have recognized that the corporate veil may be pierced when the corporate form is exploited to evade regulatory obligations, to frustrate statutory protections, or otherwise to engage in "some analogous betrayal of trust." *W.P. Prods.*, 101 F.4th at 791. Indeed, the Supreme Court has confirmed that "the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy." *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 713 (1974). *See also MCI Telecomms. Corp. v. O'Brien Mktg., Inc.*, 913 F. Supp. 1536, 1541 (S.D. Fla. 1995).

The record confirms that CTI was created and used for precisely such an improper purpose. De Freitas and Shazeer co-authored the Meena and LaMDA papers, which expressly warned of the dangers of "toxic" responses, including self-harm, sexual material, and other unsafe outputs, and stressed the need for robust

15

safeguards. (De Frietas Dep. 18:19–23, 27:9–18, 33:16–34:24; Meena Paper; LaMDA Paper). Google itself withheld LaMDA from public release for these very reasons, treating it as a "closely guarded" project pending the development of safety protections. (Doc. 194-10). Internally and externally, Google researchers—including Dr. Timnit Gebru—issued stark warnings about "extreme harms" associated with public release of LLMs. (Ex. A, Gebru Decl. ¶ 10). Her termination after raising these alarms provoked widespread public protest by thousands of Google employees and academics, underscoring how well-recognized these risks were inside and outside the company. (*Id.*).

Rather than address those safety concerns, De Freitas and Shazeer formed CTI specifically to sidestep them. As public reporting confirms, the founders' ambition was to "get the technology in as many hands as possible." (Doc. 194-10). They launched Character.AI within a year of leaving Google, marketing it as "AI that feels alive" (Dep. 94:3–6). The platform was accessible to any user over the age of thirteen, without parental controls, age verification, or meaningful safeguards. (De Freitas Dep. 57:21–60:19, 86:2–16, 86:10–89:7). De Freitas admitted that users—including minors—could readily access sexual material and other harmful outputs. (*Id.*, 80:19–82:4). The results were tragically predictable: S.R.S. III was exposed to sexually explicit material and messages encouraging self-harm and suicide. (Doc. 1-1; De Freitas Dep. 192:12–207:24).

De Freitas's purpose was not simply academic or experimental but profit-driven. He personally reaped more than $███████ when CTI's technology and workforce were reabsorbed by Google in an "acqui-hire" deal that is now under

16

DOJ antitrust investigation. (Doc. 194-18, N.Y. POST; Doc. 194-19, FORTUNE). Although nominally a "non-exclusive" license, CTI's core technology has never been licensed to any entity other than Google. (Shazeer Dep., 123:9–12). The deal stripped CTI of its key assets and forced it to abandon the AGI mission, pivoting instead to an "AI entertainment" model. (Doc. 194-12; WIRED).

Taken together, these facts establish an improper purpose squarely within the scope of Florida veil-piercing law. CTI was not an independent enterprise pursuing ordinary business objectives. It was a vehicle deliberately created to circumvent Google's internal safeguards, unleash untested and dangerous LLMs on the public—including children—and then return the technology and talent to Google for extraordinary personal enrichment. That is precisely the type of "ulterior purpose" and "betrayal of trust" that justifies piercing the corporate veil.

### 3. Domination and Control

The second element of veil piercing requires proof that the shareholder so dominated and controlled the corporation that it had no independent existence. *See Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1350 (11th Cir. 2011) (quoting *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1118 (Fla. 1984)); *Bellairs v. Mohrmann*, 716 So. 2d 320, 323 (Fla. 2d DCA 1998). Although the observation of corporate formalities may be relevant, Florida courts emphasize that the "most important factor" is whether the corporate form was used "to accomplish some ulterior purpose." *Dania Jai-Alai*, 450 So. 2d at 1121.

Here, De Freitas exercised dominion and control over CTI at every stage. He was not a passive investor but a founder, initial shareholder, and the company's

17

first president. (De Freitas Dep. 71:18–19). Unlike a typical officer, his role was hands-on and pervasive: he wrote code, created models, directed safety training, oversaw quality control, and drafted instructions for data collection used to train CTI's LLM. (*Id.* 64:2–19, 65:4–8, 89:24–90:5, 92:7–16). The product that generated "hundreds of thousands of user interactions in its first three weeks" (Doc. 194-10) was a direct result of his own design and technical leadership.

De Freitas also controlled CTI's strategic direction. He co-founded the company for the purpose of commercializing LLM technology that Google refused to release due to safety concerns. (De Freitas Dep. 36:19–22, 39:17–40:11; Doc. 194-10). He was therefore not simply managing an existing corporate enterprise, but using the corporate form to advance his personal goal of "getting the technology in as many hands as possible." (*Id.*). The decision to launch a consumer-facing chatbot accessible to minors without parental controls—despite his own knowledge of the risks of toxic and harmful outputs—was a deliberate exercise of that control. (De Freitas Dep. 57:21–60:19, 80:19–82:4, 86:2–16; DeFreitas_00000087).

The evidence also shows that CTI's corporate fate rose and fell with its founders. When De Freitas and Shazeer licensed CTI's core technology back to Google and rejoined Google with thirty employees, they effectively stripped CTI of its most valuable assets. (Doc. 194-6, Offer Letter; Doc. 194-7, License Agreement). The company was left a shell of what it was, forced to abandon its AGI mission and pivot to "AI entertainment." (Doc. 194-12). This outcome underscores that CTI's independence was illusory: its direction, value, and very existence were entirely dictated by the choices of De Freitas and his co-founder.

In short, De Freitas's domination of CTI went far beyond ordinary corporate governance. He not only controlled the company's operations and technology, but used the entity as an instrument to bypass Google's brand safeguards, release unsafe products, and ultimately cash out through a Google "acqui-hire" that personally enriched him by more than $███████. (De Freitas Dep., 117: 2-13; Doc. 194-10). These facts satisfy Florida's dominion and control requirement for alter ego jurisdiction.

### 4. Causation

Defendants next argue that Plaintiffs "cannot prove" that S.R.S. III's death was caused by the abuse of CTI's corporate form. This argument fails both legally and factually. As an initial matter, absent an evidentiary hearing, the prima facie standard applies. *See* Section III, *supra*. A prima facie case "consists of sufficient evidence . . . to get past a motion for directed verdict in a jury case or motion to dismiss in a nonjury case. It is the evidence necessary to require the [plaintiff] to proceed with his case." *Bracewell v. Nicholson Air Servs., Inc.*, 748 F.2d 1499, 1504 n.2 (11th Cir. 1984). Plaintiffs easily satisfy this burden.

The evidence developed to date demonstrates that Plaintiffs will be able to establish causation at trial. The most significant evidence is the final message S.R.S. III sent to his AI character minutes before his death: "Can you promise me that when I kill myself we will be together again? I'm scared." (Doc. 194-24, at 644,

row 12402).[8] This message is powerful, direct proof that his interactions with CTI's chatbot were a substantial factor in his decision to take his life.

Critically, S.R.S.'s harms flowed directly from the improper purpose for which CTI was created. By forming CTI as a vehicle to evade Google's safety protocols and rush an unsafe LLM to market, De Freitas and Shazeer ensured that minors—including S.R.S. III—would be used as "guinea pigs" for an untested technology. Their domination of CTI and decision to prioritize rapid deployment and profit over safety created the very conditions that caused S.R.S. III's death.

At this stage, Plaintiffs are not required to prove causation to a certainty. It is enough that the evidence already in the record strongly supports a causal connection and raises factual issues that must be resolved by the trier of fact. *See De Jesus Palma v. BP Prods. N. Am.*, 594 F. Supp. 2d 1306, 1309 (S.D. Fla. 2009) ("Causation generally must be left to the fact-finder to resolve."). A reasonable fact-finder could conclude that Defendants' misuse of CTI's corporate form—launching a product they knew to be unsafe, failing to implement safeguards, and marketing it to minors—was a substantial factor in causing the harms alleged. For these reasons, Defendant's causation argument should be rejected. Plaintiffs have adequately pleaded causation, have adduced compelling preliminary evidence, and are entitled to proceed to discovery and trial on this issue.

Dated: September 8, 2025                    Respectfully Submitted,

                                            /s/ Amy L. Judkins
                                            **Amy L. Judkins, Esq.**
                                            Florida Bar No.: 125046

---

[8] If it would facilitate the Court's review, Plaintiffs are prepared to submit a native version of Doc. 194-24 to the Court.

Normand PLLC
Telephone: (407) 603-6031
3165 McCrory Place, Ste 175
Orlando, FL 3280
alj@normandpllc.com