UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MEGAN GARCIA and SEWELL SETZER JR., individually and as the Personal Representatives of the Estate of S.R.S. III, <br><br> Plaintiff, <br><br> v. <br><br> CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FREITAS ADIWARSANA; GOOGLE LLC; ALPHABET INC., <br><br> Defendants. | CASE NO.: 6:24-cv-01903-ACC-EJK |

## PLAINTIFF'S AMENDED OPPOSITION TO DEFENDANT NOAM SHAZEER'S RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICITON

Plaintiffs oppose the Renewed Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 182), filed by Defendant Noam Shazeer ("Defendant" or "Shazeer"), on the following grounds:

## I.    INTRODUCTION

The starting point for evaluating personal jurisdiction over Defendant Shazeer is recognizing that this Court is properly exercising specific jurisdiction over Character Technologies, Inc. ("CTI")—itself a nonresident corporation—based on well-pleaded allegations that CTI designed, produced, and promoted a defective product (Character.AI) into Florida, causing Plaintiffs' harm. (Doc. 157, ¶ 27). Not a single Defendant disputed that CTI's acts of marketing, selling, and distributing Character.AI into Florida satisfy both Florida's long-arm statute and the

1

requirements of due process. By failing to raise such a challenge, Defendants waived any objection to personal jurisdiction as to CTI. See Fed. R. Civ. P. 12(h).

That waiver, and the underlying Florida contacts, may be attributed to Shazeer—the founder and CEO of CTI—for two independent reasons. First, Personal jurisdiction extends to corporate officers who personally participate in or direct the wrongful conduct at issue, even where those acts were carried out in a corporate capacity. Shazeer was the primary participant in the very acts giving rise to jurisdiction—acts directed into Florida that he undertook for his own benefit and from which he personally profited.

Second, Shazeer is the alter ego of CTI. Plaintiffs have alleged, and jurisdictional discovery has confirmed, that CTI's corporate form was dominated and controlled by Shazeer to such an extent that it operated as his personal instrumentality. Under the alter ego doctrine, CTI's purposeful contacts with Florida are properly imputed to Shazeer, and he cannot evade jurisdiction by sheltering behind the corporate form.[1]

## II.    FACTS ESTABLISHING JURISDICTION

From the very beginning of his career, Noam Shazeer pursued one singular goal: to build artificial general intelligence ("AGI") and "make it available to the world." (Doc. 194-8, Pitch Deck). Industry leaders have described him as the

---

[1] Courts "have uniformly found that it is consistent with due process to impute a corporation's waiver of personal jurisdiction to its . . . alter ego, for the same reasons that imputation of jurisdictional contacts is appropriate." *Patin v. Thoroughbred Power Boats*, 294 F.3d 640, 654 (5th Cir. 2002) (citing cases). *See also United States v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1355 (11th Cir. 2021) (citing *Patin*).

"single person most responsible for the current AI revolution." (Doc. 194-14, Jeff Dean Podcast, p. 1, 00:00:47).[2]

For over twenty years, Shazeer worked at Google as a leading engineer in the development of artificial intelligence. He was instrumental in building "large language models" or LLMs, including development of the Transformer model that "is used in pretty much every major [LLM] application." (Doc. 194-2, Shazeer Dep. 19:2–20:16; 27:19–25). As Google's own leaders acknowledged, Shazeer was "the inventor or co-inventor of all the main architectures and techniques that are used for modern [LLMs]." (Doc. 194-14, Jeff Dean Podcast, p. 1, 00:00:47).

But Google's caution stood in the way of Shazeer's ambition. While at Google, Shazeer was aware of the risks associated with releasing open-ended AI chatbots to the public. He co-authored a 2022 paper on LaMDA, warning of the need for guardrails to prevent "harmful suggestions" and identifying "safety" as the first challenge in creating a model. (Shazeer Dep., 53:17–23); (Doc. 194-3, LaMDA Paper, p. 1). He admits that Google was concerned that models could "produce sexual content" or "encourage self-harm," dangers he recognized were "greater risks with minors." (Shazeer Dep. 32:2–24; 40:20–41:2). Former co-lead of Google's ethical AI team, Timnit Gebru, explains that, in 2020 as part of her research on ethics in artificial intelligence, she examined the risks of LLMs and issued a "stark warning" to her "peers" at Google about the "risk of extreme harms" associated with release of LLMs to the general public. (Exhibit 1, "Gebru Decl."). It

---

[2] Importantly, Shazeer acknowledged that he was in fact the person in the media interviews cited herein. Shazeer Dep. 105:18–115:16 and Ex. 9.

is her believe that her warnings "contributed to a widespread recognition of the dangers associated with LLMs." (*Id.* ¶ 10).

Shortly thereafter, Gebru was fired by Google. Nearly 2,700 Google employees and over 4,300 academics, technologists, members of civil society joined in opposition to Google's seemingly retaliatory action of firing Gebru for sounding the alarm. (*Id.*). Shazeer remained at Google through this controversy and co-founded CTI less than a year later.

Rather than apply his talents to address these safety concerns, Shazeer walked away. In October 2021, he left his lucrative position at Google to cofound CTI—a startup designed to "launch stuff" quickly to the public, regardless of safety concerns. (Doc. 194-15, Times Tech Podcast, p. 8, 10:46) (Shazeer Dep. 20:18–21:22; 30:5–6). As he later admitted: Google was "not the right company" to bring his "valuable" product to market, because it would "move too slow." (Shazeer Dep. 30:5–6); (Doc. 194-15, Times Tech Podcast, p. 8, 10:46). By contrast, at CTI, "we were just like, okay, let's just build this thing and launch as fast as we can." (Doc. 194-16, No Priors, p. 11, 15:30).

Shazeer's departure from Google was also subject to contractual restrictions. His employment agreement included a non-solicitation clause prohibiting him from directly or indirectly recruiting Google employees to leave their employment. (Doc. 194-22, Employment Agreement). Yet Shazeer admitted that, almost immediately after his departure, he recruited "top talent" from Google to join his new venture. (Shazeer Dep. 72:22–25); (Pitch Deck). The fact that Google did not take steps to enforce this breach strongly suggests that CTI's creation occurred

4

with Google's knowledge and tacit blessing—functioning as an external vehicle to launch Character.AI free from the safety measures and compliance barriers that constrained Google itself.

CTI launched Character.AI, marketed nationwide as "AI that feels alive." (Doc. 194-1, De Freitas Dep. 58:17–22, 94:3–6). The platform enabled users—including minors as young as 13—to create characters, interact with them, and "train" them through swipes to reinforce behavior. (De Freitas Dep. 57:21–60:19, 86:2–16; Shazeer Dep. 23:1–12). All users were treated identically as far as safety mechanisms go, regardless of age. (De Freitas Dep. 86:10–16). No parental controls or age-based protections were implemented, and users could easily bypass terms of service to access harmful material. (Shazeer Dep. 81:5–13; De Freitas Dep. 86:10–89:7).

Character.AI quickly became a massive platform. By 2023, it had nearly two million daily active users who spent on average two hours a day engaged with its chatbots. (Doc. 194-17, TechCheck, at p. 3, 08:10). Tragically, among those users was S.R.S. III, who created characters that produced sexually explicit exchanges and messages encouraging suicide and self-harm. (Doc. 1-1; De Freitas Dep. 192:12–207:24).

Shazeer's control over CTI was absolute. He was founder, CEO, sole director, chairman, majority shareholder, and the company's central technical architect. (Shazeer Dep. 60:19–22; 66:24–67:7; 78:8–11). By his own words, he was "ultimately responsible for [] everything that happens in the company." (*Id.* 60:19–22). His cofounder and minority shareholder, Daniel De Freitas, was contractually

bound to vote in accordance with Shazeer's wishes. (Shazeer Dep. 75:20–76:1; De Freitas Dep. 93:17–22, 97:17–19, 99:3–13). Shazeer initially operated CAI out of his basement, before obtaining outside office space, and testified that he personally covered business expenses in the company's early days. (Shazeer Dep. 65:4-12).

The payoff for Shazeer was extraordinary. In 2023, after CTI had proved its ability to capture users, Shazeer orchestrated a deal in which Google rehired him and roughly thirty CTI employees and licensed CTI's core LLM. Shazeer personally profited by more than $███████. (Shazeer Dep. 123:15–124:8; De Freitas Dep. 117:2–13; Doc. 194-6; Doc. 194-7, License Agreement). The deal is now the subject of a Department of Justice antitrust investigation. (Doc. 194-18, N.Y. POST; Doc. 194-19, FORTUNE). CTI's valuation collapsed soon after. Its founders departed with enormous personal wealth, while the company's interim, CEO—its former lawyer—abandoned the founders' AGI ambitions in favor of a narrow "AI entertainment" vision. (Doc. 194-12, WIRED; Shazeer Dep. 124:7–17).

In sum, CTI was never an independent entity. It was Shazeer's instrument: created to evade Google's safeguards, push a product he knew was unsafe into the hands of millions—including children—and then sell that product back to Google for extraordinary personal gain.

### III.   ARGUMENT

### A. Shazeer Misstated the Evidentiary Standard for Personal Jurisdiction

Defendant asserts that Plaintiffs must prove the underlying facts to establish personal jurisdiction by a "preponderance of the evidence." That is incorrect.

Defendant filed a Rule 12(b)(2) motion to dismiss. "In the context of such motions in which no evidentiary hearing is held, the plaintiff must present only a prima facie showing of [] personal jurisdiction." *Bracewell v. Nicholson Air Services, Inc.*, 748 F.2d 1499, 1504 (11th Cir. 1984). Since the Court determined that Plaintiffs alleged sufficient jurisdictional facts, "the burden shifts to the defendant to make a prima facie showing of the inapplicability of the state's long-arm statute." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) (per curiam). The plaintiff must then "substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations." *Id.* Importantly, "when there is a battle of affidavits placing different constructions on the facts, the court is inclined to give greater weight, in the context of a motion to dismiss, to the plaintiff's version . . ., particularly when the jurisdictional questions are apparently intertwined with the merits of the case." *Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988); *see also Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988) ("[W]here the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff.").

The two cases relied upon by Shazeer are distinguishable. Neither *Rogers v. Coloplast Corp.*, 2022 U.S. Dist. LEXIS 15177 (M.D. Fla. Jan. 27, 2022), nor *Frontline Int'l, Inc. v. Edelcar, Inc.*, 2011 U.S. Dist. LEXIS 166513 (M.D. Fla. Apr. 6, 2011), involved the alter-ego basis for personal jurisdiction, which necessarily

7

overlaps with the merits of the underlying claims, and both cases noted that jurisdictional discovery was complete.

"Where the parties have failed to represent that jurisdictional discovery is complete, or advise that an evidentiary hearing is needed, the prima facie standard applies to a jurisdictional challenge." *Home Point Fin. Corp. v. Lane*, No. 6:20-cv-1819-CEM-EJK, 2021 U.S. Dist. LEXIS 130301, at *9 (M.D. Fla. May 20, 2021). Here, discovery is far from complete. (See Doc. 182-1) (describing the discovery conducted "to date"); (Doc. 77) (setting a discovery deadline of May 4, 2026). And, Defendant did not request an evidentiary hearing.[3]

Even so, an evidentiary hearing would be premature here. The alter-ego basis for jurisdiction is inherently intertwined with the substantive merits of Plaintiff's claims against Shazeer individually.  Asking Plaintiffs to prove Shazeer's alter ego liability on an incomplete record would be prejudicial and inconsistent with Eleventh Circuit practice. *See Forbes*, 2020 U.S. Dist. LEXIS 80990, at *20 (citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 733 (11th Cir. 1982) ("Where the jurisdictional issues are intertwined with the substantive merits, the jurisdictional issues should be referred to the merits, for it is impossible to decide one without the other.")). Accordingly, the prima facie standard governs, and Defendant's demand for a preponderance-of-the-evidence showing at the motion-to-dismiss stage must be rejected.

## B. Jurisdiction Over Shazeer Does Not Depend on Piercing the Corporate Veil

---

[3] Pursuant to Local Rule 3.01(h), such a request must have been made "in a separate document accompanying the party's motion or response and stating the time necessary."

In his original Motion to Dismiss, Shazeer argued that his personal contacts with Florida were insufficient to confer personal jurisdiction upon this Court, and that his participation in the marketing and distributing of a dangerous product into Florida was protected by the corporate shied doctrine. In opposing Defendant's original motion to dismiss, Plaintiffs cited allegations from her Complaint supporting the alter-ego basis for personal jurisdiction, under which the suit-based contacts of CTI could be attributed to Shazeer. Now, after limited discovery, the evidence gathered to date demonstrates that this Court can exercise personal jurisdiction over Shazeer even without piercing the corporate veil.

The so-called "corporate shield" doctrine provides that a nonresident corporate employee is ordinarily not subject to personal jurisdiction for acts performed solely in a corporate capacity. *Doe v. Thompson*, 620 So. 2d 1004, 1005 (Fla. 1993). Its rationale is that it would be unfair to hale an individual into a foreign forum when his only relevant contacts are acts performed exclusively for his employer's benefit. *Id.* at 1006.

But that shield does not apply where, as here, the corporate officer is the primary participant in tortious conduct intentionally directed into the forum for their own benefit. Courts consistently recognize that personal jurisdiction may be exercised over officers who personally direct or participate in wrongful acts targeted at forum residents. *Calder v. Jones*, 465 U.S. 783, 791 (1984*); Office of Attorney Gen. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004); *Allerton v. State, Dep't of Ins.*, 635 So. 2d 36, 40 (Fla. 1st DCA 1994).

The evidence confirms that Shazeer was not a peripheral officer acting only for CAI's benefit. Shazeer admits that the development of artificial general intelligence ("AGI") is and has been his personal goal, and that CTI and the release of Character.AI was a step toward fulfilling that personal ambition. (Doc. 194-8, Pitch Deck; Doc. 194-12, WIRED). He was the co-founder, CEO, majority shareholder, and sole board member of Character Technologies. (Shazeer Dep. 60:19–22; 66:24–67:7; 78:8–11). Shazeer admitted that he was "ultimately responsible for [] everything that happens in the company." (*Id.* 60:19–22). His cofounder De Freitas was contractually obligated to vote his shares in accordance with Shazeer's wishes, confirming Shazeer's total control. (Shazeer Dep. 75:20–76:1; De Freitas Dep. 93:17–22, 97:17–19, 99:3–13).

Nor were Shazeer's actions taken merely for CTI's benefit. He deliberately left Google to escape its safety concerns and "launch stuff" to the public "as fast as we can," despite acknowledging risks of sexual content, self-harm encouragement, and heightened dangers to minors. (Shazeer Dep. 30:5–6; 32:2–24; 40:25–41:2); (Doc. 194-15, Times Tech Podcast, p. 8, 10:46). His employment agreement contained a non-solicitation clause barring him from directly or indirectly recruiting Google employees. Yet Shazeer admitted that almost immediately after his departure he recruited "top talent" from Google to join CTI. (Shazeer Dep. 72:23-25). Shazeer personally drove the launch of Character.AI into the United States market—including Florida—as an entertainment platform designed to reach millions, including children. (De Freitas Dep. 57:21–60:19, 86:2–16; Shazeer Dep. 23:1–12). These were not corporate acts performed for a distant employer: they

were his own deliberate decisions, carried out to advance his personal goal of developing AGI and to reap extraordinary personal profit.

Crucially, Shazeer was well aware that LLMs could generate sexually explicit and harmful communications. At Google, he recognized risks that open-ended models could "produce sexual content for users" and "encourag[e] self-harm," and that these risks were "greater" when minors were involved. (Shazeer Dep. 32:2–24; 40:25–41:2). Shazeer conceded that "AI directing children towards thoughts of sex . . . would be bad and something to avoid." (Shazeer Dep. 131). Despite these concerns, Shazeer marketed the platform to minors as young as thirteen years old, who were given to access to dangerous technology before adequate testing was performed to determine the risks to this vulnerable age group. (De Freitas Dep. 57:21–60:19, 86:2–16; Shazeer Dep. 23:1–12). The platform contained no parental controls, treated minors and adults identically, and allowed users to "swipe" characters into producing sexually explicit or exploitative material. (Shazeer Dep. 81:5–13; De Freitas Dep. 86:10–89:7). This reckless disregard for the safety of minors was made in furtherance of Shazeer's own personal AGI ambitions.

By knowingly exposing minors to sexually explicit and exploitative content, Shazeer personally engaged in conduct that implicates Florida's Computer Pornography and Child Exploitation Prevention Act, Fla. Stat. § 847.0135, which prohibits knowingly transmitting or providing access to materials harmful to minors. Shazeer's deliberate choice to launch Character.AI to minors despite known risks of pornographic and exploitative communications places him squarely

within *Calder's* rule: he personally directed tortious conduct into this forum, and he cannot now claim the protection of a corporate shield.

Shazeer ultimately monetized those decisions by orchestrating a deal in which Google rehired him and licensed CTI's technology, a transaction from which he personally gained more than $███████. (Shazeer Dep. 112; 123:15–124:8; De Freitas Dep. 117:2–13). These facts place Shazeer squarely within *Calder* and its progeny: an officer who personally directed wrongful conduct at forum residents, and who did so not simply for a corporate principal but for his own gain. *See, e.g.*, *Fed. Trade Comm'n v. Student Aid Ctr., Inc.*, 281 F. Supp. 3d 1324, 1336 (S.D. Fla. 2016) ("An individual defendant is personally liable for violations of FDUTPA when the individual was "a direct participant in the dealings."); *see also Rollins v. Heller*, 454 So. 2d 580 (Fla. 3d DCA 1984) (holding that piercing the corporate veil is not required to hold an individual personally liable for violations of FDUTPA, provided the individual was a direct participant in the dealings).

### C. Evidence Supports Plaintiffs' Allegations that Defendant Shazeer was the Alter Ego of Character Technologies

#### a. The alter ego exception does not require a resident corporation

Shazeer once again misstates the law by asserting that the alter-ego doctrine applies only where there is a "resident corporation." That is not the rule under either Eleventh Circuit or Florida law. Indeed, Eleventh Circuit precedent forecloses such a restriction. In *United States v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1354 (11th Cir. 2021), the Eleventh Circuit affirmed personal jurisdiction over the shareholder of a nonresident corporation, holding that because the

12

plaintiffs sufficiently alleged alter ego, the corporation's suit-related (i.e., specific-jurisdiction) forum contacts "can be imputed" to the individual for purposes of the jurisdictional analysis. That holding squarely defeats Defendant's proposed "resident-defendant" prerequisite.

What Defendant attempts to do is take a single example of how the alter-ego doctrine operates—where a nonresident subsidiary is the alter ego of a resident parent (or vice versa)—and elevate that example into a universal requirement. But that scenario merely illustrates the circumstance in which *general* jurisdiction over a resident entity can extend to its alter ego. *See, e.g.*, *Medlink Legal Sys., LLC v. QIMA Ltd.*, No. 1:21-cv-22168-KMM, 2025 U.S. Dist. LEXIS 146132, at *29 (S.D. Fla. July 29, 2025) (declining to extend general jurisdiction where both entities were non-residents and noting no basis for specific jurisdiction).

Another well-recognized scenario—endorsed by the Eleventh Circuit—is where *specific* jurisdiction exists over a nonresident corporation, and those suit-related contacts are imputed to its alter egos. *See, e.g., Mortg. Inv'rs Corp.*, 987 F.3d at 1346; *Floridians for Solar Choice, Inc. v. PCI Consultants, Inc.*, No. 15-CV-62688, 2020 U.S. Dist. LEXIS 117964, at *15 (S.D. Fla. July 2, 2020) ("[T]his Court has jurisdiction pursuant to Fla. Stat. §48.193 due to the substantial contacts and business being performed in Florida by Paparella [a nonresident] and his alter ego Defendants [also nonresidents]. . . .") (emphasis added); *Aldea Communs., Inc. v. Gardner*, 725 So. 2d 456, 457 (Fla. 2d DCA 1999) ("A nonresident shareholder of a [nonresident] corporation doing business in Florida may be subject to long-arm jurisdiction under an alter ego theory."). Federal courts more broadly have long

articulated the same principle: "a court which has jurisdiction over a corporation has jurisdiction over its alter egos." *Minn. Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1265 (5th Cir. 1985) (citing cases).

Shazeer's position confuses an example with a rule. The Court should reject such a restrictive interpretation of the alter-ego exception. If Defendant were correct, nonresident actors could insulate themselves from accountability simply by creating shell corporations to funnel tortious conduct into Florida. Even if those entities satisfied all the requirements for veil piercing, Florida courts would be powerless to reach the individuals hiding behind them merely because no "resident" corporation was involved. This would reward the very type of fraudulent conduct that the alter ego doctrine is designed to prevent.

The better rule—and the one consistent with Florida and Eleventh Circuit law—is straightforward: when a corporation purposefully directs suit-related conduct into Florida sufficient for specific jurisdiction, its alter egos are likewise subject to this Court's jurisdiction. *See Mortgage Investors*, 987 F.3d at 1354. The fiction of separate corporate identity does not shield defendants once the veil is properly pierced, and Florida courts may adjudicate claims arising from activities purposefully directed into this State, regardless of where the entity is incorporated.

**b. The evidence shows that Defendant Shazeer created Character Technologies for an improper purpose.**

Florida veil-piercing law focuses on whether "improper conduct" occurred. *W.P. Prods., Inc. v. Tramontina U.S.A., Inc.*, 101 F.4th 787, 791 (11th Cir. 2024). Plaintiff has presented prima facia evidence that Shazeer created Character

Technologies to push a dangerous product to market and to use the corporate form as a shield for labilities for those harms. This is an "improper purpose."

As an initial matter, Shazeer is incorrect in arguing that Plaintiffs' allegations cannot support a finding of improper purpose "as a matter of law." This Court has already held that Plaintiffs' allegations state a viable claim for alter ego liability. (Doc. 115, at 17). The Second Amended Complaint repeats the same allegations that were before the Court on the first motion to dismiss, and there is no reason for the Court to revisit its prior ruling on their sufficiency.

Moreover, Eleventh Circuit law makes clear that "improper purpose" is not limited to corporate fraud. Rather, improper purpose includes using a corporate entity to evade statutory or regulatory requirements or to otherwise engage in "some analogous betrayal of trust." *W.P. Prods.* 101 F.4th at 791. Courts have long recognized that "the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy." *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 713 (1974); *MCI Telecomms. Corp. v. O'Brien Mktg.*, 913 F. Supp. 1536, 1541 (S.D. Fla. 1995).

That is precisely what the record shows here. Shazeer admitted that he left Google because the company moved too slowly and would not release unsafe products to the public. (Shazeer Dep. 30:5–6). He recognized that Google's safety team identified risks including models producing sexual content, encouraging self-harm, and heightened dangers to minors. (*Id.* 32:2–24; 40:25–41:2). Despite his non-solicitation agreement, Shazeer almost immediately recruited "top talent" from Google. (*Id.* 72:23-25). The foreseeable harms of large language models had

15

been publicly flagged within Google as early as 2020. (Gebru Decl.). Rather than address those risks, he founded CTI "to launch stuff" quickly without Google's safeguards, fully aware of the public safety consequences. (Shazeer Dep., 20:18–21:22). He marketed Character.AI nationwide to reach millions of users, including children. (De Freitas Dep. 57:21–60:19, 86:2–16; Shazeer Dep. 23:1–12). The platform lacked parental controls or age-based restrictions, treating children and adults identically, even as users could "swipe" characters into producing harmful, sexual, or suicidal content. (Shazeer Dep. 81:5–13; De Freitas Dep. 86:10–89:7).

This evidence confirms the ulterior purpose at the heart of CTI's formation. Rather than serve as an independent corporation, CTI was the means by which Shazeer and Google bypassed established safeguards, shifted risks to the public—including children—and preserved the ability to reacquire the technology later through an "acqui-hire." This is precisely the sort of "betrayal of trust" and defeat of public policy that Florida veil-piercing law is designed to prevent. *See W.P. Prods.*, 101 F.4th at 791; *Bangor Punta*, 417 U.S. at 713.

> ### c. The evidence shows that Defendant Shazeer dominated and controlled CAI.

The other element of piercing the corporate veil is dominion and control. "[W]hen shareholders 'improperly disregard[ ] the corporate identities', [] litigants may peel back the veil of limited liability and hold the corporation's owners responsible for its debts." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1350 (11th Cir. 2011); *see also Bellairs v. Mohrmann*, 716 So. 2d 320, 323 (Fla. 2d DCA 1998). "However, none of these courts suggest that the observation

of corporate formalities (or the lack thereof) should be *determinative* in assessing alter ego status . . . . *Patin v. Thoroughbred Power Boats*, 294 F.3d 640, 648 (5th Cir. 2002) (applying Florida law). The most important factor for establishing alter ego liability is the use of a corporation "to accomplish some ulterior purpose." (quoting *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1118 (Fla. 1984)).

In denying Shazeer's first motion to dismiss, this Court specifically cited allegations that the Individual Defendants "formulated, directed, controlled, had the authority to control, or participated in the acts and practices of [Character Technologies]," that they personally coded and designed substantial portions of the Character.AI platform, and that they formed CAI to bypass Google's safety protocols and eventually return to Google through an "acquihire" deal that left behind only a "shell of a company." (Doc. 115, p. 17); (Doc. 127 ¶¶ 24–25, 62, 67, 81). Jurisdictional discovery has confirmed these allegations in full.

Shazeer was CTI's founder, CEO, sole director, chairman, and central technical architect. (Shazeer Dep. 60:19–22; 66:24–67:7; 78:8–11). Shazeer signed corporate documents on behalf of CTI. (Doc. 194-7, License Agreement). By his own admission, he was "ultimately responsible for [] everything that happens in the company." (*Id*. 60:19–22). He held a majority of the company's stock, while his cofounder De Freitas—the only other significant shareholder—was contractually bound to vote his shares in accordance with Shazeer's wishes. (Shazeer Dep. 75:20–76:1; De Freitas Dep. 93:17–22, 97:17–19, 99:3–13). This structure ensured Shazeer's absolute dominion: he alone controlled CTI's direction, its board, and its operations. The evidence further shows that corporate formalities were blurred.

17

Shazeer initially operated CAI out of his basement, before obtaining outside office space, and testified that he personally covered business expenses in the company's early days. (Shazeer Dep. 65:4–66:23). This blurring of personal and corporate operations further supports Plaintiffs' alter ego theory.

Finally, discovery confirms that Shazeer's control culminated in the very "acqui-hire" alleged in the complaint. After Character.AI had reached nearly two million daily active users, Shazeer personally negotiated a deal in which Google rehired him and licensed CTI's core LLM to Google. He personally profited by more than $█████████. (Shazeer Dep. 123:15–124:8; De Freitas Dep. 117:2–13; License Agreement). The result left behind precisely the "shell of a company" alleged in the pleadings—its AGI ambitions abandoned and its valuation collapsed. (Doc. 194-18 N.Y. POST; Doc. 194-19, FORTUNE; Shazeer Dep. 124:7–17).

Taken together, the record demonstrates precisely the type of domination and control that Florida courts have found sufficient to pierce the corporate veil. Shazeer was not merely a shareholder or passive investor; he was CAI. From its inception through the period of Plaintiffs' injuries, Shazeer exercised total authority over the company's direction, technology and business practices. This control, exercised to bypass safety constraints and pursue personal ambitions, satisfies the requirements for imputing CAI's jurisdictional contacts to Shazeer.

### d. Plaintiffs Have Adequately Alleged Causation

Defendant next argues that "Plaintiffs fail to satisfy the" causation element for piercing the corporate veil. That argument fails for multiple reasons. First, this Court has already ruled that Plaintiffs' allegations were sufficient to state a claim

and to survive a Rule 12(b)(6) challenge. (Doc. 115). The Second Amended Complaint repeats those allegations, and they remain sufficient now.

Second, it is premature to require Plaintiffs to prove causation at this stage. Causation is an inherently factual inquiry that is ordinarily reserved for the fact-finder. *See De Jesus Palma v. BP Prods. N. Am.*, 594 F. Supp. 2d 1306, 1309 (S.D. Fla. 2009) ("Causation generally must be left to the fact-finder to resolve."). This is not a summary judgment motion. Discovery is ongoing, the record is incomplete, and a final determination on causation would be improper.

Third, even at this early stage, the evidence produced so far demonstrates that Plaintiffs will be able to establish causation. The most significant evidence to date is a message sent by Sewell III just minutes before he took his own life, addressed to his fictional AI chatbot character: "Can you promise me that when I kill myself we will be together again? I'm scared." (Doc. 194-24, Spreadsheet, at 644, row 12402)[4]; (Shazeer Dep., 135:20–138:9) (stating that this "line . . . is text that the user [i.e., S.R.S. III] entered"). This message is powerful evidence of the causal link between his interactions with CAI and his death. A reasonable fact-finder could conclude that Shazeer's actions—founding and controlling Character Technologies, rushing a dangerous AI product to market, making it available to minors, and failing to implement adequate monitoring or safety mechanisms—directly caused the harms alleged in this case.

---

[4] If it would facilitate the Court's review, Plaintiffs are prepared to submit a native version of Doc. 194-24 to the Court.

19

For these reasons, Defendant's causation argument should be disregarded. Plaintiffs have adequately pleaded causation, and the evidence already points strongly to the causal connection between CAI's misconduct and Plaintiffs' injuries. The issue is factual, not legal, and must be resolved by a fact finder, not on a motion to dismiss.

In sum, all elements of veil piercing are met here. The record demonstrates that Shazeer exercised complete dominion and control over Character Technologies: he was its founder, sole director, chairman, majority shareholder, and technical architect, with his cofounder contractually bound to follow his wishes. (Shazeer Dep. 60:19–22; 66:24–67:7; 75:20–76:1; 78:8–11; De Freitas Dep. 93:17–22, 97:17–19, 99:3–13). And he used that dominion for an improper purpose—bypassing Google's internal safeguards to launch a dangerous LLM directly to the public, including children, and ultimately profiting personally from a $███████ "acqui-hire" deal with Google. (Shazeer Dep. 30:5–6; 32:2–24; 40:25–41:2; 123:15–124:8; De Freitas Dep. 117:2–13; License Agreement). Florida law is clear that when the corporate form is used to evade regulatory obligations, externalize foreseeable harms, and enrich an insider at the expense of the public, the veil may and should be pierced. *See W.P. Prods.*, 101 F.4th at 791; *Dania Jai-Alai*, 450 So. 2d at 1121. On this record, CTI was nothing more than Shazeer's instrumentality, and its contacts with Florida are properly attributed to him.

Dated: September 8, 2025                    Respectfully Submitted,

                                            */s/ Amy L. Judkins*
                                            **Amy L. Judkins, Esq.**
                                            Florida Bar No.: 125046

20

Normand PLLC
Telephone: (407) 603-6031
3165 McCrory Place, Ste 175
Orlando, FL 3280
alj@normandpllc.com